UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CV 10448**

---

PURELAND PICTURES, INC.

   Plaintiff,

v.

MEHRET MANDEFRO

   Defendant.

---

Case No. _____

[stamp: NOV 19 2007 U.S.D.C. S.D. N.Y. CASHIERS]

**COMPLAINT**

  Plaintiff Pureland Pictures, Inc. ("Pureland"), by its attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, for its Complaint, alleges:

### Nature of the Action

  1. This case concerns a dispute between Pureland, an award-winning film company dedicated to promoting awareness of women's issues, and Dr. Mehret Mandefro, a Harvard-trained physician and the subject of Pureland's recently-completed documentary, previously entitled *Mehret*, about the fight against HIV among African-American women and the issues faced by these women in trying to prevent the spread of the virus (the "Film"). After executing a written release (the "Release") and freely allowing Pureland to film her professional and personal life over several years, Dr. Mandefro now purports to assert creative control over the Film, even though she expressly disclaimed any right to do so in the Release.

  2. Pureland brings this action for declaratory relief establishing and enforcing (a) Pureland's contractual right to use the photographic and audio recordings of Dr. Mandefro (the "Likenesses") in the Film or otherwise; and (b) that Dr. Mandefro has no rights, contractual or otherwise, to assert any control, input, demands, or other restrictions on Pureland in connection with the Film or Pureland's use of the Likenesses.

## The Parties

3. Pureland is a New York corporation with its principal place of business at 126 10th Street, Suite 204, Brooklyn, New York 11215. Pureland is a film and commercial production company, founded in 1999 by award-winning filmmaker Emily Abt. Pureland creates narrative films and documentaries about social issues that affect women, including *Take It From Me*, a critically-acclaimed 1999 feature documentary about four women struggling to raise themselves out of poverty in New York City.

4. Upon information and belief, Defendant Dr. Mehret Mandefro is a citizen of the state of Pennsylvania. Dr. Mandefro has received undergraduate and medical degrees from Harvard University and a Master's degree from the London School of Hygiene and Tropical Medicine as a Fulbright Scholar. Dr. Mandefro is currently the Robert Wood Johnson Health and Society Scholar at the University of Pennsylvania.

## Jurisdiction and Venue

5. Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. 1332(a). There is diversity between Pureland, a New York corporation with its principal place of business in New York, and Dr. Mandefro, a citizen of Pennsylvania. The amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over both parties because the Film at issue in this action was primarily filmed in New York, Dr. Mandefro signed the Release in New York while she was living in New York, and Pureland has been based in New York throughout the production of the Film.

7. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this claim occurred in this district.

## Background

**Doctor Mandefro Agrees to Appear in the Film**

8. In 2002, Mehret Mandefro and Emily Abt were both Fulbright Scholars in London. Ms. Abt was studying at the National Film and Television School.

9. Upon information and belief, Dr. Mandefro was studying for a Master's in Science degree in Public Health at the London School of Hygiene and Tropical Medicine, investigating how HIV treatment and prevention can work together to bolster HIV control and strengthen the public health infrastructure in Ethiopia.

10. The two women became friends, bonding over their shared interest in the social, health and public policy issues confronting women. During this time in London, Ms. Abt became interested in making a film about Dr. Mandefro's life and work.

11. After returning to the United States and finishing their degrees, both women lived in New York: Dr. Mandefro began a medical residency program at Montefiore Hospital in the Bronx, and Ms. Abt continued developing her film production company, Pureland.

12. During 2004, Ms. Abt and Dr. Mandefro discussed the idea of Pureland making a documentary film about Dr. Mandefro's life and work as a resident at Montefiore and her residency project working with HIV-positive women.

13. Dr. Mandefro understood that, as a documentary, the film would not have a script. Instead, Pureland would film Dr. Mandefro at various times in various situations to gather material around the general ideas of Dr. Mandefro's residency and the

spread of HIV among African-American women. After accumulating enough material, specific storylines would develop naturally and would be more fully defined in the editing room. This is the standard practice of documentary filmmakers.

14. On several occasions, Ms. Abt communicated to Dr. Mandefro that the filming process could be long, challenging, and intrusive. She also communicated the substantial amounts of time and money that would be invested in the film and the need for Dr. Mandefro to be fully committed to and prepared for the process.

15. As is the standard practice in making any documentary film about living subjects, Pureland presented Dr. Mandefro with a written release agreement. The purpose of the Release was to ensure that Pureland would own all rights to the filming it did of Dr. Mandefro, and to ensure that Pureland would maintain its creative independence and integrity in the production, editing and distribution of the Film.

16. On May 25, 2005, Dr. Mandefro signed the Release (see Exhibit A). Under the Release, Dr. Mandefro granted Pureland permission:

> (1) to take photographs of me and record my voice in connection with the film currently titled "MEHRET"
>
> [and]
>
> (2) to put the finished pictures, negatives, reproductions and copies of the original prints and negatives of me and any sound track recordings and recordings which may be made of my voice in any manner deemed proper by Pureland Pictures used in connection with the exhibition, advertising, promotion, distribution and/or exploitation of the [Film] or otherwise.

17. The Release also granted exclusive ownership of and rights to the Film to Pureland. In particular, the signed Release provided that:

4

> Pureland Pictures shall be the exclusive owner of the Likenesses and Pureland Pictures and its affiliates, licensees, successors and assigns shall have the right, throughout the world, in perpetuity, to copyright, to use and to license others to use, in any manner in all media now known or hereafter devised, all or any portion thereof or a reproduction thereof in connection with MEHRET or otherwise.

18. Throughout filming, Pureland filmed Dr. Mandefro at her workplace, while visiting her patients, and in various personal situations.

19. All filming of Dr. Mandefro was done with Dr. Mandefro's consent, knowledge, and quite often, her active assistance. Whenever Dr. Mandefro told Pureland that she was in a situation or environment that was too sensitive or otherwise inappropriate for filming, Pureland respected the privacy rights of Dr. Mandefro and her patients and did not film such situations or environments.

20. As the filming continued, several storylines developed and were pursued. These included (1) Dr. Mandefro's treatment of two of her HIV-positive patients, both of whom were former sex workers and former drug abusers; (2) a trip Dr. Mandefro took to Ethiopia to assess and compare the HIV treatment situation there; and (3) the lack of sexual autonomy asserted by African-American women as a factor in the spread of HIV.

**Dr. Mandefro's Personal Storyline**

21. From the Film's inception, a storyline containing film footage of Dr. Mandefro's personal life was contemplated and agreed upon by Pureland and Dr. Mandefro.

22. Driven by Dr. Mandefro's own beliefs and medical advice, parts of the filming addressed the lack of sexual autonomy asserted by women, in particular, the

5

difficulty women face in insisting that their partners use condoms and remain monogamous. In order to demonstrate that the relevance of these issues was not limited to poor, uneducated and otherwise disenfranchised women, Dr. Mandefro agreed that footage from her personal life would be used to serve as a bridge between the experiences of her patients and the film-watching audience. It was well understood by Dr. Mandefro that this footage was critical to illustrating the universality of the issues raised by the HIV/AIDS crisis.

23. In filmed discussions, two of Dr. Mandefro's patients admitted that their partners had not always used condoms and had not always been monogamous, but that the women did not feel comfortable insisting on condom usage. Dr. Mandefro shared her belief that the difficulty African-American women face in asserting their personal rights in the bedroom was a significant contributing factor to the spread of HIV.

24. In discussions during and after filming, Ms. Abt and other Pureland personnel repeatedly told Dr. Mandefro that they needed to get more footage of Dr. Mandefro doing things outside of work. Such filming was necessary both to provide material to be used to bridge between scenes, and because the candor and unpredictability of such moments often allow a filmmaker to capture compelling conversations and events that otherwise might not be filmed. Additionally, these perspectives made Dr. Mandefro a more compelling and empathetic voice in the film.

25. Dr. Mandefro agreed to provide material that would more fully develop her role in the Film. Among other things, Dr. Mandefro discussed her relationship with her boyfriend on film, and allowed Pureland to film scenes with him.

As with Dr. Mandefro, her boyfriend signed a written release granting Pureland unconditional rights to use his likeness in the Film.

26. As Dr. Mandefro was aware, her boyfriend was neither a medical worker nor an HIV patient. His only connection to the Film was his personal relationship with Dr. Mandefro.

27. With Dr. Mandefro's knowledge, consent, and assistance, Pureland also filmed Dr. Mandefro in settings outside of the medical field, including birthday parties, photography shoots, dinner parties, and nightclubs.

28. These discussions and related scenes create a powerful storyline (the "Storyline"), which serves several vitally important purposes, from both a medical perspective and a dramatic perspective. First, from a medical perspective, they powerfully illustrate the exact problems that Dr. Mandefro has worked to address. Dr. Mandefro has focused her career on preventing the spread of HIV in the African-American community. If the Storyline were excluded, the Film's representation of the at-risk community would only focus on two HIV-positive former sex workers who had abused drugs. By revealing the struggles faced by Dr. Mandefro in her relationship, the Film is able to convey the medical message that HIV and condom usage are extremely important health issues, not just for a certain portion of the population, but for all women.

29. Second, from a dramatic perspective, this Storyline humanizes Dr. Mandefro in the Film and makes her appear to be a more likeable and rounded person, rather than merely a "talking head." When a trailer featuring several minutes of footage from the Film, but not including the Storyline, was submitted to compete for a grant, the reviewer who denied Pureland the grant observed that the lack of development in Dr.

Mandefro's character was a significant problem with the Film. This problem was confirmed by test screening audiences, some of whom reported that Dr. Mandefro would have seemed "preachy" but for the perspective provided by the Storyline.

30. At various points in the filming, Dr. Mandefro expressed some unease with including the Storyline in the Film. However, each time this happened, Pureland personnel explained that the material was necessary and helpful, and each time, Dr. Mandefro continued to discuss willingly the Storyline on film.

31. At one point, Pureland completed a rough cut of the Film that did not include the Storyline, because Pureland initially believed that it lacked enough suitable material to make the Storyline compelling. At that time, Ms. Abt sent an email to Dr. Mandefro advising her that the rough cut did not include the Storyline. Ms. Abt did not say that Pureland waived any of its rights with regard to the Storyline or that the possibility of including the Storyline would not be revisited at a later time.

32. As the editing process continued, more useable material was found and Pureland determined that it had sufficient footage to make the Storyline a compelling and valuable part of the Film.

33. Beginning in 2006, Dr. Mandefro began making demands on Pureland to which she had no rights, contractual or otherwise. These included demands to define the focus of the Film and to remove from the Film any material of which she did not approve, including scenes with her Likeness as well as scenes in which she did not even appear.

34. After repeatedly threatening to take legal action against Pureland if it did not give in to her demands, Dr. Mandefro, through her counsel, sent a purported cease

and desist letter to Pureland on October 22, 2007. In this letter, Dr. Mandefro devised a theory — directly contradicted by the written Release — that she had granted only a "limited license" to Pureland to use her name and likeness, based on an alleged oral agreement in 2004.

35. There was no such contract between Pureland and Dr. Mandefro in 2004 or otherwise, nor would Ms. Abt or Pureland or any reputable documentary filmmaker ever cede the type of control over a documentary film that Dr. Mandefro claims Ms. Abt willingly gave over in 2004. Granting the subject of a documentary approval of the final film seriously compromises the integrity of the documentary and, in the eyes of the documentary filmmaking industry, renders the film as something less than a true documentary.

36. Additionally, none of the alleged conditions that Dr. Mandefro claims to have placed on her "limited license" are collateral to the Release that Dr. Mandefro signed after she claims to have entered the oral agreement. Even if these conditions had been discussed in 2004, which they were not, the subsequent written Release directly contradicts and supersedes Dr. Mandefro's assertions. Furthermore, Dr. Mandefro's allegations are belied by her actions after signing the Release, including, but not limited to, her efforts to involve her boyfriend in the filming.

37. On information and belief, Dr. Mandefro has begun an informal campaign to discredit the Film and to cast Pureland, Ms. Abt, and other Pureland personnel in a negative and false light.

38. Dr. Mandefro consented to all of the filming that Pureland did and she granted all rights to the use of such material in any manner in all media, in part or in

whole, in the Film or otherwise, exclusively to Pureland and its affiliates, licensees, successors, and assigns. Her dissatisfaction with certain portions of the final edited Film does not unilaterally rescind the rights she clearly granted to Pureland.

## FIRST CLAIM
### (For Declaratory Judgment)

39. Pureland repeats and realleges the allegations of paragraphs 1 through 38 above.

40. Dr. Mandefro signed a written Release allowing Pureland to film her and to use that film in any manner deemed proper by Pureland Pictures. In reliance on this Release, Pureland filmed Dr. Mandefro in various situations over three years.

41. Pureland edited the Likenesses of Dr. Mandefro into a feature-length film. The Film addresses the medical epidemic of HIV among African-American women, including obstacles faced by these women in their efforts to prevent the spread of the virus. Consistent with the terms of the written Release, Pureland has deemed this Film proper.

42. The Release was the only contract executed between Dr. Mandefro and Pureland. The Release contains the entire agreement between the parties regarding the filming of Dr. Mandefro and the rights to ownership and usage of the Likenesses.

43. Nevertheless, Dr. Mandefro contends that the parties reached an oral agreement in 2004 on matters directly addressed by the written agreement in 2005. Specifically, Dr. Mandefro claims that, in 2004, she made an oral agreement with Pureland to restrict the exhibition, advertising, promotion, distribution, exploitation, and rights to use and license others to use the Film.

44. Dr. Mandefro has threatened to take legal action against Pureland, unless Pureland gives in to her demands to remove segments of the Film deemed proper by Pureland, to re-edit the Film to suit her goals, to refrain from using the Film for any purpose of which she does not approve, and to refrain from showing the Film in any public forum without her express approval. On information and belief, Dr. Mandefro has also attempted to discredit the Film and to cast Pureland, Ms. Abt, and other Pureland personnel in a negative and false light.

45. Dr. Mandefro's demands are meritless, and motivated by malice and bad faith. The written Release contains the entire agreement between the parties and, to the extent that any oral agreement existed prior to the Release, any terms which Dr. Mandefro alleges were included in that agreement are not collateral to terms in the written Release and are contradicted by those later, written terms.

46. By virtue of the foregoing, an actual controversy exists between Pureland and Dr. Mandefro.

47. Pureland is entitled to a judgment declaring that it is not in breach of any legal agreement between Pureland and Dr. Mandefro; that Dr. Mandefro does not have any ownership, use, licensing, copyright, or other rights at law or in equity to the Likenesses filmed by Pureland; and that Dr. Mandefro does not have standing to assert the rights of any other individuals with regard to the Film.

WHEREFORE, Pureland respectfully requests the entry of Judgment against Defendant as follows:

1. A declaratory judgment that the production, distribution, and display of the Film does not breach any agreement between Pureland and Dr. Mandefro;

2. A declaratory judgment that Dr. Mandefro has not retained any rights to the Likenesses filmed by Pureland or to any use to which Pureland may apply the Likenesses;

3. A declaratory judgment that Dr. Mandefro may not bring any claims on behalf of other individuals not listed as parties in this Complaint.

4. An award of its costs and expenses, including reasonable attorneys' fees;

5. Such other relief as this Court deems just and proper.

Dated: November 19, 2007
    New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
    Darren W. Johnson
    1285 Avenue of the Americas
    New York, New York  10019-6064
    (212) 373-3000

*Attorneys for Plaintiff Pureland Pictures, Inc.*

# Exhibit A

Appearance Release

I, MEHRET MANDEFRO residing at 105 E. 122nd ST APT 2W, NY, NY 10035, hereby consent and grant to Pureland Pictures, Inc. and its affiliates, licensees, successors and assigns, permission (1) to take photographs of me and record my voice in connection with the film currently titled "MEHRET" (2) to put the finished pictures, negatives, reproductions and copies or the original prints and negatives of me and any sound track recordings and recordings which may be made of my voice in any manner deemed proper by Pureland Pictures used in connection with the exhibition, advertising, promotion, distribution and/or exploitation of the MEHRET or otherwise.

I agree that Pureland Pictures shall be the exclusive owner of the Likenesses and Pureland Pictures and its affiliates, licensees, successors and assigns shall have the right, throughout the world, in perpetuity, to copyright, to use and to license others to use, in any manner in all media now known or hereafter devised, all or any portion thereof or a reproduction thereof in connection with MEHRET or otherwise.

In the event of any dispute arising out of or relating to this release, my sole remedy shall be an action for damages at law. I expressly waive any and all equitable rights I may have hereunder, including but not limited to any right to enjoin, rescind, terminate or otherwise interfere with the production, distribution and/or exploitation of MEHRET or any other productions based thereon in whole or in part.

_____
Name:

Date: 05/25/05

21372254v2