Vaughn C. Williams
Stephanie J. Kamerow
Michael Ridgway Jones
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Defendant/Counterclaim-Plaintiff Mehret Mandefro

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| | : | |
| **PURELAND PICTURES, INC.,** | : | |
| **Plaintiff/Counterclaim-Defendant,** | : | **07 Civ. 10448 (LAP)** |
| **v.** | : | **ECF Case**<br>**Electronically Filed** |
| **MEHRET MANDEFRO,** | : | **AMENDED ANSWER AND** |
| **Defendant/Counterclaim-Plaintiff.** | : | **COUNTERCLAIMS** |
| | : | |

---

## AMENDED ANSWER

Defendant/Counterclaim-Plaintiff Mehret Mandefro ("Dr. Mandefro"), by

and through her undersigned counsel, hereby answers the Complaint of

Plaintiff/Counterclaim-Defendant Pureland Pictures, Inc. ("Pureland") as follows:

### Nature of the Action

1.      Defendant denies the allegations of paragraph 1 of the Complaint,

except admits that Pureland is the plaintiff herein, and Dr, Mandefro, a Harvard-trained

physician has been named as the defendant.

2.     Defendant states that the allegations of paragraph 2 of the Complaint are descriptions of the claims asserted by plaintiff in this action as to which no responsive pleading is required.

### The Parties

3.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 3 of the Complaint and therefore denies the same.

4.     Defendant admits the allegations of paragraph 4 of the Complaint.

### Jurisdiction and Venue

5.     Defendant admits the allegations of paragraph 5 of the Complaint.

6.     Defendant admits the allegations of paragraph 6 of the Complaint for jurisdictional purposes only.

7.     Defendant admits the allegations of paragraph 7 of the Complaint.

### Background

8.     Defendant admits the allegations of paragraph 8 of the Complaint.

9.     Defendant denies the allegations of paragraph 9 of the Complaint.

10.     Defendant admits the allegations of the first sentence of paragraph 10 of the Complaint.  Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of paragraph 10 of the Complaint and therefore denies the same.

11.     Defendant admits the allegations of paragraph 11 of the Complaint.

12.     Defendant denies the allegations of paragraph 12 of the Complaint.

13.    Defendant denies the allegations of the first and second sentences of paragraph 13 of the Complaint. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the third and fourth sentences of paragraph 13 of the Complaint and therefore denies the same.

14.    Defendant denies the allegations of paragraph 14 of the Complaint.

15.    Defendant denies the allegations of paragraph 15 of the Complaint, except admits that Pureland presented Defendant with the document attached as Exhibit A to the Complaint.

16.    Defendant denies the allegations of paragraph 16 of the Complaint, except admits that she signed the document attached as Exhibit A to the Complaint and refers to that document for the true and correct contents thereof.

17.    Defendant denies the allegations of paragraph 17 of the Complaint and refers to the document attached as Exhibit A to the Complaint for the true and correct contents thereof.

18.    Defendant admits the allegations of paragraph 18 of the Complaint, except denies that she agreed to or authorized the inclusion in the Film of each and every instance filmed by Pureland.

19.    Defendant denies the allegations of paragraph 19 of the Complaint.

20.    Defendant denies the allegations of paragraph 20 of the Complaint, except admits that the filming included Defendant's treatment of her patients and Defendant's trip to Ethiopia as a part of her residency.

21.    Defendant denies the allegations of paragraph 21 of the Complaint.

22.    Defendant denies the allegations of paragraph 22 of the Complaint.

3

23.    Defendant denies the allegations of paragraph 23 of the Complaint, except admits that during Defendant's counseling sessions with her patients, they stated that their partners had not always used condoms and that they did not feel comfortable insisting on condom usage.

24.    Defendant denies the allegations of paragraph 24 of the Complaint.

25.    Defendant denies the allegations of the first two sentences of paragraph 25 of the Complaint.  With respect to the third sentence of paragraph 25 of the Complaint, Defendant lacks knowledge or information sufficient as to the truth or falsity of the allegations contained therein and therefore denies the same.

26.    Defendant denies the allegations of paragraph 26 of the Complaint, except admits that her former boyfriend was neither a medical worker nor an HIV patient.

27.    Defendant admits that Pureland filmed Defendant in certain settings outside of the medical field, except denies that Defendant consented to or authorized the inclusion in the Film of each and every such scene.  Defendant denies the remaining allegations of paragraph 27 of the Complaint.

28.    Defendant denies the allegations of paragraph 28 of the Complaint, except admits that she has focused her career on preventing the spread of HIV in the African-American community.

29.    Defendant denies the allegations of the first sentence of paragraph 29 of the Complaint.  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the second and third sentences of paragraph 29 of the Complaint and therefore denies the same.

30.    Defendant denies the allegations of paragraph 30 of the Complaint.

31.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of paragraph 31 of the Complaint and therefore denies the same.  Defendant denies the remaining allegations of paragraph 31 of the Complaint, except admits that Ms. Abt sent to defendant an e-mail concerning the contents of the film, and refers to the e-mail for the true and correct contents thereof.

32.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 32 of the Complaint and therefore denies the same.

33.    Defendant denies the allegations of paragraph 33 of the Complaint.

34.    Defendant denies the allegations of paragraph 34 of the Complaint, except admits that her counsel sent Pureland a cease and desist letter on October 22, 2007 and refers to that letter for the true and correct contents thereof.

35.    Defendant denies the allegations of paragraph 35 of the Complaint.

36.    Defendant denies the allegations of paragraph 36 of the Complaint.

37.    Defendant denies the allegations of paragraph 37 of the Complaint.

38.    Defendant denies the allegations of paragraph 38 of the Complaint.

## FIRST CLAIM
### (For Declaratory Judgment)

39.    Defendant repeats and realleges her responses to the allegations of paragraphs 1-38 of the Complaint as if fully set forth herein.

40.    Defendant denies the allegations of paragraph 40 of the Complaint.

41.    Defendant admits the allegations of the first and second sentences of paragraph 41 of the Complaint.  Defendant states that the allegations of the third sentence of paragraph 41 of the Complaint are legal conclusions to which no response is required.

42.    Defendant denies the allegations of paragraph 42 of the Complaint.

43.    Defendant denies the allegations of paragraph 43 of the Complaint, except admits that the parties reached an oral agreement in 2004.

44.    Defendant denies the allegations of paragraph 44 of the Complaint.

45.    Defendant denies the allegations of paragraph 45 of the Complaint.

46.    Defendant states that the allegation of paragraph 46 of the Complaint is a legal conclusion to which no response is required.

47.    Defendant denies the allegations of paragraph 47 of the Complaint and further states that paragraph 47 purports to set forth the relief requested in the Complaint and that therefore no response is required.

## **AFFIRMATIVE DEFENSES**

The Complaint fails to state a claim upon which relief may be granted.

## COUNTERCLAIMS

Defendant/Counterclaim-Plaintiff Mehret Mandefro ("Dr. Mandefro"), by and through her undersigned counsel, for her counterclaims against Plaintiff/Counterclaim-Defendant Pureland Pictures, Inc. ("Pureland") alleges upon personal knowledge with respect to herself and her own acts, and upon information and belief as to all other matters, as follows:

### Nature of the Claims

1.      By using Dr. Mandefro's likeness, voice, and medical research without her authorization, Pureland has breached agreements it reached with Dr. Mandefro in 2004, 2006 and 2007.  In doing so, Pureland has violated Dr. Mandefro's right of privacy and right of publicity, has misappropriated her research, has engaged in false advertising with respect to the film currently entitled "All of Us" (the "Film"), and has unjustly enriched itself at Dr. Mandefro's expense, thereby causing Dr. Mandefro damages to be determined at trial.  Moreover, by continuing to promote, distribute, and exhibit the Film, Pureland has caused and will continue to cause irreparable harm to Dr. Mandefro's standing in the medical community and to her personal reputation.

### The Parties

2.      Dr. Mehret Mandefro is an Ethiopian-born, Harvard-trained physician who has devoted her life and work to researching the causes of, and advocating solutions to, the epidemic of HIV/AIDS among African American women.

3.      Dr. Mandefro is currently a Robert Wood Johnson Health and Society Scholar at the University of Pennsylvania and, along with Dr. Manel Silva, is the founder of TruthAIDS, a New York-based non-profit organization dedicated to

promoting gender equity within relationships as an HIV-prevention strategy, with a particular focus on African American women affected by, and at risk for, HIV/AIDS.

4.    During the creation of the Film, Dr. Mandefro was completing her internal medicine residency at Montefiore Medical Center ("Montefiore") in the South Bronx.

5.    Upon information and belief, Pureland is a film production company based in Brooklyn, New York.  Upon information and belief, Emily Abt is the founder of Pureland, which is co-owned by Ms. Abt and Reva Goldberg.

6.    Dr. Mandefro met Ms. Abt while Dr. Mandefro was a Fulbright Scholar in 2002-2004 studying for, and ultimately receiving, a Masters of Science in the Public Health of Developing Countries at the London School of Hygiene and Tropical Medicine.

### Jurisdiction and Venue

7.    Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. § 1332(a).  There is diversity between Pureland, upon information and belief, a New York corporation with its principal place of business in New York, and Dr. Mandefro, a citizen of Pennsylvania.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.    This Court has personal jurisdiction over both parties because the Film was primarily filmed in New York, Dr. Mandefro was living in New York during filming, and, upon information and belief, Pureland has been based in New York throughout the production of the Film.

9.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the Counterclaims occurred in this judicial district.

### The Film

10.    Over the course of the summer of 2004, Ms. Abt approached Dr. Mandefro numerous times about making a film that would follow Dr. Mandefro in her work as a resident at Montefiore as she embarked on a research project investigating the heterosexual transmission of HIV in African American women.  Ms. Abt was at this time one of Dr. Mandefro's closest friends, and Dr. Mandefro trusted her.

11.    Dr. Mandefro repeatedly advised Ms. Abt that she was not interested in the film proposal because of the privacy and ethical concerns associated with disclosing the details of medical care provided at Montefiore.  Dr. Mandefro only agreed to consider making the Film after Pureland (i) satisfied her and Montefiore's concern about patient privacy and confidentiality issues; (ii) promised Dr. Mandefro that Dr. Mandefro could use the Film as a platform to teach about HIV/AIDS and advocate for treatment of the disease; and (iii) committed that the Film would accurately represent what Dr. Mandefro's research revealed about why the incidence of HIV/AIDS was so alarmingly high in the African American female community.

12.    In 2004, in reliance upon the foregoing promises, Dr. Mandefro entered into an oral agreement with Pureland which, among other things, conveyed to Pureland a limited license to use Dr. Mandefro's name and likeness in connection with a film to be entitled "Mehret."

13. This license was expressly conditioned on Pureland's agreement that: (i) the Film would be used for educational, charitable, and legislative advocacy purposes, not for Pureland's commercial gain; (ii) the focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same; (iii) the Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission; (iv) the Film would not contain confidential personal information about Dr. Mandefro's patients, or Dr. Mandefro's patient-physician relationship with those patients, without Dr. Mandefro's express permission; and (v) the Film would not be displayed, distributed, or viewed in any public forum without Dr. Mandefro's express approval of the final edited version.

14. Before the project began, Dr. Mandefro and Ms. Abt met with Dr. Mandefro's supervisor and Chairman of the Department of Family Medicine at Montefiore, Dr. Peter Selwyn, to discuss the Film and obtain his permission to begin filming at Montefiore, and specifically to film Montefiore patients. Ms. Abt expressly represented to Dr. Selwyn that the Film would be used for educational purposes, that it could be used by Dr. Mandefro as a part of her residency program, and that the Film would not disclose confidential information about Montefiore patients, or about Dr. Mandefro's patient-physician relationship with those patients, without Dr. Mandefro's express approval.

15. Dr. Selwyn only approved the filming of Dr. Mandefro's research because of, and subject to, the representations made by Ms. Abt.

16.    Pursuant to hospital policy, Dr. Mandefro and Ms. Abt also met with Montefiore's Office of Public Relations prior to filming.  Again, Ms. Abt represented to Montefiore's senior personnel that the Film would be used for educational purposes as a part of Dr. Mandefro's residency research program.

17.    Montefiore's public relations personnel only approved the filming of Dr. Mandefro's research because of, and subject to, the representations made by Ms. Abt.

18.    After obtaining Montefiore's permission to begin filming, Dr. Mandefro personally enlisted a number of her teachers and mentors to serve on the Film's advisory board as an extension of Dr. Mandefro's research.  These advisors had no connection with Pureland apart from Dr. Mandefro.

19.    Consistent with the Film's educational purpose, a 2006 press kit used to promote the Film, a 2006 letter to the Film's advisory board, and the Film's 2006 trailer all stressed that the Film's focus was on Dr. Mandefro's research, not her personal and/or sexual relationships, or those of her patients.

20.    After discussions about the Film with an HIV social worker at the Montefiore clinic where Dr. Mandefro was conducting her research, in January 2005, the social worker brought to Dr. Mandefro's attention Tara Stanley and Chevelle Wilson, the two HIV-positive patients who ultimately became subjects of the Film.

21.    Dr. Mandefro met with each patient separately, introduced them to her research project, and discussed with them the possibility of their being filmed in connection with her research.  Ms. Stanley and Ms. Wilson both told Dr. Mandefro that they were willing to participate because both saw the Film as an opportunity to teach others about the disease and its prevalence among African American women.  Both Ms.

Stanley and Ms. Wilson agreed to participate based on their understanding that Dr.

Mandefro had the right to review and approve any footage containing confidential patient

information and would therefore be able to ensure that any footage problematic to them

would not be included in the final version of the Film.

22. Ms. Stanley died in July 2006.

23. Dr. Mandefro suggested which scenes should be filmed to further

advance the educational message of the Film and to accurately reflect the ongoing results

of her research. To this end, Dr. Mandefro selected the patients to be filmed, arranged

specific shoots, and engaged the scholars to be interviewed for the Film.

24. All of the scholars and advisors engaged by Dr. Mandefro to work

on the Film were told by Dr. Mandefro and/or Ms. Abt that the Film was a part of Dr.

Mandefro's research and would be used for educational and advocacy purposes, and,

upon information and belief, it was on this basis that the scholars and advisors agreed to

participate in the Film.

**Pureland's Pattern of Deception**

25. As set forth below, Ms. Abt and Pureland betrayed Dr. Mandefro's

trust on more than one occasion.

26. On May 5, 2005—seven months into filming—Ms. Abt presented

Dr. Mandefro with a document entitled "Appearance Release" (the "2005 Release")

(attached as Exhibit A to Pureland's Complaint). When asked by Dr. Mandefro why it

was necessary for her to sign the release, Ms. Abt expressly represented to Dr. Mandefro

that it would have no effect on, and indeed was consistent with, the parties' original 2004

agreement—the agreement used to obtain Dr. Mandefro's agreement to the filming, and

12

Montefiore's approval of same—and, indeed, specifically reiterated Pureland's commitment to abide by the terms of the 2004 agreement.

27.    Given their friendship, Dr. Mandefro trusted Ms. Abt's representations, and signed the Release.

28.    Neither the 2005 Release nor the parties' 2004 agreement imposed any obligation on Dr. Mandefro to complete, or indeed even to continue her participation in, the Film should she choose at any time not to do so.

### Content of the Film

29.    During one filming session in 2006, Ms. Stanley disclosed to Ms. Abt that her mother had prostituted her for many years.  As is standard with respect to documentary filming, the camera was rolling at all times.  This was a very private, family secret that was not to be revealed.  Ms. Stanley, very ill at the time, was overwhelmed by emotions during the filming when she disclosed this and almost immediately deeply regretted doing so.

30.    Later that day, Dr. Mandefro received a call from Ms. Stanley and her home health aide requesting that this very painful disclosure not be included in the Film.  Dr. Mandefro immediately raised this issue with both Ms. Abt and Ms. Goldberg, co-owners of Pureland.  Pureland acknowledged Dr. Mandefro's right under the parties' agreement to prohibit the inclusion of certain confidential patient information and agreed to honor Dr. Mandefro's direction and Ms. Stanley's request to remove this footage.

31.    Moreover, Ms. Abt and Ms. Goldberg repeated this promise to Ms. Stanley before she died.  Ms. Stanley's home health aide was also present on this occasion.  In fact, in a letter sent to the Film's "former and current advisors," including

Dr. Selwyn, Pureland stated that "we gave Tara our word that the specific piece of footage that bothered her would not make it into the final cut of the film, and we honored that word."

32.    Contrary to the parties' agreements that Dr. Mandefro had the right to review and approve the Film in its final form, Pureland's promises to Ms. Stanley prior to her death, and its earlier representations to Dr. Mandefro and the Film's advisors, this footage appears in the current version of the Film, which, as noted below, has been shown to selection committees of several film festivals and, indeed, to a general audience at at least one such film festival.

33.    On another occasion in early 2006, Dr. Mandefro invited her friends, including fellow Montefiore residents, to participate in a "Truth Circle" in her home to test out some of the key ideas underlying her research.  Ms. Abt was invited to participate as a friend, but not to film the Truth Circle because of the sexually explicit nature of some of the discussions that were to be shared.

34.    After considerable pressure from Ms. Abt, the participants ultimately agreed to be filmed, but only after agreeing that the footage taken would not be included in the Film unless or until each participant had viewed and specifically approved (or disapproved) the footage that Ms. Abt proposed to include.

35.    Ms. Abt agreed to this condition, and filming began.  The Truth Circle proved to be very emotional, and several women shared rape histories and other sexually explicit information.

36.    After the Truth Circle concluded, Ms. Abt tried to force participants into signing releases that would allow their revelations to be included in the Film.  The

participants were offended and insulted by Ms. Abt's behavior, as was Dr. Mandefro, who commented on the unethical nature of Ms. Abt's proposal. Dr. Mandefro became very concerned about subjecting her friends, family, and professional colleagues to the Film project in light of Ms. Abt's behavior.

37.    As a result, in March 2006, Dr. Mandefro withdrew from the project and cancelled an upcoming trip to Ethiopia that she and Ms. Abt had planned.

38.    Desperate to induce Dr. Mandefro to resume her participation in the Film, in May 2006, Ms. Abt asked Dr. Mandefro on what terms she would rejoin the project. Dr. Mandefro made it clear that she would resume her participation only if Ms. Abt agreed that Pureland would abide by each of the terms agreed to by the parties in 2004.

39.    In return for Dr. Mandefro's agreement to renew her participation in the Film, Ms. Abt expressly agreed to the same terms agreed upon by the parties in 2004, namely that (i) the Film would be used for educational, charitable, and legislative advocacy purposes, not solely for Pureland's commercial gain; (ii) the focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same; (iii) the Film would not contain any footage concerning Dr. Mandefro's personal life, without Dr. Mandefro's express permission; (iv) the Film would not contain confidential personal information about Dr. Mandefro's patients, or Dr. Mandefro's patient-physician relationship with those patients, without Dr. Mandefro's express permission; and (v) the Film would not be displayed, distributed, or viewed in any public

forum without Dr. Mandefro's express approval of the final edited version (the "2006 Agreement").

### The Trip to Ethiopia

40.    As noted, Dr. Mandefro was born in Ethiopia, and many members of her family still live there.

41.    As a result of her background and her work, Dr. Mandefro has over the years developed personal and professional contacts with healthcare professionals in Ethiopia, particularly those specializing in the treatment and prevention of HIV/AIDS.

42.    Although Ms. Abt expressed an interest in the Ethiopian storyline throughout the filming, Dr. Mandefro repeatedly cautioned her about drawing parallels in the Film between Dr. Mandefro's patients' situations and those of Ethiopian women, given that frank disclosure of sexual behavior and practices would be taboo in Ethiopian culture.

43.    For example, during the course of Dr. Mandefro's work, she had discovered an Ethiopian non-governmental organization, Mary Joy Aid, as a potential partner in the implementation of her ideas.  Mary Joy Aid is headed by a devoutly Christian nurse, Sister Zebider Zewdie.  Ms. Abt persuaded Dr. Mandefro that the Film would showcase Sister Zebider's efforts and promised that the Film would be respectful of Ethiopian cultural norms respecting sexual behavior and practices.

44.    Although it was clear that Ms. Abt understood the importance of Ethiopian cultural sensitivities regarding sexual behavior, she ignored her earlier promises to Dr. Mandefro and included material in the final version of the Film that is culturally inappropriate and offensive to Ethiopian norms—once again, in clear violation

16

of the parties' agreement that Dr. Mandefro had the right to review and approve the final edit of the Film. Because of the Film's current content, Dr. Mandefro is in grave danger of losing a working relationship with Mary Joy Aid and Sister Zebider.

45.   The Film was heavily promoted and advertised within the Ethiopian-American community. In fact, the Ethiopian ambassador to the United States was present at a screening of the Film's trailer in Washington, D.C. where Dr. Mandefro spoke on a panel about her work. As noted, at that time the trailer presented the Film as an extension of Dr. Mandefro's research and did not include details of Dr. Mandefro's or her patients' personal relationships.

46.   Based on this panel discussion and the trailer itself, the Ethiopian-American community believed, and presumably still believes, that the Film is solely about Dr. Mandefro's work, and not replete with details of Dr. Mandefro's personal life that would offend the Ethiopian-American community and dishonor Dr. Mandefro's family.

### Pureland Breaches the Parties' Agreements

47.   As noted, Dr. Mandefro's sole reason for agreeing in 2004 to participate in the Film was that the Film would be used for educational and advocacy purposes. Pureland was well aware of this.

48.   As also noted, in 2006 Pureland induced Dr. Mandefro to resume participation in the Film by, among other things, promising that the Film would be used for educational purposes and would be focused on Dr. Mandefro's research, i.e., that Pureland would abide by the same terms previously agreed to in 2004.

49.    Beginning in early 2007, Dr. Mandefro asked Pureland to make the Film available for lobbying and educational purposes, as agreed, but Pureland refused.  In fact, Pureland even refused to give Dr. Mandefro access to the Film to use in connection with her final residency presentation in June 2007.

50.    These acts, which violated the very basis of the agreements between the parties, together with Ms. Abt's previous behavior caused Dr. Mandefro to become increasingly concerned that the final version of the Film would misrepresent her research and damage her reputation within the relevant field of medical and social work professionals.  Accordingly, in early 2007, Dr. Mandefro requested a meeting between herself and Dr. Silva and Ms. Abt and Ms. Goldberg of Pureland to discuss these concerns.  Ms. Abt refused to attend.  Only Ms. Goldberg met with Dr. Mandefro and Dr. Silva.

51.    At the meeting, Dr. Mandefro and Dr. Silva discussed the importance of how the Film would address structural processes of violence, addiction, and racism, all of which contribute to the spread of HIV/AIDS among African American women.  They also reiterated their concern that, by omitting discussion of these issues and focusing instead on the personal storylines, the Film risked distorting the message of Dr. Mandefro's research.  Ms. Goldberg's response to their concerns was that they "didn't have to like the film."

52.    Dr. Mandefro and Dr. Silva again noted the importance of these structural factors and reminded Ms. Goldberg of interest in the Film expressed by policymakers as evidenced by the discussion and trailer screening held in Washington, D.C.  Once again, Ms. Goldberg responded that they "didn't have to like the film,"

despite Dr. Mandefro's express right under the parties' agreements to review and approve the final edited version of the Film.

53.    Pureland advised Dr. Mandefro that a version of the Film focused primarily on Dr. Mandefro's research would not be commercially successful, thus causing Pureland to breach its agreements with Dr. Mandefro by creating a version of the Film that emphasized the personal storylines of Dr. Mandefro and her patients at the expense of the Film's intended educational message.

54.    Based on these clear breaches of the parties' agreements, Dr. Mandefro withdrew for a second time from the project in early 2007.  At a meeting shortly thereafter in May 2007 requested by Ms. Abt and Ms. Goldberg and attended by Ms. Abt and Ms. Goldberg, a senior member of the production team, and Dr. Manel Silva, the co-founder with Dr. Mandefro of the TruthAIDS organization, Dr. Mandefro once again vigorously expressed her concern that the Film's original educational and policy focus had been lost in the drive to emphasize Dr. Mandefro's and her patients' personal relationships.

55.    Dr. Mandefro only agreed to rejoin the project on the condition that this original focus be restored and on the further condition that the Film, as previously agreed to by Pureland, would not be displayed, distributed, or viewed in any public forum without Dr. Mandefro's express approval of the final edited version of the Film, especially given the Film's potential impact on Dr. Mandefro's work and professional reputation.

56.    Ms. Abt again expressly promised that Pureland would abide by these terms, and Dr. Mandefro agreed to rejoin the project.

19

57. However, Dr. Mandefro soon became increasingly worried that this commitment, too, was being disregarded by Pureland. She received reports from a senior member of the production team that Pureland had persisted in emphasizing the personal "storyline," thus distorting and misrepresenting the Film's original message. The senior member of the production team repeatedly expressed her disagreement with Pureland's actions and insisted that Pureland show the Film to Dr. Mandefro as promised.

58. Upon information and belief, this senior member of the production team discontinued her involvement with Pureland and the project due to Pureland's failure to live up to the terms of the parties' agreement.

59. Dr. Mandefro again repeatedly asked Pureland for an opportunity to review the Film, particularly because the Film's trailer had been submitted as a part of her application to the Robert Wood Johnson program and the program would require her to provide an update on the status of the Film in connection with her fellowship at the University of Pennsylvania, which was scheduled to begin in September 2007.

60. Pureland did not permit Dr. Mandefro to view the Film until November 2007.

61. When Dr. Mandefro was finally allowed to view the Film, she was appalled by its distortion of the educational message of her research due to its emphasis on the personal storylines that were never intended to be the focus of the Film, and the inclusion of which was a clear breach of the parties' agreements. She was also troubled by the Film's omission of any discussion of structural factors, like inner-city poverty and sexual abuse, which her research had determined contributed in no small measure to the spread of HIV/AIDS among the African American female community. Indeed, footage

addressing such structural factors had been filmed at Dr. Mandefro's direction, including several interviews with well-respected scholars in the field, but this footage had been omitted from this version of the Film.

62.    Upon information and belief, Pureland has submitted the Film to a number of U.S. and non-U.S. film festivals and has advertised and promoted the Film in that connection, all without Dr. Mandefro's first having had an opportunity to review and approve the final edited version of the Film, as required by the parties' agreements.

63.    Upon information and belief, the Film was rejected by the Sundance Film Festival in November 2007.

64.    The Film was recently accepted by the Cleveland International Film Festival, and, upon information and belief, it was shown there on March 15-16, 2008.

65.    Again, this was done without Dr. Mandefro's knowledge or authorization.

### Harm Caused by Pureland's Acts

66.    As noted, the Film in its current form is marred by the inclusion of personal material that not only directly breaches the parties' agreements, but that also damages the Film's effectiveness as an educational tool by seriously misrepresenting and distorting Dr. Mandefro's research. Most significantly, the Film reduces the problem of the HIV/AIDS epidemic in African American women to personal relationships without paying sufficient attention to the structural factors (e.g., poverty, abuse of women, and related problems) contributing to this epidemic, especially the history of the South Bronx, factors explored by Dr. Mandefro's research and the research of others and which Dr. Mandefro had explained to Pureland were necessary to include in the Film.

67.     For example, Dr. Mindy Fullilove has explored the significance of the burning of the South Bronx and the crack epidemic in that community in connection with the spread of HIV.  An interview with Dr. Fullilove, although filmed by Pureland, was ultimately cut from the Film.

68.     Another example of this oversimplification is the scene showing the coroner's report concluding that Ms. Stanley died of a probable drug overdose, but with no discussion of the drug epidemic in inner-city communities like Ms. Stanley's. Without an exploration of the structural factors that are at the heart of the epidemic, this scene frames the issue in a very irresponsible, and ultimately harmful, way.

69.     This distortion of Dr. Mandefro's research does a great disservice to the communities she seeks to help and undermines her reputation and credibility as a researcher who has been viewed as understanding these issues.

70.     Pureland's desperation to make the Film commercially saleable appears to explain its decision to feature so prominently Dr. Mandefro's personal life.  Dr. Mandefro never gave Ms. Abt or Pureland permission to include these very personal scenes in the Film.  In fact, with respect to a number of these scenes, Ms. Abt represented to Dr. Mandefro that she was filming them only to make Dr. Mandefro more comfortable in front of the camera.  Dr. Mandefro would never have allowed Ms. Abt to record such intimate conversations if she had known that they would be included in the Film and would be emphasized so heavily in the Film's promotion and advertisement.

71.     More importantly, the inclusion of these personal scenes, with scant attention paid to the structural factors already discussed, is disrespectful to the experiences of Ms. Stanley, Ms. Wilson and other women in a similar situation.  Any

22

attempt to align Dr. Mandefro's upper middle class experiences with those of Ms. Stanley and Ms. Wilson without any structural analysis only serves to trivialize the problems faced by African American women who deal with poverty, violence and abuse on a daily basis.

72.    Moreover, the emphasis on Dr. Mandefro's personal relationship distorts the message that Dr. Mandefro had hoped that the Film would convey to young African American girls, namely that women should celebrate their own power of self-determination and their own capacity for freedom, particularly as it relates to their physical health.

### FIRST CLAIM
### (Breach of Contract)

73.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-72 of the Counterclaims as if fully set forth herein.

74.    Dr. Mandefro entered into an oral agreement with Pureland in 2004 granting Pureland a limited license in connection with the Film.

75.    Under the 2004 agreement, the final version of the Film would be subject to Dr. Mandefro's feedback and ultimate approval.

76.    The 2004 agreement was reiterated and reaffirmed by Pureland in 2006 and in 2007.

77.    By creating, promoting, advertising, and distributing the Film without Dr. Mandefro's approval, Pureland has breached the 2004, 2006 and 2007 agreements.

78.    As a result of Pureland's breach of the 2004, 2006 and 2007 agreements, Dr. Mandefro has been injured in an amount to be determined.  Dr.

Mandefro is entitled to the recovery of damages and, in addition, to an award of Pureland's profits from the promotion, distribution, sale, and exhibition of the Film.

79.     Moreover, Dr. Mandefro is without an adequate remedy at law. Pureland's continuing breach of the parties' agreements has irreparably injured Dr. Mandefro.  Dr. Mandefro asks that the Court grant permanent injunctive relief enjoining Pureland from continuing to use Dr. Mandefro's likeness and research and, specifically, from promoting, distributing, or exhibiting the Film.

## SECOND CLAIM
### (Breach of the Covenant of Good Faith and Fair Dealing)

80.     Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-79 of the Counterclaims as if fully set forth herein.

81.     Rather than comply with its contractual obligations under the terms of the 2004, 2006 and 2007 agreements, Pureland has breached the agreements' implied covenant of good faith and fair dealing by failing and refusing to honor its commitment that the Film would be used for educational, lobbying, and legislative purposes and that Dr. Mandefro would have the right to provide feedback on, and ultimately approve, the final version of the Film.

82.     Pureland's actions were undertaken with malice and wanton disregard of Dr. Mandefro's rights.

83.     Dr. Mandefro is entitled to an award of monetary damages in an amount to be determined.  Dr. Mandefro is also entitled to an award of punitive damages in an amount according to proof.

## THIRD CLAIM
## (Invasion of Right of Privacy)

84.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-84 of the Counterclaims as if fully set forth herein.

85.    Pureland's use of Dr. Mandefro's name and likeness both in the Film and in connection with its advertisement, marketing and promotion as set forth above was done, at least in part, in the State of New York and was done without Dr. Mandefro's written consent in violation of New York Civil Rights Law § 51.

86.    As a direct and proximate result of Pureland's use of Dr. Mandefro's name and likeness without the requisite consent, Dr. Mandefro has been damaged in an amount to be determined.

87.    Dr. Mandefro further alleges upon information and belief that Pureland's use of her name and likeness without the requisite consent was accomplished with the knowledge that it was unlawful and for the purpose of damaging her, or with reckless indifference to such damage, thus entitling Dr. Mandefro to exemplary damages.

88.    Dr. Mandefro has suffered and will continue to suffer irreparable harm as a result of Pureland's conduct for which there is no adequate remedy at law.

## FOURTH CLAIM
## (Violation of Right of Publicity)

89.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-88 of the Counterclaims as if fully set forth herein.

90.    The publicity rights of Dr. Mandefro are valuable, and the right to use and license others to use these rights belongs exclusively to Dr. Mandefro.

91.    Because Pureland has breached the agreements entered into by the parties, and the limited license granted therein, it does not have Dr. Mandefro's consent to use her name and likeness in connection with the Film and, therefore, has no entitlement to use such likeness.

92.    By using Dr. Mandefro's publicity rights without her consent, Pureland has misappropriated her name and likeness for commercial benefit.

93.    As a result of Pureland's misappropriation of Dr. Mandefro's publicity rights, Dr. Mandefro has been injured in an amount to be determined.

94.    Pureland's violations are willful and intentional.

95.    Notwithstanding any damages that might be recoverable for these violations, Dr. Mandefro is without an adequate remedy at law.  Pureland's misappropriation of Dr. Mandefro's name and likeness irreparably harms her by depriving her of the right to control the commercial use of her publicity rights, and by potentially diluting the value of those rights by injury to her reputation.  Accordingly, Dr. Mandefro requests that this Court permanently enjoin Pureland from promoting, distributing, selling, offering for sale, or exhibiting the Film to the extent that Dr. Mandefro's name or likeness is used in connection therewith or appears therein.

### FIFTH CLAIM
### (Misappropriation)

96.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-95 of the Counterclaims as if fully set forth herein.

97.    Pureland has appropriated Dr. Mandefro's name, likeness, and research without her permission and has continued to retain and benefit from that misappropriation.

98. By reason of the foregoing, Dr. Mandefro has been damaged in an amount to be proven.

99. By reason of the foregoing, Dr. Mandefro is entitled to punitive damages in an amount to be proven.

100. Notwithstanding any damages that might be recoverable for these violations, Dr. Mandefro is without an adequate remedy at law.  Pureland's misappropriation of Dr. Mandefro's name, likeness, and research irreparably harms her by depriving her of the right to control the commercial use of the same, and by potentially diluting the value of the same by injury to her reputation.  Accordingly, Dr. Mandefro requests that this Court permanently enjoin Pureland from promoting, distributing, selling, offering for sale, or exhibiting the Film to the extent that Dr. Mandefro's name, likeness, or research is used in connection therewith or appears therein.

## SIXTH CLAIM
### (False Advertising)

101. Defendant/Counterclaim-Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-100 of the Counterclaims as if fully set forth herein.

102. Pureland's false and/or misleading use of Dr. Mandefro's name, likeness, and research in connection with marketing, advertising, and promotion of the Film as alleged herein violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits Pureland from using false and misleading descriptions of fact or representations of fact made in connection with services offered in interstate commerce.

103. Pureland's various uses of Dr. Mandefro's name, likeness, and research has caused and will continue to cause others to be misled into believing that Dr. Mandefro is associated with the Film or has otherwise authorized Pureland to use her

27

name, likeness, and research in connection with marketing, advertising and promotion of the Film.

104.   Moreover, Pureland's numerous false statements regarding the nature of Dr. Mandefro's research have caused and will continue harm to Dr. Mandefro's personal and professional reputation and will impede her mission to investigate the causes of the rapid spread of HIV/AIDS among African American and African women and her efforts to advocate for critical changes in public policy in response to this epidemic.

105.   Pureland's conduct complained of herein is intentional, malicious, and willful.

106.   Dr. Mandefro has suffered and will continue to suffer irreparable harm as a result of Pureland's conduct for which there is no adequate remedy at law.

## SEVENTH CLAIM
### (Unjust Enrichment)

107.   Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-106 of the Counterclaims as if fully set forth herein.

108.   By exploiting Dr. Mandefro's name, likeness, and research without her permission, Pureland has been, and continues to be, unjustly enriched at Dr. Mandefro's expense.

109.   Pureland's retention of any and all profits, revenues and consideration that Pureland has received or obtained from exploitation of the Film without Dr. Mandefro's permission is against equity and good conscience.

110.   By reason of the foregoing, Dr. Mandefro demands that Pureland disgorge any and all profits, revenues and consideration that Pureland has received or obtained from exploitation of the Film.

WHEREFORE, Dr. Mandefro respectfully requests the entry of Judgment against Plaintiff/Counterclaim-Defendant as follows:

1.     Awarding damages to Dr. Mandefro in an amount to be determined;

2.     Enjoining Pureland from distributing, advertising, and promoting the Film;

3.     Ordering Pureland to withdraw all copies of the Film currently in circulation, including copies submitted for consideration by film festivals in the United States and abroad;

4.     Awarding Dr. Mandefro her costs and expenses, including reasonable attorneys' fees; and

5.     Ordering such other and further relief as this Court deems just and proper.

Dated: March 24, 2008
New York, New York

                                                 Vaughn C. Williams
                                                 vaughn.williams@skadden.com
                                                 Stephanie J. Kamerow
                                                 stephanie.kamerow@skadden.com
                                                 Michael Ridgway Jones
                                               michael.jones@skadden.com
                                                 Four Times Square
                                                 New York, New York 10036-6522
                                                 (212) 735-3000

                                                 By:   /s/ Michael Ridgway Jones

                                                 Attorneys for Defendant/Counterclaim-
                                                 Plaintiff Mehret Mandefro