UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PURELAND PICTURES, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>MEHRET MANDEFRO<br><br>  Defendant. | 07 CV 10448 (LAP)<br><br>**PLAINTIFF'S LOCAL RULE 56.1<br>STATEMENT OF UNDISPUTED FACTS<br>IN SUPPORT OF ITS MOTION<br>FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1, plaintiff Pureland Pictures, Inc. ("Pureland") submits this statement of material facts as to which there can be no dispute:

**The Parties**

1. Pureland is a New York corporation with its principal place of business at 126 10th Street, Suite 204, Brooklyn, New York 11215. Pureland is a film and commercial production company, founded in 1999 by award-winning filmmaker Emily Abt. (*See* Cplt. ¶ 3; Amended Answer and Counterclaims dated March 24, 2008 ("Amended Answer"), at ¶ 3)[1]

2. Reva Goldberg is employed by Pureland as a producer. (Declaration of Emily Abt ("Abt") ¶ 3)

3. Defendant Dr. Mehret Mandefro is a citizen of the state of Pennsylvania. Dr. Mandefro has received undergraduate and medical degrees from Harvard University and a

---

[1] The Amended Answer and Counterclaims includes 47 numbered paragraphs in response to Pureland's Complaint and 110 numbered paragraphs setting forth counterclaims. References to the first 47 paragraphs will be cited herein as "Amended Answer," while references to the following 110 paragraphs will be cited herein as "Counterclaims."

Master's degree from the London School of Hygiene and Tropical Medicine as a Fulbright Scholar. Dr. Mandefro is currently the Robert Wood Johnson Health and Society Scholar at the University of Pennsylvania. (Cplt. ¶ 4; Amended Answer ¶ 4)

**Doctor Mandefro Agreed to Appear in the Film**

4. In 2002, Mehret Mandefro and Emily Abt were both Fulbright Scholars in London. The two women became friends, bonding over their shared interest in the social, health and public policy issues confronting women. (Cplt. at ¶¶ 8, 10; Counterclaims ¶¶ 8, 10)

5. In 2004, after returning to the United States and finishing her master's degree in film directing from Columbia Univeristy's Film Program, Ms. Abt discussed with Dr. Mandefro the idea of Pureland making a documentary film that would feature Dr. Mandefro's work and personal life. (Abt ¶ 8)

6. On several occasions, Pureland informed Dr. Mandefro that it intended to have the Film shown on HBO, PBS, or other networks, and that it intended to submit the Film to various film festivals. One such occasion included an email to Dr. Mandefro on June 15, 2004 in which Ms. Abt stated: "I also want to pitch this to HBO and PBS's POV series (where TIFM aired) ASAP to try and get seed funds. I think my friend at HBO might be really into this for a bunch of reasons…" (Abt, ¶ 9, Ex. B)

7. Pureland filmed Dr. Mandefro at various times in various situations to gather material for the Film, including, but not limited to, material involving Dr. Mandefro's residency, the spread of HIV among African-American women, and Dr. Mandefro's personal life. (Abt, ¶10)

8. A standard practice of documentary filmmakers is to accumulate enough material until specific storylines develop naturally and are more fully defined in the editing room. (Abt, ¶ 5)

9. On several occasions, Ms. Abt communicated to Dr. Mandefro that the filming process could be long, challenging, and intrusive, including an email to Dr. Mandefro on June 15, 2004 in which Ms. Abt stated:

> I do need you to make a final decision about this project. Of course I'm totally hyped on the idea but I don't want to do this unless you are really committed. Worst of all, would be to sink months of work into this and have you change your mind. One we start filming/raising funds, you need to be sure you will see the project thru, regardless of how long that takes (maybe even a few years!)

(Abt, ¶ 11, Ex. D)

**Doctor Mandefro Signed a Written Release Agreement**

10. Pureland presented Dr. Mandefro with a written release agreement, which Dr. Mandefro signed, on May 25, 2005 (the "Release"). (Cplt. ¶ 16; Amended Answer ¶ 16)

11. According to the clear terms of the Release, Dr. Mandefro granted Pureland permission:

> (1) to take photographs of me and record my voice in connection with the film currently titled "MEHRET" [now entitled *All of Us*]
>
> . . .
>
> [and]
>
> . . .
>
> (2) to put the finished pictures, negatives, reproductions and copies of the original prints and negatives of me and any sound track recordings and recordings which may be made of my voice in any manner deemed proper by Pureland Pictures used in connection with the exhibition, advertising, promotion, distribution and/or exploitation of the [Film] or otherwise.

3

(Cplt. Ex. A)

12. According to the clear terms of the Release, Dr. Mandefro granted exclusive ownership of and rights to the filmed material (the "Likenesses") to Pureland. In particular, the signed Release provided that:

> Pureland Pictures shall be the exclusive owner of the Likenesses and Pureland Pictures and its affiliates, licensees, successors and assigns shall have the right, throughout the world, in perpetuity, to copyright, to use and to license others to use, in any manner in all media now known or hereafter devised, all or any portion thereof or a reproduction thereof in connection with MEHRET or otherwise.

(Cplt. Ex. A)

13. At no time before or after the Release did Pureland and Dr. Mandefro enter any other written agreement concerning the same rights addressed by the Release. (Abt ¶ 13)

14. Whenever Dr. Mandefro asked Pureland not to film a situation or environment, Pureland did not film such situations or environments, or if it had already begun shooting, stopped shooting. (Abt ¶ 14)

15. As the filming continued, Pureland sought footage to support several potential storylines. These storylines included:

    a. Dr. Mandefro's treatment of two HIV-positive patients, both of whom were former sex workers and former drug abusers;

    b. a trip Dr. Mandefro took to Ethiopia to assess and compare the HIV treatment situation there;

    c. the lack of sexual autonomy asserted by African-American women as a factor in the spread of HIV; and

   d. events in Dr. Mandefro's personal life, including her own relationships.

(Abt, ¶ 15d; *see also* Abt, Ex. A)

**Dr. Mandefro Introduces Tara Stanley and Chevelle Wilson to Pureland**

  16. A contact of Dr. Mandefro's brought to the attention of Dr. Mandefro and Pureland two HIV-positive patients—Tara Stanley and Chevelle Wilson—who would go on to participate in the film. (Counterclaims ¶ 20)

  17. On May 26, 2005, Ms. Stanley entered an agreement with Pureland entitled "Appearance Release and Consent for the Release of Confidential Medical and HIV Information." (Abt, ¶ 17, Ex. E)

  18. On June 5, 2006, Ms. Wilson entered an agreement with Pureland entitled "Appearance Release and Consent for the Release of Confidential Medical and HIV Information." (Abt, ¶ 18, Ex. F)

  19. Pureland filmed numerous scenes with Ms. Stanley and Ms. Wilson, with Dr. Mandefro present for some scenes and not present for others. (Abt, ¶ 19; *see also* Abt, Ex. A)

  20. Scenes filmed with Ms. Stanley and Ms. Wilson included discussion of their medical and personal history and of their romantic and sexual relationships with their current and former partners, including discussions of previous drug abuse, sexual abuse, and prostitution. (*See* Abt, Ex. A)

  21. Pureland filmed Ms. Stanley and Ms. Wilson in scenes that were not centered around medical discussion, including the wedding party of Ms. Wilson and her husband, Robert Barrett, which Dr. Mandefro attended. (*See* Abt, Ex. A)

**The Lack of Sexual Autonomy Asserted by African-American Women as a Factor in the Spread of HIV**

22. During the period when the Film was being filmed, Dr. Mandefro invited Ms. Abt to participate in a Truth Circle. Dr. Mandefro was also to participate in the event. (Abt ¶ 25)

23. Dr. Mandefro has espoused the use of "Truth Circles"—gatherings of women speaking openly and honestly about personal issues—as a tool to help prevent the spread of HIV and to improve women's confidence and autonomy. (Abt ¶ 26; *see also* Abt, Ex. A)

24. Ms. Abt indicated interest in shooting footage of the Truth Circle. Because she would be participating in the event and could not simultaneously operate a camera, Pureland hired a camera operator to record the event. Reva Goldberg, the producer of the Film, recorded sound at the event. (Abt ¶¶ 27, 28)

25. Prior to the event, several of the women who would be participating in the event expressed concern about whether the footage from the Truth Circle would be used in the Film. Pureland agreed to discuss whether footage from Truth Circle would be used after the event was over. After the event, Pureland agreed to inform the women what footage it intended to use in the Film after the footage had been edited. (Abt ¶ 29)

**Dr. Mandefro's Personal Storyline**

26. From the Film's inception, Pureland's desire to obtain film footage of Dr. Mandefro's personal life was discussed by Pureland and Dr. Mandefro. Pureland emphasized, on numerous occasions, the importance of such a storyline to the film. Exchanges between Pureland and Dr. Mandefro show that Dr. Mandefro was aware that Pureland wanted to get footage of Dr. Mandefro doing things outside of work. These exchanges include, but are not limited to:

   a. Email to Dr. Mandefro on February 21, 2005, in which Ms. Abt stated: "I MUST, MUST have footage of both Dre and Nes, so please try and

6

grab some stuff of them chillin if you possibly can." "Dre and Nes" were men with whom Dr. Mandefro had an actual or potential romantic and/or sexual relationship. (Abt Ex. G)

        b.      Email to Dr. Mandefro on April 21, 2005, in which Ms. Abt stated: "We really need to capture you interacting with guys.  So far we have only HEARD about your dating life rather than witnessed it.  This does not a dynamic film make.  Please let me know about any such opportunities…" (Abt Ex. H)

        c.      Email reply to Ms. Goldberg's previously stated question, "Date for guitar session with Dre?," in which Dr. Mandefro, copying Ms. Abt, on November 29, 2005, stated: "lastly, I am meeting dre tomorrow and will ask him for a specific date that works with his sched. cool?" (Goldberg Ex. A)

        d.      Email from Dr. Mandefro to Ms. Goldberg on October 2, 2006, in which Dr. Mandefro stated:

> first off, it seems like trying to "force" drama is the very thing that does not come off as genuine… yet it seems like its genuine real life/ action with me and the people in my lives you are seeking… that said as i think about all of the stuff and truthAIDS it seems like a good way to talk about my story and link it will [*sic*] the other ladies is the theme of relationships… remember when you guys had the a-ha moment in lagano that my arch was research to action… well i think a similar a-ha moment for the film should be that this is the film that makes the world realize that HIV is about RELATIONSHIPS… not sex. [all alterations in original].
> 
> . . .
> 
> TruthIAIDS [*sic*] is growing and right now it's about framing the HIV prevention around our relationships, and marrying rights-based rhetoric to realize love, trust, intimacy and identity are really what's putting women at risk… not just sex, and these common human sentiments are about relationships… all kinds of them, the bond with yourself, your partner, your family, and the commty at large.

(Goldberg Ex. B)

   e. Email from Ms. Goldberg to Dr. Mandefro on October 4, 2006, in which Ms. Goldberg stated:

> [W]e need you to tell us where the real risks and challegnes are for you, career-wise and personally, and where they might manifest themselves in action. If those challenges are within relationships, we need scenes to show that.
>
> The film poses the following questions which need to somehow be answered in action if the story is going to feel whole:
>
> . . .
>
> -Why does she care about this so deeply? What in her life (and thus the audiences' lives) makes this research something we should all take personally?

(Goldberg Ex. C)

   f. Email from Dr. Mandefro to Ms. Abt on February 24, 2007, in which Dr. Mandefro stated: "as for dre, he's ready to talk to you so just call him: [_]. be gentle with him… he's really feeling like our relationship is being 'exploited', *his words not mine*, so just go easy. let me know how it goes…" (emphasis added). (Abt Ex. I)

27. Beginning no later than September 2004 and continuing intermittently at least through January 18, 2007, Pureland filmed scenes of Dr. Mandefro experiencing or discussing her personal life on at least thirty-six separate tapes covering a total of approximately twenty-three and one-half hours of filming, including the following scenes, among numerous others:

   a. In September 2004, Pureland filmed Dr. Mandefro at an outdoor dance party, including scenes dancing with her friends, for approximately four hours;

8

   b.  In December 2004, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately twenty-six minutes;

   c.  In December 2004, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her feelings about being single and about her relationships, for approximately one hour;

   d.  In January 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately forty-one minutes;

   e.  In Summer 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately one hour;

   f.  In October 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship and sexual intercourse with "Dre";

   g.  In November 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre" and other men she was dating at the time;

   h.  In March 2006, as discussed furter below, Pureland filmed Dr. Mandefro and her friends talking about their personal and sexual lives for approximately three hours;

    i.  In Fall 2006, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about four men she was dating at the time, including "Dre";

    j.  In October 2006, Pureland filmed Dr. Mandefro talking about her personal life with Ms. Wilson, including a discussion about her sex life and discussion revealing that she had had unprotected sex with "Dre" and subsequently learned that he was not sexually monogamous with her.

(*See* Abt Ex. J; Goldberg Ex. D)

  28. In filmed discussions with two of her patients, Dr. Mandefro shared her belief that one contributing factor to the spread of HIV is the difficulty African-American women face in asserting their personal rights in the bedroom. (*See* Abt Ex. A)

  29. Dr. Mandefro discussed her relationship with her boyfriend on film, and allowed Pureland to film scenes with him. As Dr. Mandefro was aware, her boyfriend was neither a medical worker nor an HIV patient. His only connection to the Film was his personal relationship with Dr. Mandefro. (Abt ¶ 35)

  30. With Dr. Mandefro's knowledge, consent, and assistance, Pureland also filmed Dr. Mandefro in settings outside of the medical field, including birthday parties, photography shoots, dinner parties, and nightclubs. (Abt ¶ 36; Goldberg ¶ 21; *see also* Abt Ex A)

  31. These discussions and related scenes create a powerful storyline (the "Storyline"), which Pureland believes serves several vitally important purposes, including strengthening the medical message of the Film, making the message of the Film accessible to a

wider audience, and showing that some of the challenges faced by Dr. Mandefro are similar to those faced by her patients. (Abt ¶ 37)

**Dr. Mandefro's Assertions of Alleged Oral Agreements**

32. Dr. Mandefro has asserted that she had granted only a "limited license" to Pureland to use her name and likeness, based on an alleged oral agreement in 2004. (Counterclaims, at ¶ 13)

33. Dr. Mandefro has asserted that this alleged 2004 oral agreement was "expressly conditioned" on the following terms:

> (i) The Film would be used for educational, charitable, and legislative advocacy purposes, not for Pureland's commercial gain;
>
> (ii) The focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same;
>
> (iii) The Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission;
>
> (iv) The Film would not contain confidential patient-physician relationship with those patients, without Dr. Mandefro's express permission; and
>
> (v) The Film would not be displayed, distributed or viewed in any public forum without Dr. Mandefro's express approval of the final edited version.

(Counterclaims, at ¶ 13)

34. Dr. Mandefro has asserted in her filings related to this case that she and Pureland reiterated the purported 2004 oral agreement in oral agreements in 2006 (the "2006 Agreement") and 2007 (the "2007 Agreement"). (Johnson Ex. 3, 4)

35. Dr. Mandefro communicated frequently via email with Pureland during the filming of *All of Us*. Prior to the purported cease and desist letter, Dr. Mandefro never asserted

to Pureland in a writing, via email or otherwise, that an express oral agreement had been reached in 2004. (Abt ¶ 43; Goldberg ¶ 27)

36. Similarly, prior to her filings in this case, Dr. Mandefro never asserted in any writing to Pureland, via email or otherwise, that an express oral agreement had been reached in either 2006 or 2007. (Abt ¶ 44; Goldberg ¶ 28)

37. Dr. Mandefro now alleges that Pureland "expressly" agreed in 2004 and 2006 that "the Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission," (Counterclaims at ¶¶ 13, 39) and "expressly agreed" in 2004, 2006, and 2007 that "the Film would not be displayed, distributed, or viewed in any public forum without Dr. Mandefro's express approval of the final version," (Counterclaims at ¶¶ 13, 39, 55).

38. At no point prior to sending the Cease and Desist Letter, including in emails sent to convince Pureland to remove footage concerning Dr. Mandefro's personal life, did Dr. Mandefro ever claim a contractual right to review of approve the Film, nor did she ever mention any "expressly" agreed-to terms between the parties. (Abt ¶ 46; Goldberg ¶ 29; *see also, e.g.*, Goldberg Ex. E, Email from Dr. Mandefro to Ms. Goldberg, dated April 8, 2007 [Tab 18]; Goldberg Ex. F, Email from Dr. Mandefro to Ms. Goldberg, dated April 9, 2007 [Tab 19]; Abt Ex. K, Email from Dr. Mandefro to Ms. Abt, dated August 17, 2007 [Tab 21]; Goldberg Ex. G, Email from Dr. Mandefro to Ms. Goldberg, dated August 22, 2007 [Tab 22])

39. In order to settle its rights to the Film, Pureland filed this suit against Dr. Mandefro. Pureland filed a Complaint comprising one count seeking a declaratory judgment. (Cmplt. ¶¶ 39-47) Dr. Mandefro filed an Answer alleging no counterclaims (Answer.) Dr. Mandefro then filed an Amended Answer and Counterclaims comprising seven counterclaims.

Count I alleges that Pureland breached oral agreements it entered with Dr. Mandefro in 2004, 2006 and 2007. (Counterclaims at ¶¶ 73-79) Count II alleges that Pureland breached an implied covenant of good faith and fair dealing in each of the oral agreements. (*Id.* at ¶¶ 80-83) Count III alleges violations of New York Civil Rights Law § 51. (*Id.* at ¶¶ 84-88) Count IV alleges that Pureland violated Dr. Mandefro's right of publicity. (*Id.* at ¶¶ 89-95) Count V alleges that Pureland misappropriated Dr. Mandefro's name, likeness and research. (*Id.* at ¶¶ 96-100) Count VI alleges that Pureland violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (*Id.* at ¶¶ 101-106) Count VII alleges that Pureland has been unjustly enriched at Dr. Mandefro's expense. (*Id.* at ¶¶ 107-110)

Dated: April 7, 2008
New York, New York

        Respectfully submitted,

        PAUL, WEISS, RIFKIND,
        WHARTON & GARRISON LLP

        By:  /s/ Darren W. Johnson
        Darren W. Johnson
        djohnson@paulweiss.com

        1285 Avenue of the Americas
        New York City, New York 10019
        (212) 373-3000

        *Attorneys for Plaintiff Pureland Pictures, Inc.*