UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Docket No. 07 CV 10448 (LAP)

PURELAND PICTURES, INC.,

Plaintiff,

v.

MEHRET MANDEFRO

Defendant.

**DECLARATION OF DARREN W. JOHNSON**

---

DARREN W. JOHNSON declares pursuant to 28 U.S.C. § 1746:

1.     I am associated with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for plaintiff Pureland Pictures, Inc. ("Pureland"). I submit this declaration in support of the accompanying Pureland Pictures, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment.

2.     Plaintiff filed a Complaint ("Complaint") on November 19, 2007, a copy of which is attached hereto as Exhibit 1.

3.     Defendant filed an Answer ("Answer") on February 13, 2008, a copy of which is attached hereto as Exhibit 2.

4.     Defendant filed an Amended Answer and Counterclaims ("Counterclaims") on March 24, 2008, a copy of which is attached hereto as Exhibit 3.

5.     Plaintiff filed an Answer and Affirmative Defenses to Defendant's Counterclaims on April 7, 2008, a copy of which is attached hereto as Exhibit 4.

6.     Emily Abt entered an Affidavit in Support of Pureland's Motion for Summary Judgment, a copy of which is attached hereto as Exhibit 5.

1

7.    Reva Goldberg entered an Affidavit in Support of Pureland's Motion for Summary Judgment, a copy of which is attached hereto as Exhibit 6.

I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York on April 7, 2008.

_____
Darren W. Johnson

SWORN TO AND SUBSCRIBED before me
this ___7th___ th day of April, 2008.

_____
Notary Public

AUSTIN KWAME WILKINSON
Notary Public, State of New York
No. 01WI5051848
Qualified in Kings County
Certificate Filed in New York County
Commission Expires Nov. 13, 2009

2

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 07 CV 10448

---

PURELAND PICTURES, INC.

Plaintiff,

v.

MEHRET MANDEFRO

Defendant.

---

Case No. _____

NOV 1 9 2007

U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**

Plaintiff Pureland Pictures, Inc. ("Pureland"), by its attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, for its Complaint, alleges:

## Nature of the Action

1.    This case concerns a dispute between Pureland, an award-winning film company dedicated to promoting awareness of women's issues, and Dr. Mehret Mandefro, a Harvard-trained physician and the subject of Pureland's recently-completed documentary, previously entitled *Mehret*, about the fight against HIV among African-American women and the issues faced by these women in trying to prevent the spread of the virus (the "Film").   After executing a written release (the "Release") and freely allowing Pureland to film her professional and personal life over several years, Dr. Mandefro now purports to assert creative control over the Film, even though she expressly disclaimed any right to do so in the Release.

2.    Pureland brings this action for declaratory relief establishing and enforcing (a) Pureland's contractual right to use the photographic and audio recordings of Dr. Mandefro (the "Likenesses") in the Film or otherwise; and (b) that Dr. Mandefro has no rights, contractual or otherwise, to assert any control, input, demands, or other restrictions on Pureland in connection with the Film or Pureland's use of the Likenesses.

## The Parties

3. Pureland is a New York corporation with its principal place of business at 126 10th Street, Suite 204, Brooklyn, New York 11215. Pureland is a film and commercial production company, founded in 1999 by award-winning filmmaker Emily Abt. Pureland creates narrative films and documentaries about social issues that affect women, including *Take It From Me*, a critically-acclaimed 1999 feature documentary about four women struggling to raise themselves out of poverty in New York City.

4. Upon information and belief, Defendant Dr. Mehret Mandefro is a citizen of the state of Pennsylvania. Dr. Mandefro has received undergraduate and medical degrees from Harvard University and a Master's degree from the London School of Hygiene and Tropical Medicine as a Fulbright Scholar. Dr. Mandefro is currently the Robert Wood Johnson Health and Society Scholar at the University of Pennsylvania.

## Jurisdiction and Venue

5. Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. 1332(a). There is diversity between Pureland, a New York corporation with its principal place of business in New York, and Dr. Mandefro, a citizen of Pennsylvania. The amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over both parties because the Film at issue in this action was primarily filmed in New York, Dr. Mandefro signed the Release in New York while she was living in New York, and Pureland has been based in New York throughout the production of the Film.

2

7. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this claim occurred in this district.

## Background

### Doctor Mandefro Agrees to Appear in the Film

8. In 2002, Mehret Mandefro and Emily Abt were both Fulbright Scholars in London. Ms. Abt was studying at the National Film and Television School.

9. Upon information and belief, Dr. Mandefro was studying for a Master's in Science degree in Public Health at the London School of Hygiene and Tropical Medicine, investigating how HIV treatment and prevention can work together to bolster HIV control and strengthen the public health infrastructure in Ethiopia.

10. The two women became friends, bonding over their shared interest in the social, health and public policy issues confronting women. During this time in London, Ms. Abt became interested in making a film about Dr. Mandefro's life and work.

11. After returning to the United States and finishing their degrees, both women lived in New York: Dr. Mandefro began a medical residency program at Montefiore Hospital in the Bronx, and Ms. Abt continued developing her film production company, Pureland.

12. During 2004, Ms. Abt and Dr. Mandefro discussed the idea of Pureland making a documentary film about Dr. Mandefro's life and work as a resident at Montefiore and her residency project working with HIV-positive women.

13. Dr. Mandefro understood that, as a documentary, the film would not have a script. Instead, Pureland would film Dr. Mandefro at various times in various situations to gather material around the general ideas of Dr. Mandefro's residency and the

3

spread of HIV among African-American women. After accumulating enough material, specific storylines would develop naturally and would be more fully defined in the editing room. This is the standard practice of documentary filmmakers.

14. On several occasions, Ms. Abt communicated to Dr. Mandefro that the filming process could be long, challenging, and intrusive. She also communicated the substantial amounts of time and money that would be invested in the film and the need for Dr. Mandefro to be fully committed to and prepared for the process.

15. As is the standard practice in making any documentary film about living subjects, Pureland presented Dr. Mandefro with a written release agreement. The purpose of the Release was to ensure that Pureland would own all rights to the filming it did of Dr. Mandefro, and to ensure that Pureland would maintain its creative independence and integrity in the production, editing and distribution of the Film.

16. On May 25, 2005, Dr. Mandefro signed the Release (see Exhibit A). Under the Release, Dr. Mandefro granted Pureland permission:

> (1) to take photographs of me and record my voice in connection with the film currently titled "MEHRET"
>
> [and]
>
> (2) to put the finished pictures, negatives, reproductions and copies of the original prints and negatives of me and any sound track recordings and recordings which may be made of my voice in any manner deemed proper by Pureland Pictures used in connection with the exhibition, advertising, promotion, distribution and/or exploitation of the [Film] or otherwise.

17. The Release also granted exclusive ownership of and rights to the Film to Pureland. In particular, the signed Release provided that:

4

> Pureland Pictures shall be the exclusive owner of the
> Likenesses and Pureland Pictures and its affiliates,
> licensees, successors and assigns shall have the right,
> throughout the world, in perpetuity, to copyright, to use and
> to license others to use, in any manner in all media now
> known or hereafter devised, all or any portion thereof or a
> reproduction thereof in connection with MEHRET or
> otherwise.

18. Throughout filming, Pureland filmed Dr. Mandefro at her workplace, while visiting her patients, and in various personal situations.

19. All filming of Dr. Mandefro was done with Dr. Mandefro's consent, knowledge, and quite often, her active assistance. Whenever Dr. Mandefro told Pureland that she was in a situation or environment that was too sensitive or otherwise inappropriate for filming, Pureland respected the privacy rights of Dr. Mandefro and her patients and did not film such situations or environments.

20. As the filming continued, several storylines developed and were pursued. These included (1) Dr. Mandefro's treatment of two of her HIV-positive patients, both of whom were former sex workers and former drug abusers; (2) a trip Dr. Mandefro took to Ethiopia to assess and compare the HIV treatment situation there; and (3) the lack of sexual autonomy asserted by African-American women as a factor in the spread of HIV.

**Dr. Mandefro's Personal Storyline**

21. From the Film's inception, a storyline containing film footage of Dr. Mandefro's personal life was contemplated and agreed upon by Pureland and Dr. Mandefro.

22. Driven by Dr. Mandefro's own beliefs and medical advice, parts of the filming addressed the lack of sexual autonomy asserted by women, in particular, the

5

difficulty women face in insisting that their partners use condoms and remain monogamous. In order to demonstrate that the relevance of these issues was not limited to poor, uneducated and otherwise disenfranchised women, Dr. Mandefro agreed that footage from her personal life would be used to serve as a bridge between the experiences of her patients and the film-watching audience. It was well understood by Dr. Mandefro that this footage was critical to illustrating the universality of the issues raised by the HIV/AIDS crisis.

23. In filmed discussions, two of Dr. Mandefro's patients admitted that their partners had not always used condoms and had not always been monogamous, but that the women did not feel comfortable insisting on condom usage. Dr. Mandefro shared her belief that the difficulty African-American women face in asserting their personal rights in the bedroom was a significant contributing factor to the spread of HIV.

24. In discussions during and after filming, Ms. Abt and other Pureland personnel repeatedly told Dr. Mandefro that they needed to get more footage of Dr. Mandefro doing things outside of work. Such filming was necessary both to provide material to be used to bridge between scenes, and because the candor and unpredictability of such moments often allow a filmmaker to capture compelling conversations and events that otherwise might not be filmed. Additionally, these perspectives made Dr. Mandefro a more compelling and empathetic voice in the film.

25. Dr. Mandefro agreed to provide material that would more fully develop her role in the Film. Among other things, Dr. Mandefro discussed her relationship with her boyfriend on film, and allowed Pureland to film scenes with him.

As with Dr. Mandefro, her boyfriend signed a written release granting Pureland unconditional rights to use his likeness in the Film.

26. As Dr. Mandefro was aware, her boyfriend was neither a medical worker nor an HIV patient. His only connection to the Film was his personal relationship with Dr. Mandefro.

27. With Dr. Mandefro's knowledge, consent, and assistance, Pureland also filmed Dr. Mandefro in settings outside of the medical field, including birthday parties, photography shoots, dinner parties, and nightclubs.

28. These discussions and related scenes create a powerful storyline (the "Storyline"), which serves several vitally important purposes, from both a medical perspective and a dramatic perspective. First, from a medical perspective, they powerfully illustrate the exact problems that Dr. Mandefro has worked to address. Dr. Mandefro has focused her career on preventing the spread of HIV in the African-American community. If the Storyline were excluded, the Film's representation of the at-risk community would only focus on two HIV-positive former sex workers who had abused drugs. By revealing the struggles faced by Dr. Mandefro in her relationship, the Film is able to convey the medical message that HIV and condom usage are extremely important health issues, not just for a certain portion of the population, but for all women.

29. Second, from a dramatic perspective, this Storyline humanizes Dr. Mandefro in the Film and makes her appear to be a more likeable and rounded person, rather than merely a "talking head." When a trailer featuring several minutes of footage from the Film, but not including the Storyline, was submitted to compete for a grant, the reviewer who denied Pureland the grant observed that the lack of development in Dr.

Mandefro's character was a significant problem with the Film.  This problem was confirmed by test screening audiences, some of whom reported that Dr. Mandefro would have seemed "preachy" but for the perspective provided by the Storyline.

30. At various points in the filming, Dr. Mandefro expressed some unease with including the Storyline in the Film.  However, each time this happened, Pureland personnel explained that the material was necessary and helpful, and each time, Dr. Mandefro continued to discuss willingly the Storyline on film.

31. At one point, Pureland completed a rough cut of the Film that did not include the Storyline, because Pureland initially believed that it lacked enough suitable material to make the Storyline compelling.  At that time, Ms. Abt sent an email to Dr. Mandefro advising her that the rough cut did not include the Storyline.  Ms. Abt did not say that Pureland waived any of its rights with regard to the Storyline or that the possibility of including the Storyline would not be revisited at a later time.

32. As the editing process continued, more useable material was found and Pureland determined that it had sufficient footage to make the Storyline a compelling and valuable part of the Film.

33. Beginning in 2006, Dr. Mandefro began making demands on Pureland to which she had no rights, contractual or otherwise.  These included demands to define the focus of the Film and to remove from the Film any material of which she did not approve, including scenes with her Likeness as well as scenes in which she did not even appear.

34. After repeatedly threatening to take legal action against Pureland if it did not give in to her demands, Dr. Mandefro, through her counsel, sent a purported cease

and desist letter to Pureland on October 22, 2007. In this letter, Dr. Mandefro devised a theory — directly contradicted by the written Release — that she had granted only a "limited license" to Pureland to use her name and likeness, based on an alleged oral agreement in 2004.

35. There was no such contract between Pureland and Dr. Mandefro in 2004 or otherwise, nor would Ms. Abt or Pureland or any reputable documentary filmmaker ever cede the type of control over a documentary film that Dr. Mandefro claims Ms. Abt willingly gave over in 2004. Granting the subject of a documentary approval of the final film seriously compromises the integrity of the documentary and, in the eyes of the documentary filmmaking industry, renders the film as something less than a true documentary.

36. Additionally, none of the alleged conditions that Dr. Mandefro claims to have placed on her "limited license" are collateral to the Release that Dr. Mandefro signed after she claims to have entered the oral agreement. Even if these conditions had been discussed in 2004, which they were not, the subsequent written Release directly contradicts and supersedes Dr. Mandefro's assertions. Furthermore, Dr. Mandefro's allegations are belied by her actions after signing the Release, including, but not limited to, her efforts to involve her boyfriend in the filming.

37. On information and belief, Dr. Mandefro has begun an informal campaign to discredit the Film and to cast Pureland, Ms. Abt, and other Pureland personnel in a negative and false light.

38. Dr. Mandefro consented to all of the filming that Pureland did and she granted all rights to the use of such material in any manner in all media, in part or in

whole, in the Film or otherwise, exclusively to Pureland and its affiliates, licensees, successors, and assigns. Her dissatisfaction with certain portions of the final edited Film does not unilaterally rescind the rights she clearly granted to Pureland.

## FIRST CLAIM
### (For Declaratory Judgment)

39. Pureland repeats and realleges the allegations of paragraphs 1 through 38 above.

40. Dr. Mandefro signed a written Release allowing Pureland to film her and to use that film in any manner deemed proper by Pureland Pictures. In reliance on this Release, Pureland filmed Dr. Mandefro in various situations over three years.

41. Pureland edited the Likenesses of Dr. Mandefro into a feature-length film. The Film addresses the medical epidemic of HIV among African-American women, including obstacles faced by these women in their efforts to prevent the spread of the virus. Consistent with the terms of the written Release, Pureland has deemed this Film proper.

42. The Release was the only contract executed between Dr. Mandefro and Pureland. The Release contains the entire agreement between the parties regarding the filming of Dr. Mandefro and the rights to ownership and usage of the Likenesses.

43. Nevertheless, Dr. Mandefro contends that the parties reached an oral agreement in 2004 on matters directly addressed by the written agreement in 2005. Specifically, Dr. Mandefro claims that, in 2004, she made an oral agreement with Pureland to restrict the exhibition, advertising, promotion, distribution, exploitation, and rights to use and license others to use the Film.

10

44. Dr. Mandefro has threatened to take legal action against Pureland, unless Pureland gives in to her demands to remove segments of the Film deemed proper by Pureland, to re-edit the Film to suit her goals, to refrain from using the Film for any purpose of which she does not approve, and to refrain from showing the Film in any public forum without her express approval. On information and belief, Dr. Mandefro has also attempted to discredit the Film and to cast Pureland, Ms. Abt, and other Pureland personnel in a negative and false light.

45. Dr. Mandefro's demands are meritless, and motivated by malice and bad faith. The written Release contains the entire agreement between the parties and, to the extent that any oral agreement existed prior to the Release, any terms which Dr. Mandefro alleges were included in that agreement are not collateral to terms in the written Release and are contradicted by those later, written terms.

46. By virtue of the foregoing, an actual controversy exists between Pureland and Dr. Mandefro.

47. Pureland is entitled to a judgment declaring that it is not in breach of any legal agreement between Pureland and Dr. Mandefro; that Dr. Mandefro does not have any ownership, use, licensing, copyright, or other rights at law or in equity to the Likenesses filmed by Pureland; and that Dr. Mandefro does not have standing to assert the rights of any other individuals with regard to the Film.

11

WHEREFORE, Pureland respectfully requests the entry of Judgment against Defendant as follows:

1.    A declaratory judgment that the production, distribution, and display of the Film does not breach any agreement between Pureland and Dr. Mandefro;

2.    A declaratory judgment that Dr. Mandefro has not retained any rights to the Likenesses filmed by Pureland or to any use to which Pureland may apply the Likenesses;

3.    A declaratory judgment that Dr. Mandefro may not bring any claims on behalf of other individuals not listed as parties in this Complaint.

4.    An award of its costs and expenses, including reasonable attorneys' fees;

5.    Such other relief as this Court deems just and proper.

Dated: November 19, 2007
       New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
     Darren W. Johnson
     1285 Avenue of the Americas
     New York, New York  10019-6064
     (212) 373-3000

*Attorneys for Plaintiff Pureland Pictures, Inc.*

12

**Exhibit A**

Appearance Release

I, _MEHRET MANDEFRO_ residing at _105 E. 122nd ST APT 2N_ _NY, NY 10035_, hereby cons
and grant to Pureland Pictures, Inc. and its affiliates, licensees, successors and assigns,
permission (1) to take photographs of me and record my voice in connection with the
film currently titled "MEHRET " (2) to put the finished pictures, negatives, reprodu
and copies or the original prints and negatives of me and any sound track recording
recordings which may be made of my voice in any manner deemed proper by Pureland
Pictures used in connection with the exhibition, advertising, promotion, distribution
and/or exploitation of the MEHRET or otherwise.

I agree that Pureland Pictures shall be the exclusive owner of the Likenesses an
Pureland Pictures and its affiliates, licensees, successors and assigns shall have the
throughout the world, in perpetuity, to copyright, to use and to license others to us
any manner in all media now known or hereafter devised, all or any portion thereof
reproduction thereof in connection with MEHRET or otherwise.

In the event of any dispute arising out of or relating to this release, my sole
remedy shall be an action for damages at law. I expressly waive any and all equitab
rights I may have hereunder, including but not limited to any right to enjoin, rescind
terminate or otherwise interfere with the production, distribution and/or exploitation
MEHRET or any other productions based thereon in whole or in part.

Name: _____

Date: _05 / 25 / 05_

# Exhibit 2

Vaughn C. Williams (VW 7990)
Stephanie J. Kamerow (SK 6921)
Michael Ridgway Jones (MJ 9200)
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Defendant Mehret Mandefro

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| **PURELAND PICTURES, INC.,** | : | |
| **Plaintiff,** | : | |
| | : | **07 Civ. 10448 (LAP)** |
| v. | : | **ECF Case** |
| **MEHRET MANDEFRO,** | : | **Electronically Filed** |
| **Defendant.** | : | **ANSWER** |
| | : | |

---

Defendant Mehret Mandefro, by and through her undersigned counsel, hereby answers the Complaint of Plaintiff Pureland Pictures, Inc. ("Pureland") as follows:

<u>Nature of the Action</u>

1.      Defendant denies the allegations of paragraph 1 of the Complaint, except admits that Pureland is the plaintiff herein, and Dr, Mandefro, a Harvard-trained physician has been named as the defendant.

2.      Defendant states that the allegations of paragraph 2 of the Complaint are descriptions of the claims asserted by plaintiff in this action as to which no responsive pleading is required.

**The Parties**

3.  Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 3 of the Complaint and therefore denies the same.

4.  Defendant admits the allegations of paragraph 4 of the Complaint.

**Jurisdiction and Venue**

5.  Defendant admits the allegations of paragraph 5 of the Complaint.

6.  Defendant admits the allegations of paragraph 6 of the Complaint for jurisdictional purposes only.

7.  Defendant admits the allegations of paragraph 7 of the Complaint.

**Background**

8.  Defendant admits the allegations of paragraph 8 of the Complaint.

9.  Defendant denies the allegations of paragraph 9 of the Complaint.

10. Defendant denies the allegations of paragraph 10 of the Complaint.

11. Defendant admits the allegations of paragraph 11 of the Complaint.

12. Defendant denies the allegations of paragraph 12 of the Complaint.

13. Defendant denies the allegations of the first and second sentences of paragraph 13 of the Complaint. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the third and fourth sentences of paragraph 13 of the Complaint and therefore denies the same.

14. Defendant denies the allegations of paragraph 14 of the Complaint.

15.    Defendant denies the allegations of paragraph 15 of the Complaint, except admits that Pureland presented Defendant with the document attached as Exhibit A to the Complaint.

16.    Defendant denies the allegations of paragraph 16 of the Complaint, except admits that she signed the document attached as Exhibit A to the Complaint and refers to that document for the true and correct contents thereof.

17.    Defendant denies the allegations of paragraph 17 of the Complaint and refers to the document attached as Exhibit A to the Complaint for the true and correct contents thereof.

18.    Defendant admits the allegations of paragraph 18 of the Complaint, except denies that she agreed to or authorized the inclusion in the Film of each and every instance filmed by Pureland.

19.    Defendant denies the allegations of paragraph 19 of the Complaint.

20.    Defendant denies the allegations of paragraph 20 of the Complaint, except admits that the filming included Defendant's treatment of her patients and Defendant's trip to Ethiopia as a part of her residency.

21.    Defendant denies the allegations of paragraph 21 of the Complaint.

22.    Defendant denies the allegations of paragraph 22 of the Complaint.

23.    Defendant denies the allegations of paragraph 23 of the Complaint, except admits that during Defendant's counseling sessions with her patients, they stated that their partners had not always used condoms and that they did not feel comfortable insisting on condom usage.

24.    Defendant denies the allegations of paragraph 24 of the Complaint.

25.    Defendant denies the allegations of the first two sentences of paragraph 25 of the Complaint. With respect to the third sentence of paragraph 25 of the Complaint, Defendant lacks knowledge or information sufficient as to the truth or falsity of the allegations contained therein and therefore denies the same.

26.    Defendant denies the allegations of paragraph 26 of the Complaint, except admits that her former boyfriend was neither a medical worker nor an HIV patient.

27.    Defendant admits that Ms. Abt filmed Defendant in certain settings outside of the medical field, except denies that Defendant consented to or authorized the inclusion in the Film of each and every such scene. Defendant denies the remaining allegations of paragraph 27 of the Complaint.

28.    Defendant denies the allegations of paragraph 28 of the Complaint, except admits that she has focused her career on preventing the spread of HIV in the African-American community.

29.    Defendant denies the allegations of the first sentence of paragraph 29 of the Complaint. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the second and third sentences of paragraph 29 of the Complaint and therefore denies the same.

30.    Defendant denies the allegations of paragraph 30 of the Complaint.

31.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of paragraph 31 of the Complaint and therefore denies the same. Defendant denies the remaining allegations of paragraph 31 of the Complaint, except admits that Ms. Abt sent to defendant an e-mail

concerning the contents of the film, and refers to the e-mail for the true and correct contents thereof.

32.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 32 of the Complaint and therefore denies the same.

33.    Defendant denies the allegations of paragraph 33 of the Complaint.

34.    Defendant denies the allegations of paragraph 34 of the Complaint, except admits that her counsel sent Pureland a cease and desist letter on October 22, 2007 and refers to that letter for the true and correct contents thereof.

35.    Defendant denies the allegations of paragraph 35 of the Complaint.

36.    Defendant denies the allegations of paragraph 36 of the Complaint, except refers to the contents of the cease and desist letter for the true and correct contents thereof.

37.    Defendant denies the allegations of paragraph 37 of the Complaint.

38.    Defendant denies the allegations of paragraph 38 of the Complaint.

## FIRST CLAIM
### (For Declaratory Judgment)

39.    Defendant repeats and realleges her responses to the allegations of paragraphs 1-38 of the Complaint as if fully set forth herein.

40.    Defendant denies the allegations of paragraph 40 of the Complaint.

41.    Defendant admits the allegations of the second sentence of paragraph 41 of the Complaint.  Defendant denies the allegations of the first sentence of paragraph 41 of the Complaint and states that the allegations of the third sentence of paragraph 41 of the complaint are legal conclusions to which no response is required.

5

42.    Defendant denies the allegations of paragraph 42 of the Complaint.

43.    Defendant denies the allegations of paragraph 43 of the Complaint, except admits that the parties reached an oral agreement in 2004.

44.    Defendant denies the allegations of paragraph 44 of the Complaint.

45.    Defendant denies the allegations of the first sentence of paragraph 45. Defendant further states that the allegations of the second sentence of paragraph 45 are legal conclusions to which no response is required.

46.    Defendant states that the allegation of paragraph 46 is a legal conclusion to which no response is required.

47.    Defendant denies the allegations of paragraph 47 of the Complaint and further states that paragraph 47 purports to set forth the relief requested in the Complaint and that therefore no response is required.

## AFFIRMATIVE DEFENSES

1.    The Complaint fails to state a claim upon which relief may be granted.

Dated: February 13, 2008
   New York, New York

       Vaughn C. Williams (VW 7990)
       Stephanie J. Kamerow (SK 6921)
       Michael Ridgway Jones (MJ 9200)
       Four Times Square
       New York, New York 10036-6522
       (212) 735-3000

       By:  /s/ Stephanie J. Kamerow
         Stephanie J. Kamerow

       Attorneys for Defendant Mehret Mandefro

# Exhibit 3

Vaughn C. Williams
Stephanie J. Kamerow
Michael Ridgway Jones
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Defendant/Counterclaim-Plaintiff Mehret Mandefro

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

| | |
|---|---|
| **PURELAND PICTURES, INC.,** | : |
| | : |
| **Plaintiff/Counterclaim-Defendant,** | :     **07 Civ. 10448 (LAP)** |
| **v.** | :     **ECF Case** **Electronically Filed** |
| **MEHRET MANDEFRO,** | : |
| **Defendant/Counterclaim-Plaintiff.** | :     **AMENDED ANSWER AND** **COUNTERCLAIMS** |
| | : |
| | : |

———————————————————————

## AMENDED ANSWER

Defendant/Counterclaim-Plaintiff Mehret Mandefro ("Dr. Mandefro"), by

and through her undersigned counsel, hereby answers the Complaint of

Plaintiff/Counterclaim-Defendant Pureland Pictures, Inc. ("Pureland") as follows:

### Nature of the Action

1.    Defendant denies the allegations of paragraph 1 of the Complaint,

except admits that Pureland is the plaintiff herein, and Dr, Mandefro, a Harvard-trained

physician has been named as the defendant.

2.    Defendant states that the allegations of paragraph 2 of the Complaint are descriptions of the claims asserted by plaintiff in this action as to which no responsive pleading is required.

### The Parties

3.    Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 3 of the Complaint and therefore denies the same.

4.    Defendant admits the allegations of paragraph 4 of the Complaint.

### Jurisdiction and Venue

5.    Defendant admits the allegations of paragraph 5 of the Complaint.

6.    Defendant admits the allegations of paragraph 6 of the Complaint for jurisdictional purposes only.

7.    Defendant admits the allegations of paragraph 7 of the Complaint.

### Background

8.    Defendant admits the allegations of paragraph 8 of the Complaint.

9.    Defendant denies the allegations of paragraph 9 of the Complaint.

10.    Defendant admits the allegations of the first sentence of paragraph 10 of the Complaint. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of paragraph 10 of the Complaint and therefore denies the same.

11.    Defendant admits the allegations of paragraph 11 of the Complaint.

12.    Defendant denies the allegations of paragraph 12 of the Complaint.

13.    Defendant denies the allegations of the first and second sentences of paragraph 13 of the Complaint.  Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the third and fourth sentences of paragraph 13 of the Complaint and therefore denies the same.

14.    Defendant denies the allegations of paragraph 14 of the Complaint.

15.    Defendant denies the allegations of paragraph 15 of the Complaint, except admits that Pureland presented Defendant with the document attached as Exhibit A to the Complaint.

16.    Defendant denies the allegations of paragraph 16 of the Complaint, except admits that she signed the document attached as Exhibit A to the Complaint and refers to that document for the true and correct contents thereof.

17.    Defendant denies the allegations of paragraph 17 of the Complaint and refers to the document attached as Exhibit A to the Complaint for the true and correct contents thereof.

18.    Defendant admits the allegations of paragraph 18 of the Complaint, except denies that she agreed to or authorized the inclusion in the Film of each and every instance filmed by Pureland.

19.    Defendant denies the allegations of paragraph 19 of the Complaint.

20.    Defendant denies the allegations of paragraph 20 of the Complaint, except admits that the filming included Defendant's treatment of her patients and Defendant's trip to Ethiopia as a part of her residency.

21.    Defendant denies the allegations of paragraph 21 of the Complaint.

22.    Defendant denies the allegations of paragraph 22 of the Complaint.

3

23.     Defendant denies the allegations of paragraph 23 of the Complaint except admits that during Defendant's counseling sessions with her patients, they stated that their partners had not always used condoms and that they did not feel comfortable insisting on condom usage.

24.     Defendant denies the allegations of paragraph 24 of the Complaint.

25.     Defendant denies the allegations of the first two sentences of paragraph 25 of the Complaint.  With respect to the third sentence of paragraph 25 of the Complaint, Defendant lacks knowledge or information sufficient as to the truth or falsity of the allegations contained therein and therefore denies the same.

26.     Defendant denies the allegations of paragraph 26 of the Complaint except admits that her former boyfriend was neither a medical worker nor an HIV patient.

27.     Defendant admits that Pureland filmed Defendant in certain scenes outside of the medical field, except denies that Defendant consented to or authorized the inclusion in the Film of each and every such scene.  Defendant denies the remaining allegations of paragraph 27 of the Complaint.

28.     Defendant denies the allegations of paragraph 28 of the Complaint except admits that she has focused her career on preventing the spread of HIV in the African-American community.

29.     Defendant denies the allegations of the first sentence of paragraph 29 of the Complaint.  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the second and third sentences of paragraph 29 of the Complaint and therefore denies the same.

30.     Defendant denies the allegations of paragraph 30 of the Complaint

4

31.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of paragraph 31 of the Complaint and therefore denies the same.  Defendant denies the remaining allegations of paragraph 31 of the Complaint, except admits that Ms. Abt sent to defendant an e-mail concerning the contents of the film, and refers to the e-mail for the true and correct contents thereof.

32.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 32 of the Complaint and therefore denies the same.

33.    Defendant denies the allegations of paragraph 33 of the Complaint.

34.    Defendant denies the allegations of paragraph 34 of the Complaint, except admits that her counsel sent Pureland a cease and desist letter on October 22, 2007 and refers to that letter for the true and correct contents thereof.

35.    Defendant denies the allegations of paragraph 35 of the Complaint.

36.    Defendant denies the allegations of paragraph 36 of the Complaint.

37.    Defendant denies the allegations of paragraph 37 of the Complaint.

38.    Defendant denies the allegations of paragraph 38 of the Complaint.

### FIRST CLAIM
### (For Declaratory Judgment)

39.    Defendant repeats and realleges her responses to the allegations of paragraphs 1-38 of the Complaint as if fully set forth herein.

40.    Defendant denies the allegations of paragraph 40 of the Complaint.

41.    Defendant admits the allegations of the first and second sentences of paragraph 41 of the Complaint.  Defendant states that the allegations of the third sentence of paragraph 41 of the Complaint are legal conclusions to which no response is required.

42.    Defendant denies the allegations of paragraph 42 of the Complaint.

43.    Defendant denies the allegations of paragraph 43 of the Complaint, except admits that the parties reached an oral agreement in 2004.

44.    Defendant denies the allegations of paragraph 44 of the Complaint.

45.    Defendant denies the allegations of paragraph 45 of the Complaint.

46.    Defendant states that the allegation of paragraph 46 of the Complaint is a legal conclusion to which no response is required.

47.    Defendant denies the allegations of paragraph 47 of the Complaint and further states that paragraph 47 purports to set forth the relief requested in the Complaint and that therefore no response is required.

## AFFIRMATIVE DEFENSES

The Complaint fails to state a claim upon which relief may be granted.

**COUNTERCLAIMS**

Defendant/Counterclaim-Plaintiff Mehret Mandefro ("Dr. Mandefro"), by

and through her undersigned counsel, for her counterclaims against

Plaintiff/Counterclaim-Defendant Pureland Pictures, Inc. ("Pureland") alleges upon

personal knowledge with respect to herself and her own acts, and upon information and

belief as to all other matters, as follows:

**Nature of the Claims**

1.    By using Dr. Mandefro's likeness, voice, and medical research

without her authorization, Pureland has breached agreements it reached with Dr.

Mandefro in 2004, 2006 and 2007.  In doing so, Pureland has violated Dr. Mandefro's

right of privacy and right of publicity, has misappropriated her research, has engaged in

false advertising with respect to the film currently entitled "All of Us" (the "Film"), and

has unjustly enriched itself at Dr. Mandefro's expense, thereby causing Dr. Mandefro

damages to be determined at trial.  Moreover, by continuing to promote, distribute, and

exhibit the Film, Pureland has caused and will continue to cause irreparable harm to Dr.

Mandefro's standing in the medical community and to her personal reputation.

**The Parties**

2.    Dr. Mehret Mandefro is an Ethiopian-born, Harvard-trained

physician who has devoted her life and work to researching the causes of, and advocating

solutions to, the epidemic of HIV/AIDS among African American women.

3.    Dr. Mandefro is currently a Robert Wood Johnson Health and

Society Scholar at the University of Pennsylvania and, along with Dr. Manel Silva, is the

founder of TruthAIDS, a New York-based non-profit organization dedicated to

7

promoting gender equity within relationships as an HIV-prevention strategy, with a particular focus on African American women affected by, and at risk for, HIV/AIDS.

4.     During the creation of the Film, Dr. Mandefro was completing her internal medicine residency at Montefiore Medical Center ("Montefiore") in the South Bronx.

5.     Upon information and belief, Pureland is a film production company based in Brooklyn, New York.  Upon information and belief, Emily Abt is the founder of Pureland, which is co-owned by Ms. Abt and Reva Goldberg.

6.     Dr. Mandefro met Ms. Abt while Dr. Mandefro was a Fulbright Scholar in 2002-2004 studying for, and ultimately receiving, a Masters of Science in the Public Health of Developing Countries at the London School of Hygiene and Tropical Medicine.

## Jurisdiction and Venue

7.     Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. § 1332(a).  There is diversity between Pureland, upon information and belief, a New York corporation with its principal place of business in New York, and Dr. Mandefro, a citizen of Pennsylvania.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over both parties because the Film was primarily filmed in New York, Dr. Mandefro was living in New York during filming, and, upon information and belief, Pureland has been based in New York throughout the production of the Film.

9.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the Counterclaims occurred in this judicial district.

### The Film

10.    Over the course of the summer of 2004, Ms. Abt approached Dr. Mandefro numerous times about making a film that would follow Dr. Mandefro in her work as a resident at Montefiore as she embarked on a research project investigating the heterosexual transmission of HIV in African American women.  Ms. Abt was at this time one of Dr. Mandefro's closest friends, and Dr. Mandefro trusted her.

11.    Dr. Mandefro repeatedly advised Ms. Abt that she was not interested in the film proposal because of the privacy and ethical concerns associated with disclosing the details of medical care provided at Montefiore.  Dr. Mandefro only agreed to consider making the Film after Pureland (i) satisfied her and Montefiore's concern about patient privacy and confidentiality issues; (ii) promised Dr. Mandefro that Dr. Mandefro could use the Film as a platform to teach about HIV/AIDS and advocate for treatment of the disease; and (iii) committed that the Film would accurately represent what Dr. Mandefro's research revealed about why the incidence of HIV/AIDS was so alarmingly high in the African American female community.

12.    In 2004, in reliance upon the foregoing promises, Dr. Mandefro entered into an oral agreement with Pureland which, among other things, conveyed to Pureland a limited license to use Dr. Mandefro's name and likeness in connection with a film to be entitled "Mehret."

9

13.    This license was expressly conditioned on Pureland's agreement that: (i) the Film would be used for educational, charitable, and legislative advocacy purposes, not for Pureland's commercial gain; (ii) the focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same; (iii) the Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission; (iv) the Film would not contain confidential personal information about Dr. Mandefro's patients, or Dr. Mandefro's patient-physician relationship with those patients, without Dr. Mandefro's express permission; and (v) the Film would not be displayed, distributed, or viewed in any public forum without Dr. Mandefro's express approval of the final edited version.

14.    Before the project began, Dr. Mandefro and Ms. Abt met with Dr. Mandefro's supervisor and Chairman of the Department of Family Medicine at Montefiore, Dr. Peter Selwyn, to discuss the Film and obtain his permission to begin filming at Montefiore, and specifically to film Montefiore patients.  Ms. Abt expressly represented to Dr. Selwyn that the Film would be used for educational purposes, that it could be used by Dr. Mandefro as a part of her residency program, and that the Film would not disclose confidential information about Montefiore patients, or about Dr. Mandefro's patient-physician relationship with those patients, without Dr. Mandefro's express approval.

15.    Dr. Selwyn only approved the filming of Dr. Mandefro's research because of, and subject to, the representations made by Ms. Abt.

10

16.    Pursuant to hospital policy, Dr. Mandefro and Ms. Abt also met with Montefiore's Office of Public Relations prior to filming.  Again, Ms. Abt represented to Montefiore's senior personnel that the Film would be used for educational purposes as a part of Dr. Mandefro's residency research program.

17.    Montefiore's public relations personnel only approved the filming of Dr. Mandefro's research because of, and subject to, the representations made by Ms. Abt.

18.    After obtaining Montefiore's permission to begin filming, Dr. Mandefro personally enlisted a number of her teachers and mentors to serve on the Film's advisory board as an extension of Dr. Mandefro's research.  These advisors had no connection with Pureland apart from Dr. Mandefro.

19.    Consistent with the Film's educational purpose, a 2006 press kit used to promote the Film, a 2006 letter to the Film's advisory board, and the Film's 2006 trailer all stressed that the Film's focus was on Dr. Mandefro's research, not her personal and/or sexual relationships, or those of her patients.

20.    After discussions about the Film with an HIV social worker at the Montefiore clinic where Dr. Mandefro was conducting her research, in January 2005, the social worker brought to Dr. Mandefro's attention Tara Stanley and Chevelle Wilson, the two HIV-positive patients who ultimately became subjects of the Film.

21.    Dr. Mandefro met with each patient separately, introduced them to her research project, and discussed with them the possibility of their being filmed in connection with her research.  Ms. Stanley and Ms. Wilson both told Dr. Mandefro that they were willing to participate because both saw the Film as an opportunity to teach others about the disease and its prevalence among African American women.  Both Ms.

Stanley and Ms. Wilson agreed to participate based on their understanding that Dr. Mandefro had the right to review and approve any footage containing confidential patient information and would therefore be able to ensure that any footage problematic to them would not be included in the final version of the Film.

      22.    Ms. Stanley died in July 2006.

      23.    Dr. Mandefro suggested which scenes should be filmed to further advance the educational message of the Film and to accurately reflect the ongoing results of her research.  To this end, Dr. Mandefro selected the patients to be filmed, arranged specific shoots, and engaged the scholars to be interviewed for the Film.

      24.    All of the scholars and advisors engaged by Dr. Mandefro to work on the Film were told by Dr. Mandefro and/or Ms. Abt that the Film was a part of Dr. Mandefro's research and would be used for educational and advocacy purposes, and, upon information and belief, it was on this basis that the scholars and advisors agreed to participate in the Film.

### Pureland's Pattern of Deception

      25.    As set forth below, Ms. Abt and Pureland betrayed Dr. Mandefro's trust on more than one occasion.

      26.    On May 5, 2005—seven months into filming—Ms. Abt presented Dr. Mandefro with a document entitled "Appearance Release" (the "2005 Release") (attached as Exhibit A to Pureland's Complaint).  When asked by Dr. Mandefro why it was necessary for her to sign the release, Ms. Abt expressly represented to Dr. Mandefro that it would have no effect on, and indeed was consistent with, the parties' original 2004 agreement—the agreement used to obtain Dr. Mandefro's agreement to the filming, and

12

Montefiore's approval of same—and, indeed, specifically reiterated Pureland's commitment to abide by the terms of the 2004 agreement.

27.    Given their friendship, Dr. Mandefro trusted Ms. Abt's representations, and signed the Release.

28.    Neither the 2005 Release nor the parties' 2004 agreement imposed any obligation on Dr. Mandefro to complete, or indeed even to continue her participation in, the Film should she choose at any time not to do so.

### Content of the Film

29.    During one filming session in 2006, Ms. Stanley disclosed to Ms. Abt that her mother had prostituted her for many years. As is standard with respect to documentary filming, the camera was rolling at all times. This was a very private, family secret that was not to be revealed. Ms. Stanley, very ill at the time, was overwhelmed by emotions during the filming when she disclosed this and almost immediately deeply regretted doing so.

30.    Later that day, Dr. Mandefro received a call from Ms. Stanley and her home health aide requesting that this very painful disclosure not be included in the Film. Dr. Mandefro immediately raised this issue with both Ms. Abt and Ms. Goldberg, co-owners of Pureland. Pureland acknowledged Dr. Mandefro's right under the parties' agreement to prohibit the inclusion of certain confidential patient information and agreed to honor Dr. Mandefro's direction and Ms. Stanley's request to remove this footage.

31.    Moreover, Ms. Abt and Ms. Goldberg repeated this promise to Ms. Stanley before she died. Ms. Stanley's home health aide was also present on this occasion. In fact, in a letter sent to the Film's "former and current advisors," including

13

Dr. Selwyn, Pureland stated that "we gave Tara our word that the specific piece of footage that bothered her would not make it into the final cut of the film, and we honored that word."

32.    Contrary to the parties' agreements that Dr. Mandefro had the right to review and approve the Film in its final form, Pureland's promises to Ms. Stanley prior to her death, and its earlier representations to Dr. Mandefro and the Film's advisors, this footage appears in the current version of the Film, which, as noted below, has been shown to selection committees of several film festivals and, indeed, to a general audience at at least one such film festival.

33.    On another occasion in early 2006, Dr. Mandefro invited her friends, including fellow Montefiore residents, to participate in a "Truth Circle" in her home to test out some of the key ideas underlying her research.  Ms. Abt was invited to participate as a friend, but not to film the Truth Circle because of the sexually explicit nature of some of the discussions that were to be shared.

34.    After considerable pressure from Ms. Abt, the participants ultimately agreed to be filmed, but only after agreeing that the footage taken would not be included in the Film unless or until each participant had viewed and specifically approved (or disapproved) the footage that Ms. Abt proposed to include.

35.    Ms. Abt agreed to this condition, and filming began.  The Truth Circle proved to be very emotional, and several women shared rape histories and other sexually explicit information.

36.    After the Truth Circle concluded, Ms. Abt tried to force participants into signing releases that would allow their revelations to be included in the Film.  The

14

participants were offended and insulted by Ms. Abt's behavior, as was Dr. Mandefro, who commented on the unethical nature of Ms. Abt's proposal. Dr. Mandefro became very concerned about subjecting her friends, family, and professional colleagues to the Film project in light of Ms. Abt's behavior.

37.    As a result, in March 2006, Dr. Mandefro withdrew from the project and cancelled an upcoming trip to Ethiopia that she and Ms. Abt had planned.

38.    Desperate to induce Dr. Mandefro to resume her participation in the Film, in May 2006, Ms. Abt asked Dr. Mandefro on what terms she would rejoin the project. Dr. Mandefro made it clear that she would resume her participation only if Ms. Abt agreed that Pureland would abide by each of the terms agreed to by the parties in 2004.

39.    In return for Dr. Mandefro's agreement to renew her participation in the Film, Ms. Abt expressly agreed to the same terms agreed upon by the parties in 2004, namely that (i) the Film would be used for educational, charitable, and legislative advocacy purposes, not solely for Pureland's commercial gain; (ii) the focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same; (iii) the Film would not contain any footage concerning Dr. Mandefro's personal life, without Dr. Mandefro's express permission; (iv) the Film would not contain confidential personal information about Dr. Mandefro's patients, or Dr. Mandefro's patient-physician relationship with those patients, without Dr. Mandefro's express permission; and (v) the Film would not be displayed, distributed, or viewed in any public

forum without Dr. Mandefro's express approval of the final edited version (the "2006 Agreement").

## The Trip to Ethiopia

40.    As noted, Dr. Mandefro was born in Ethiopia, and many members of her family still live there.

41.    As a result of her background and her work, Dr. Mandefro has over the years developed personal and professional contacts with healthcare professionals in Ethiopia, particularly those specializing in the treatment and prevention of HIV/AIDS.

42.    Although Ms. Abt expressed an interest in the Ethiopian storyline throughout the filming, Dr. Mandefro repeatedly cautioned her about drawing parallels in the Film between Dr. Mandefro's patients' situations and those of Ethiopian women, given that frank disclosure of sexual behavior and practices would be taboo in Ethiopian culture.

43.    For example, during the course of Dr. Mandefro's work, she had discovered an Ethiopian non-governmental organization, Mary Joy Aid, as a potential partner in the implementation of her ideas.  Mary Joy Aid is headed by a devoutly Christian nurse, Sister Zebider Zewdie.  Ms. Abt persuaded Dr. Mandefro that the Film would showcase Sister Zebider's efforts and promised that the Film would be respectful of Ethiopian cultural norms respecting sexual behavior and practices.

44.    Although it was clear that Ms. Abt understood the importance of Ethiopian cultural sensitivities regarding sexual behavior, she ignored her earlier promises to Dr. Mandefro and included material in the final version of the Film that is culturally inappropriate and offensive to Ethiopian norms—once again, in clear violation

16

of the parties' agreement that Dr. Mandefro had the right to review and approve the final

edit of the Film. Because of the Film's current content, Dr. Mandefro is in grave danger

of losing a working relationship with Mary Joy Aid and Sister Zebider.

45.    The Film was heavily promoted and advertised within the Ethiopian-

American community. In fact, the Ethiopian ambassador to the United States was present

at a screening of the Film's trailer in Washington, D.C. where Dr. Mandefro spoke on a

panel about her work. As noted, at that time the trailer presented the Film as an extension

of Dr. Mandefro's research and did not include details of Dr. Mandefro's or her patients'

personal relationships.

46.    Based on this panel discussion and the trailer itself, the Ethiopian-

American community believed, and presumably still believes, that the Film is solely

about Dr. Mandefro's work, and not replete with details of Dr. Mandefro's personal life

that would offend the Ethiopian-American community and dishonor Dr. Mandefro's

family.

### Pureland Breaches the Parties' Agreements

47.    As noted, Dr. Mandefro's sole reason for agreeing in 2004 to

participate in the Film was that the Film would be used for educational and advocacy

purposes. Pureland was well aware of this.

48.    As also noted, in 2006 Pureland induced Dr. Mandefro to resume

participation in the Film by, among other things, promising that the Film would be used

for educational purposes and would be focused on Dr. Mandefro's research, i.e., that

Pureland would abide by the same terms previously agreed to in 2004.

49.     Beginning in early 2007, Dr. Mandefro asked Pureland to make the Film available for lobbying and educational purposes, as agreed, but Pureland refused. In fact, Pureland even refused to give Dr. Mandefro access to the Film to use in connection with her final residency presentation in June 2007.

50.     These acts, which violated the very basis of the agreements between the parties, together with Ms. Abt's previous behavior caused Dr. Mandefro to become increasingly concerned that the final version of the Film would misrepresent her research and damage her reputation within the relevant field of medical and social work professionals. Accordingly, in early 2007, Dr. Mandefro requested a meeting between herself and Dr. Silva and Ms. Abt and Ms. Goldberg of Pureland to discuss these concerns. Ms. Abt refused to attend. Only Ms. Goldberg met with Dr. Mandefro and Dr. Silva.

51.     At the meeting, Dr. Mandefro and Dr. Silva discussed the importance of how the Film would address structural processes of violence, addiction, and racism, all of which contribute to the spread of HIV/AIDS among African American women. They also reiterated their concern that, by omitting discussion of these issues and focusing instead on the personal storylines, the Film risked distorting the message of Dr. Mandefro's research. Ms. Goldberg's response to their concerns was that they "didn't have to like the film."

52.     Dr. Mandefro and Dr. Silva again noted the importance of these structural factors and reminded Ms. Goldberg of interest in the Film expressed by policymakers as evidenced by the discussion and trailer screening held in Washington, D.C. Once again, Ms. Goldberg responded that they "didn't have to like the film,"

18

despite Dr. Mandefro's express right under the parties' agreements to review and approve the final edited version of the Film.

53.    Pureland advised Dr. Mandefro that a version of the Film focused primarily on Dr. Mandefro's research would not be commercially successful, thus causing Pureland to breach its agreements with Dr. Mandefro by creating a version of the Film that emphasized the personal storylines of Dr. Mandefro and her patients at the expense of the Film's intended educational message.

54.    Based on these clear breaches of the parties' agreements, Dr. Mandefro withdrew for a second time from the project in early 2007.  At a meeting shortly thereafter in May 2007 requested by Ms. Abt and Ms. Goldberg and attended by Ms. Abt and Ms. Goldberg, a senior member of the production team, and Dr. Manel Silva, the co-founder with Dr. Mandefro of the TruthAIDS organization, Dr. Mandefro once again vigorously expressed her concern that the Film's original educational and policy focus had been lost in the drive to emphasize Dr. Mandefro's and her patients' personal relationships.

55.    Dr. Mandefro only agreed to rejoin the project on the condition that this original focus be restored and on the further condition that the Film, as previously agreed to by Pureland, would not be displayed, distributed, or viewed in any public forum without Dr. Mandefro's express approval of the final edited version of the Film, especially given the Film's potential impact on Dr. Mandefro's work and professional reputation.

56.    Ms. Abt again expressly promised that Pureland would abide by these terms, and Dr. Mandefro agreed to rejoin the project.

19

57.    However, Dr. Mandefro soon became increasingly worried that this commitment, too, was being disregarded by Pureland. She received reports from a senior member of the production team that Pureland had persisted in emphasizing the personal "storyline," thus distorting and misrepresenting the Film's original message. The senior member of the production team repeatedly expressed her disagreement with Pureland's actions and insisted that Pureland show the Film to Dr. Mandefro as promised.

58.    Upon information and belief, this senior member of the production team discontinued her involvement with Pureland and the project due to Pureland's failure to live up to the terms of the parties' agreement.

59.    Dr. Mandefro again repeatedly asked Pureland for an opportunity to review the Film, particularly because the Film's trailer had been submitted as a part of her application to the Robert Wood Johnson program and the program would require her to provide an update on the status of the Film in connection with her fellowship at the University of Pennsylvania, which was scheduled to begin in September 2007.

60.    Pureland did not permit Dr. Mandefro to view the Film until November 2007.

61.    When Dr. Mandefro was finally allowed to view the Film, she was appalled by its distortion of the educational message of her research due to its emphasis on the personal storylines that were never intended to be the focus of the Film, and the inclusion of which was a clear breach of the parties' agreements. She was also troubled by the Film's omission of any discussion of structural factors, like inner-city poverty and sexual abuse, which her research had determined contributed in no small measure to the spread of HIV/AIDS among the African American female community. Indeed, footage

addressing such structural factors had been filmed at Dr. Mandefro's direction, including several interviews with well-respected scholars in the field, but this footage had been omitted from this version of the Film.

62.    Upon information and belief, Pureland has submitted the Film to a number of U.S. and non-U.S. film festivals and has advertised and promoted the Film in that connection, all without Dr. Mandefro's first having had an opportunity to review and approve the final edited version of the Film, as required by the parties' agreements.

63.    Upon information and belief, the Film was rejected by the Sundance Film Festival in November 2007.

64.    The Film was recently accepted by the Cleveland International Film Festival, and, upon information and belief, it was shown there on March 15-16, 2008.

65.    Again, this was done without Dr. Mandefro's knowledge or authorization.

### Harm Caused by Pureland's Acts

66.    As noted, the Film in its current form is marred by the inclusion of personal material that not only directly breaches the parties' agreements, but that also damages the Film's effectiveness as an educational tool by seriously misrepresenting and distorting Dr. Mandefro's research.  Most significantly, the Film reduces the problem of the HIV/AIDS epidemic in African American women to personal relationships without paying sufficient attention to the structural factors (e.g., poverty, abuse of women, and related problems) contributing to this epidemic, especially the history of the South Bronx, factors explored by Dr. Mandefro's research and the research of others and which Dr. Mandefro had explained to Pureland were necessary to include in the Film.

21

67.    For example, Dr. Mindy Fullilove has explored the significance of the burning of the South Bronx and the crack epidemic in that community in connection with the spread of HIV. An interview with Dr. Fullilove, although filmed by Pureland, was ultimately cut from the Film.

68.    Another example of this oversimplification is the scene showing a coroner's report concluding that Ms. Stanley died of a probable drug overdose, but with no discussion of the drug epidemic in inner-city communities like Ms. Stanley's. Without an exploration of the structural factors that are at the heart of the epidemic, the scene frames the issue in a very irresponsible, and ultimately harmful, way.

69.    This distortion of Dr. Mandefro's research does a great disservice the communities she seeks to help and undermines her reputation and credibility as a researcher who has been viewed as understanding these issues.

70.    Pureland's desperation to make the Film commercially saleable appears to explain its decision to feature so prominently Dr. Mandefro's personal Mandefro never gave Ms. Abt or Pureland permission to include these very personal scenes in the Film. In fact, with respect to a number of these scenes, Ms. Abt represented to Dr. Mandefro that she was filming them only to make Dr. Mandefro more comfortable in front of the camera. Dr. Mandefro would never have allowed Ms. Abt to record these intimate conversations if she had known that they would be included in the Film and would be emphasized so heavily in the Film's promotion and advertisement.

71.    More importantly, the inclusion of these personal scenes, with scant attention paid to the structural factors already discussed, is disrespectful to the experiences of Ms. Stanley, Ms. Wilson and other women in a similar situation. Any

22

attempt to align Dr. Mandefro's upper middle class experiences with those of Ms. Stanley and Ms. Wilson without any structural analysis only serves to trivialize the problems faced by African American women who deal with poverty, violence and abuse on a daily basis.

72.     Moreover, the emphasis on Dr. Mandefro's personal relationship distorts the message that Dr. Mandefro had hoped that the Film would convey to young African American girls, namely that women should celebrate their own power of self-determination and their own capacity for freedom, particularly as it relates to their physical health.

### FIRST CLAIM
### (Breach of Contract)

73.     Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-72 of the Counterclaims as if fully set forth herein.

74.     Dr. Mandefro entered into an oral agreement with Pureland in 2004 granting Pureland a limited license in connection with the Film.

75.     Under the 2004 agreement, the final version of the Film would be subject to Dr. Mandefro's feedback and ultimate approval.

76.     The 2004 agreement was reiterated and reaffirmed by Pureland in 2006 and in 2007.

77.     By creating, promoting, advertising, and distributing the Film without Dr. Mandefro's approval, Pureland has breached the 2004, 2006 and 2007 agreements.

78.     As a result of Pureland's breach of the 2004, 2006 and 2007 agreements, Dr. Mandefro has been injured in an amount to be determined.  Dr.

23

Mandefro is entitled to the recovery of damages and, in addition, to an award of Pureland's profits from the promotion, distribution, sale, and exhibition of the Film.

79.    Moreover, Dr. Mandefro is without an adequate remedy at law. Pureland's continuing breach of the parties' agreements has irreparably injured Dr. Mandefro.  Dr. Mandefro asks that the Court grant permanent injunctive relief enjoining Pureland from continuing to use Dr. Mandefro's likeness and research and, specifically, from promoting, distributing, or exhibiting the Film.

### SECOND CLAIM
### (Breach of the Covenant of Good Faith and Fair Dealing)

80.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-79 of the Counterclaims as if fully set forth herein.

81.    Rather than comply with its contractual obligations under the terms of the 2004, 2006 and 2007 agreements, Pureland has breached the agreements' implied covenant of good faith and fair dealing by failing and refusing to honor its commitment that the Film would be used for educational, lobbying, and legislative purposes and that Dr. Mandefro would have the right to provide feedback on, and ultimately approve, the final version of the Film.

82.    Pureland's actions were undertaken with malice and wanton disregard of Dr. Mandefro's rights.

83.    Dr. Mandefro is entitled to an award of monetary damages in an amount to be determined.  Dr. Mandefro is also entitled to an award of punitive damages in an amount according to proof.

24

**THIRD CLAIM**
**(Invasion of Right of Privacy)**

84.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-84 of the Counterclaims as if fully set forth herein.

85.    Pureland's use of Dr. Mandefro's name and likeness both in the Film and in connection with its advertisement, marketing and promotion as set forth above was done, at least in part, in the State of New York and was done without Dr. Mandefro's written consent in violation of New York Civil Rights Law § 51.

86.    As a direct and proximate result of Pureland's use of Dr. Mandefro's name and likeness without the requisite consent, Dr. Mandefro has been damaged in an amount to be determined.

87.    Dr. Mandefro further alleges upon information and belief that Pureland's use of her name and likeness without the requisite consent was accomplished with the knowledge that it was unlawful and for the purpose of damaging her, or with reckless indifference to such damage, thus entitling Dr. Mandefro to exemplary damages.

88.    Dr. Mandefro has suffered and will continue to suffer irreparable harm as a result of Pureland's conduct for which there is no adequate remedy at law.

**FOURTH CLAIM**
**(Violation of Right of Publicity)**

89.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-88 of the Counterclaims as if fully set forth herein.

90.    The publicity rights of Dr. Mandefro are valuable, and the right to use and license others to use these rights belongs exclusively to Dr. Mandefro.

25

91.    Because Pureland has breached the agreements entered into by the parties, and the limited license granted therein, it does not have Dr. Mandefro's consent to use her name and likeness in connection with the Film and, therefore, has no entitlement to use such likeness.

92.    By using Dr. Mandefro's publicity rights without her consent, Pureland has misappropriated her name and likeness for commercial benefit.

93.    As a result of Pureland's misappropriation of Dr. Mandefro's publicity rights, Dr. Mandefro has been injured in an amount to be determined.

94.    Pureland's violations are willful and intentional.

95.    Notwithstanding any damages that might be recoverable for these violations, Dr. Mandefro is without an adequate remedy at law.  Pureland's misappropriation of Dr. Mandefro's name and likeness irreparably harms her by depriving her of the right to control the commercial use of her publicity rights, and by potentially diluting the value of those rights by injury to her reputation.  Accordingly, Dr. Mandefro requests that this Court permanently enjoin Pureland from promoting, distributing, selling, offering for sale, or exhibiting the Film to the extent that Dr. Mandefro's name or likeness is used in connection therewith or appears therein.

### FIFTH CLAIM
### (Misappropriation)

96.    Defendant/Counterclaim-Plaintiff repeats and realleges the allegations of paragraphs 1-95 of the Counterclaims as if fully set forth herein.

97.    Pureland has appropriated Dr. Mandefro's name, likeness, and research without her permission and has continued to retain and benefit from that misappropriation.

98.    By reason of the foregoing, Dr. Mandefro has been damaged in an amount to be proven.

99.    By reason of the foregoing, Dr. Mandefro is entitled to punitive damages in an amount to be proven.

100.   Notwithstanding any damages that might be recoverable for these violations, Dr. Mandefro is without an adequate remedy at law. Pureland's misappropriation of Dr. Mandefro's name, likeness, and research irreparably harms her by depriving her of the right to control the commercial use of the same, and by potentially diluting the value of the same by injury to her reputation. Accordingly, Dr. Mandefro requests that this Court permanently enjoin Pureland from promoting, distributing, selling, offering for sale, or exhibiting the Film to the extent that Dr. Mandefro's name, likeness, or research is used in connection therewith or appears therein.

## SIXTH CLAIM
### (False Advertising)

101.   Defendant/Counterclaim-Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-100 of the Counterclaims as if fully set forth herein.

102.   Pureland's false and/or misleading use of Dr. Mandefro's name, likeness, and research in connection with marketing, advertising, and promotion of the Film as alleged herein violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits Pureland from using false and misleading descriptions of fact or representations of fact made in connection with services offered in interstate commerce.

103.   Pureland's various uses of Dr. Mandefro's name, likeness, and research has caused and will continue to cause others to be misled into believing that Dr. Mandefro is associated with the Film or has otherwise authorized Pureland to use her

27

name, likeness, and research in connection with marketing, advertising and promotion

the Film.

104. Moreover, Pureland's numerous false statements regarding the

nature of Dr. Mandefro's research have caused and will continue harm to Dr. Mandefro

personal and professional reputation and will impede her mission to investigate the

causes of the rapid spread of HIV/AIDS among African American and African women

and her efforts to advocate for critical changes in public policy in response to this

epidemic.

105. Pureland's conduct complained of herein is intentional, malicious

and willful.

106. Dr. Mandefro has suffered and will continue to suffer irreparable

harm as a result of Pureland's conduct for which there is no adequate remedy at law

### SEVENTH CLAIM
### (Unjust Enrichment)

107. Defendant/Counterclaim-Plaintiff repeats and realleges the

allegations of paragraphs 1-106 of the Counterclaims as if fully set forth herein.

108. By exploiting Dr. Mandefro's name, likeness, and research without

her permission, Pureland has been, and continues to be, unjustly enriched at Dr.

Mandefro's expense.

109. Pureland's retention of any and all profits, revenues and

consideration that Pureland has received or obtained from exploitation of the Film

without Dr. Mandefro's permission is against equity and good conscience.

28

110. By reason of the foregoing, Dr. Mandefro demands that Pureland disgorge any and all profits, revenues and consideration that Pureland has received or obtained from exploitation of the Film.

WHEREFORE, Dr. Mandefro respectfully requests the entry of Judgment against Plaintiff/Counterclaim-Defendant as follows:

1. Awarding damages to Dr. Mandefro in an amount to be determined;

2. Enjoining Pureland from distributing, advertising, and promoting the Film;

3. Ordering Pureland to withdraw all copies of the Film currently in circulation, including copies submitted for consideration by film festivals in the United States and abroad;

4. Awarding Dr. Mandefro her costs and expenses, including reasonable attorneys' fees; and

5. Ordering such other and further relief as this Court deems just and proper.

Dated: March 24, 2008
New York, New York

          Vaughn C. Williams
          vaughn.williams@skadden.com
          Stephanie J. Kamerow
          stephanie.kamerow@skadden.com
          Michael Ridgway Jones
          michael.jones@skadden.com
          Four Times Square
          New York, New York 10036-6522
          (212) 735-3000

          By:  /s/ Michael Ridgway Jones

          Attorneys for Defendant/Counterclaim-
          Plaintiff Mehret Mandefro

# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- )
PURELAND PICTURES, INC.                                  )
                                                         )
                      Plaintiff,                         )
                                                         )
         v.                                              )
                                                         )
MEHRET MANDEFRO, M.D.                                    )
                                                         )
                      Defendant.                         )
-------------------------------------------------------- )

Docket No.: 07 CV 10448
(LAP) (MHD)

**PLAINTIFF'S ANSWER
AND AFFIRMATIVE
DEFENSES TO
DEFENDANT'S
COUNTERCLAIMS**

        Plaintiff Pureland Pictures, Inc. ("Pureland"), for its answer and

affirmative defenses to Defendant's Counterclaims, states as follows:

        1.      Pureland denies the allegations in Paragraph 1 of the Counterclaims,

except admits that Dr. Mandefro purports to bring this action in the manner described in

the Counterclaims.

        2.      Pureland denies knowledge or information sufficient to form a belief as to

the allegations in Paragraph 2 of the Counterclaims, except, upon information and belief,

admits that Dr. Mandefro is an Ethiopian-born, Harvard-trained physician.

        3.      Pureland admits, on information and belief, the allegations in Paragraph 3

of the Counterclaims.

        4.      Pureland denies the allegations of Paragraph 4 of the Counterclaims,

except admits, upon information and belief, that Dr. Mandefro was completing her

internal medicine residency at Montefiore Medical Center ("Montefiore") in the South

Bronx during some parts of the creation of the Film.

        5.      Pureland admits the allegations of the first sentence of Paragraph 5 of the

Counterclaims.  Pureland denies the allegations of the second sentence of Paragraph 5 of

the Counterclaims, except admits that Emily Abt is the founder of Pureland and admits that Pureland is owned by Ms. Abt.

6.    Pureland admits, upon information and belief, the allegations of Paragraph 6 of the Counterclaims.

7.    Pureland admits the allegations in Paragraph 7 of the Counterclaims.

8.    Pureland admits the allegations in Paragraph 8 of the Counterclaims.

9.    Pureland admits the allegations in Paragraph 9 of the Counterclaims.

10.    Pureland denies the allegations in the first sentence of Paragraph 10 of the Counterclaims, except admits that Ms. Abt and Dr. Mandefro spoke numerous times over the course of the summer of 2004 about making a film about Dr. Mandefro.  Pureland denies knowledge and information sufficient to form a belief as to the allegations in the second sentence of Paragraph 10 of the Counterclaims, except admits that Ms. Abt and Dr. Mandefro were friends at this time.

11.    Pureland denies the allegations in Paragraph 11 of the Counterclaims.

12.    Pureland denies the allegations in Paragraph 12 of the Counterclaims.

13.    Pureland denies the allegations in Paragraph 13 of the Counterclaims.

14.    Pureland denies the allegations in the first sentence of Paragraph 14 of the Counterclaims, except admits that Dr. Mandefro and Ms. Abt met with Dr. Peter Selwyn to discuss the Film and obtain permission to begin filming at Montefiore and to film Montefiore patients.  Pureland denies the allegations in the second sentence of Paragraph 14 of the Counterclaims, except admits that Ms. Abt represented to Dr. Selwyn that the Film could be used for educational purposes.

15.    Pureland denies knowledge or information sufficient to form a belief as to the allegations in Paragraph 15 of the Counterclaims, except admits that Dr. Selwyn approved of filming at Montefiore.

16.    Pureland denies the allegations in Paragraph 16 of the Counterclaims.

17.    Pureland denies knowledge or information sufficient to form a belief as to the allegations in Paragraph 17 of the Counterclaims.

18.    Pureland denies the allegations in the first sentence of Paragraph 18 of the Counterclaims, except admits that Dr. Mandefro enlisted a number of her teachers and mentors to serve on the Film's advisory board.  Pureland admits the allegations in the second sentence of Paragraph 18 of the Counterclaims.

19.    Pureland denies the allegations in Paragraph 19 of the Counterclaims.

20.    Pureland admits the allegations in Paragraph 20 of the Counterclaims.

21.    Pureland denies knowledge or information sufficient to form a belief as to the allegations in Paragraph 21 of the Counterclaims.

22.    Pureland admits the allegations in Paragraph 22 of the Counterclaims.

23.    Pureland denies the allegations in Paragraph 23 of the Counterclaims, except admits that Dr. Mandefro suggested some scenes to be filmed, selected some of the individuals to be filmed, arranged some of the specific shoots, and engaged the scholars who were interviewed for the Film.

24.    Pureland denies the allegations in Paragraph 24 of the Counterclaims, except denies knowledge and information sufficient to form a belief as to the basis for the scholars and advisors agreeing to participate in the Film.

25.    Pureland denies the allegations in Paragraph 25 of the Counterclaims.

26.     Pureland denies the allegations in Paragraph 26 of the Complaint, except admits that Ms. Abt presented Dr. Mandefro with a document entitled "Appearance Release" (the "Release").

27.     Pureland denies knowledge or information sufficient to form a belief as to the allegations in Paragraph 27 of the Counterclaims, except admits that Dr. Mandefro signed the Release.

28.     Pureland denies the allegations in Paragraph 28 of the Counterclaims to the extent that they purport to state a legal conclusion which does not require an answer, and to the extent an answer is required, Pureland denies the allegations in Paragraph 26 of the Counterclaims.

29.     Pureland denies knowledge or information sufficient to form a belief as to the allegations in Paragraph 29 of the Counterclaims, except admits the allegations in the first two sentences of Paragraph 29 of the Counterclaims.

30.     Pureland denies the allegations in Paragraph 30 of the Counterclaims, except Pureland denies knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 30 of the Counterclaims, admits that Dr. Mandefro raised an issue with Ms. Abt and Ms. Goldberg of removing some footage containing Ms. Stanley, and admits that Pureland did not include in the Film the footage that Ms. Stanley asked Pureland to remove.

31.     Pureland denies the allegations in Paragraph 31, except admits that Ms. Abt and Ms. Goldberg repeated a promise to Ms. Stanley not to include a scene which she requested Pureland not use, admits that Ms. Stanley's home health aide was also present on this occasion, and admits that Pureland sent a letter to the Film's former and

4

current advisors, including Dr. Selwyn, which stated that "we gave Tara our word that the specific footage that bothered her would not make it into the final cut of the film, and we honored that word."

32.    Pureland denies the allegations in Paragraph 32 of the Counterclaims, except admits that the current version of the Film has been shown to selection committees of several film festivals and to a general audience at at least one such film festival.

33.    Pureland denies the allegations in Paragraph 33 of the Counterclaims, except admits that in early 2006, Dr. Mandefro invited several of her friends, including fellow Montefiore residents, to participate in a "Truth Circle" in her home and admits that Ms. Abt was also invited to participate.

34.    Pureland denies the allegations in Paragraph 34 of the Counterclaims, except admits that the participants agreed to be filmed and admits that Ms. Abt provided the footage she proposed to include to each participant.

35.    Pureland denies that Ms. Abt agreed to the condition described in the first sentence of Paragraph 35 of the Counterclaims, and admits the remaining allegations in Paragraph 35, except denies that more than two women shared rape histories.

36.    Pureland denies the allegations in Paragraph 36 of the Counterclaims, except Pureland denies information and knowledge sufficient to form a belief as to the third sentence of Paragraph 36 of the Counterclaims.

37.    Pureland denies the allegations in Paragraph 37 of the Counterclaims.

38.    Pureland denies the allegations in Paragraph 38 of the Counterclaims.

39.    Pureland denies the allegations in Paragraph 39 of the Counterclaims.

40.    Pureland admits the allegations in Paragraph 40 of the Counterclaims.

41.     Pureland admits the allegations in Paragraph 41 of the Counterclaims.

42.     Pureland denies the allegations in Paragraph 42 of the Counterclaims.

43.     Pureland denies knowledge or information sufficient to form a belief as to the allegations in the first two sentences of Paragraph 43 of the Counterclaims, and Pureland denies the remaining allegations in Paragraph 43 of the Counterclaims.

44.     Pureland denies the allegations in Paragraph 44 of the Counterclaims.

45.     Pureland denies the allegations in Paragraph 45 of the Counterclaims, except admits that the Film was promoted within the Ethiopian-American community and admits that the Ethiopian ambassador to the United States was present at a screening of the Film's trailer in Washington, D.C. where Dr. Mandefro spoke on a panel about her work.

46.     Pureland denies the allegations in Paragraph 46 of the Counterclaims.

47.     Pureland denies the allegations in Paragraph 47 of the Counterclaims.

48.     Pureland denies the allegations in Paragraph 48 of the Counterclaims.

49.     Pureland denies the allegations in Paragraph 49 of the Counterclaims, except admits that Dr. Mandefro asked Pureland to make the Film available in connection with her final residency presentation in June 2007.

50.     Pureland denies the allegations in Paragraph 50 of the Counterclaims, except admits that, in early 2007, Dr. Mandefro requested a meeting between herself and Dr. Silva and Ms. Abt and Ms. Goldberg, and admits that Ms. Goldberg met with Dr. Mandefro and Dr. Silva.

51.    Pureland denies the allegations in Paragraph 51 of the Counterclaims, except admits that Ms. Goldberg told Dr. Mandefro and Dr. Silva that their approval of the film was in no way necessary.

52.    Pureland denies the allegations in Paragraph 52 of the Counterclaims, except admits that Ms. Goldberg told Dr. Mandefro and Dr. Silva that their approval of the Film was in no way necessary.

53.    Pureland denies the allegations in Paragraph 53 of the Counterclaims.

54.    Pureland denies the allegations in Paragraph 54 of the Counterclaims, except admits that, at a meeting in May 2007, attended by Ms. Abt, Ms. Goldberg, the editor of the Film, Dr. Mandefro, and Dr. Silva, Dr. Mandefro expressed concerns about the Film.

55.    Pureland denies the allegations in Paragraph 55 of the Counterclaims.

56.    Pureland denies the allegations in Paragraph 56 of the Counterclaims.

57.    Pureland denies the allegations in Paragraph 57 of the Counterclaims.

58.    Pureland denies the allegations in Paragraph 58 of the Counterclaims, except admits that the editor of the Film stopped working on the Film shortly before giving birth to her child.

59.    Pureland admits the allegations in Paragraph 59 of the Counterclaims.

60.    Pureland admits the allegations in Paragraph 60 of the Counterclaims.

61.    Pureland denies the allegations in Paragraph 61 of the Counterclaims, except admits that a great deal of footage that was shot was not included in the Film.

62.    Pureland denies the allegations in Paragraph 58 of the Counterclaim except admits that Pureland has submitted the Film to a number of U.S. and non-U.S. film festivals and has promoted the Film in that connection.

63.    Pureland admits the allegations in Paragraph 63 of the Counterclaims.

64.    Pureland admits the allegations in Paragraph 64 of the Counterclaims.

65.    Pureland denies that the Film was submitted to, rejected by, accepted and shown at film festivals without Dr. Mandefro's knowledge and Pureland denies Dr. Mandefro had the ability or right to "authorize" any such act.

66.    Pureland denies the allegations in Paragraph 66 of the Counterclaim

67.    Pureland admits the allegations in Paragraph 67 of the Counterclaim

68.    Pureland denies the allegations in Paragraph 68 of the Counterclaim

69.    Pureland denies the allegations in Paragraph 69 of the Counterclaims

70.    Pureland denies the allegations in Paragraph 70 of the Counterclaim

71.    Pureland denies the allegations in Paragraph 71 of the Counterclaim

72.    Pureland denies the allegations in Paragraph 72 of the Counterclaim

73.    With respect to each and every allegation of Paragraphs 73 through the Complaint, Pureland repeats and realleges Paragraphs 1 through 72 of its Answer

74.    Pureland denies the allegations in Paragraph 74 of the Counterclaims

75.    Pureland denies the allegations in Paragraph 75 of the Counterclaims.

76.    Pureland denies the allegations in Paragraph 76 of the Counterclaims

77.    Pureland denies the allegations in Paragraph 77 of the Counterclaims.

78.    The allegations in Paragraph 78 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis

8

79.     The allegations in Paragraph 78 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except that Pureland admits that Dr. Mandefro purports to assert equitable rights and to request equitable relief.

80.     With respect to each and every allegation of Paragraphs 80 through 83 of the Complaint, Pureland repeats and realleges Paragraphs 1 through 79 of its Answer.

81.     The allegations in Paragraph 81 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

82.     Pureland denies the allegations in Paragraph 82 of the Counterclaims.

83.     The allegations in Paragraph 83 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

84.     With respect to each and every allegation of Paragraphs 84 through 88 of the Complaint, Pureland repeats and realleges Paragraphs 1 through 83 of its Answer.

85.     The allegations in Paragraph 85 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except that Pureland admits that its use of Dr. Mandefro's name and likeness in the Film and in connection with its promotion was done, in part, in the State of New York.

86.     The allegations in Paragraph 86 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

87.     Pureland denies the allegations in Paragraph 87 of the Counterclaims.

88.     The allegations in Paragraph 88 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except admits that Dr. Mandefro has purported to assert equitable rights.

89.    With respect to each and every allegation of Paragraphs 89 through 95 of the Complaint, Pureland repeats and realleges Paragraphs 1 through 88 of its Answer.

90.    The allegations in Paragraph 90 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

91.    The allegations in Paragraph 91 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

92.    The allegations in Paragraph 92 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

93.    The allegations in Paragraph 93 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

94.    The allegations in Paragraph 94 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

95.    The allegations in Paragraph 95 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except that Pureland admits that Dr. Mandefro has purported to assert equitable rights and to request equitable relief.

96.    With respect to each and every allegation of Paragraphs 96 through 100 of the Complaint, Pureland repeats and realleges Paragraphs 1 through 95 of its Answer.

97.    Pureland denies the allegations in Paragraph 97 of the Counterclaims.

98.    The allegations in Paragraph 98 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

99.    The allegations in Paragraph 99 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

100.    The allegations in Paragraph 100 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except that Pureland admits that Dr. Mandefro has purported to assert equitable rights and to request equitable relief.

101.    With respect to each and every allegation of Paragraphs 101 through 106 of the Complaint, Pureland repeats and realleges Paragraphs 1 through 100 of its Answer.

102.    The allegations in Paragraph 102 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

103.    The allegations in Paragraph 103 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

104.    Pureland denies the allegations in Paragraph 104 of the Counterclaims.

105.    The allegations in Paragraph 105 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

106.    The allegations in Paragraph 106 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except that Pureland admits that Dr. Mandefro has purported to assert equitable rights and to request equitable relief.

107.    With respect to each and every allegation of Paragraphs 107 through 110 of the Complaint, Pureland repeats and realleges Paragraphs 1 through 106 of its Answer.

108.    The allegations in Paragraph 108 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis.

109.    The allegations in Paragraph 109 of the Counterclaims purport to state legal conclusions as to which no response is required, and therefore are denied on that basis, except that Pureland admits that Dr. Mandefro has purported to assert equitable rights.

110.    Pureland denies the allegations in Paragraph 110 of the Counterclaims that Pureland has received or obtained any profits from exploitation of the Film, and admits that Dr. Mandefro has purported to assert equitable rights and to request equitable relief.


Pureland denies all allegations not specifically admitted herein, and it further pleads the following affirmative defenses:

### FIRST DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the terms of the Appearance Release dated May 5, 2005 between Pureland Pictures, Inc. and Dr. Mandefro, including but not limited to the provision that "I expressly waive any and all equitable rights I may have hereunder, including but not limited to any right to enjoin, rescind, terminate or otherwise interfere with the production, distribution and/or exploitation of MEHRET or any other productions based thereon in whole or in part."

## SECOND DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because Dr. Mandefro has not stated any claim upon which relief may be granted.

## THIRD DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because the oral agreements alleged by Dr. Mandefro never existed.

## FOURTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the Statute of Frauds.

## FIFTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because Dr. Mandefro provided consent, impliedly or expressly, to the actions taken as alleged in the Counterclaims.

## SIXTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the doctrine of estoppel.

## SEVENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the doctrine of waiver.

## EIGHTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the doctrine of failure of consideration.

## NINTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the doctrine of release.

## TENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the doctrine of unclean hands.

## ELEVENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred by the doctrine of laches.

## TWELFTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims that purports to sound in tort is barred because it simply restates the claim for breach of contract.

## THIRTEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because Dr. Mandefro has not suffered any damages as a result of any of the events described in the Counterclaims.

## FOURTEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because Dr. Mandefro's damages, if any, are speculative, and thus are not recoverable.

## FIFTEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because if damages were sustained by Dr. Mandefro, such damages are attributable to Dr. Mandefro's own reckless, negligent or culpable conduct and Dr. Mandefro's claims are therefore barred by comparative and/or contributory negligence.

## SIXTEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because Dr. Mandefro failed to act reasonably to mitigate damages, if any.

## SEVENTEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because if damages were sustained by Dr. Mandefro, such damages must be offset by the value rendered to Dr. Mandefro by Pureland.

## EIGHTEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because Pureland at all times acted in good faith.

## NINETEENTH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because the Film has not been used for commercial benefit or for advertising or trade purposes.

## TWENTIETH DEFENSE

Each and every claim for relief in the Amended Answer and Counterclaims is barred because the Film is protected speech under the First Amendment of the United States Constitution.

## TWENTY-FIRST DEFENSE

To the extent that any claim in this action seeks exemplary or punitive damages, any such relief would violate statutory limitations to damages and/or Pureland's right to substantive and procedural due process under the Fourteenth Amendment of the United States Constitution.

## TWENTY-SECOND DEFENSE

Pureland asserts each and every defense available to it under applicable law. Pureland reserves the right to assert additional defenses.

## TWENTY-THIRD DEFENSE

Pureland states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available. Pureland reserves the right to assert additional affirmative defenses in the event that discovery indicates they would be appropriate.

16

WHEREFORE, Pureland respectfully requests that the Court:

(a)    Enter judgment dismissing the Counterclaims with

prejudice;

(b)    Award Pureland its costs and reasonable attorneys' fees;

and

(c)    Grant Pureland such other relief as the Court deems

equitable and just.

Dated: New York, New York              Respectfully submitted,
       April 7, 2008

                                       PAUL, WEISS, RIFKIND,
                                       WHARTON & GARRISON LLP


                                       By:  ___/s/ Darren W. Johnson_____

                                       Darren W. Johnson
                                       1285 Avenue of the Americas
                                       New York, New York 10019-6064
                                       (212) 373-3000 telephone
                                       (212) 757-3990 facsimile

                                       *Attorney for Plaintiff Pureland Pictures, Inc.*

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PURELAND PICTURES, INC., <br><br>                 Plaintiff, <br><br>                 v. <br><br> MEHRET MANDEFRO <br><br>                 Defendant. | Docket No. 07 CV 10448 (LAP) (MHD) <br><br><br> **AFFIDAVIT OF EMILY ABT IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

EMILY ABT declares pursuant to 28 U.S.C. § 1746:

1.     I am the owner of Pureland Pictures, Inc. I submit this affidavit in support of the accompanying Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment.

2.     Pureland is a New York corporation with its principal place of business at 126 10th Street, Suite 204, Brooklyn, New York 11215. Pureland is a film and commercial production company, which I founded in 1999.

3.     Reva Goldberg is employed by Pureland as a producer.

4.     I am a documentary film producer and director. I have studied documentary film production for more than ten years. Included in this study, I received a Fulbright Scholarship to study at the National Film and Television School in London in 2002 and a Masters Degree in film directing from Columbia University in 2004. I also directed the documentary feature entitled, *Take It From Me*, which aired on PBS'S

1

P.O.V. series in 2001. *Take It From Me* received an award as well as critical acclaim from publications including the New York Times, among others.

5.    A standard practice of documentary filmmakers is to accumulate enough material until specific storylines develop naturally and are more fully defined in the editing room.

6.    I am the director of the film, *All of Us*, attached to this affidavit as Exhibit A.

7.    In 2002, Mehret Mandefro and I were both Fulbright Scholars in London.  We became friends, bonding over our shared interest in the social, health and public policy issues confronting women.

8.    In 2004, after returning to the United States and finishing our degrees, Dr. Mandefro and I discussed the idea of Pureland making a documentary film featuring Dr. Mandefro.

9.    Pureland always intended to submit the Film to film festivals and to attempt to sell the Film for distribution.  On multiple occasions, Pureland specifically informed Dr. Mandefro that it intended to submit the Film to HBO, PBS, and other networks, and that it intended to submit the Film to various film festivals.  One such occasion included an email to Dr. Mandefro on June 15, 2004 in which I stated: "I also want to pitch this to HBO and PBS's POV series (where TIFM aired) ASAP to try and get seed funds.  I think my friend at HBO might be really into this for a bunch of reasons..." (attached as Ex. B.)  Dr. Mandefro always seemed excited about these possibilities.

10.    Pureland filmed Dr. Mandefro at various times in various situations to gather material for the Film, including, but not limited to, material involving

2

Dr. Mandefro's residency, the spread of HIV among African-American women, and Dr. Mandefro's personal life. A partial log of these situations is attached as Ex. C.

11.    On several occasions, I communicated to Dr. Mandefro that the filming process could be long, challenging, and intrusive, including an email to Dr. Mandefro on June 15, 2004 in which I stated:

> I do need you to make a final decision about this project. Of course I'm totally hyped on the idea but I don't want to do this unless you are really committed. Worst of all, would be to sink months of work into this and have you change your mind. One we start filming/raising funds, you need to be sure you will see the project thru, regardless of how long that takes (maybe even a few years!)

(attached as Ex. D.)

12.    On May 25, 2005, Dr. Mandefro signed an agreement with Pureland entitled "Appearance Release" (the "Release"). This agreement was intended to cover all rights to any material which Pureland filmed or recorded of Dr. Mandefro.

13.    At no time before or after Dr. Mandefro signed the Release did Pureland and Dr. Mandefro enter any other written agreement concerning the same rights addressed by the Release.

14.    Whenever Dr. Mandefro asked Pureland not to film a situation or environment, Pureland did not film such situations or environments, or if it had already begun shooting, stopped shooting.

15.    As the filming continued, Pureland sought footage to support several potential storylines. These storylines included:

a.    Dr. Mandefro's treatment of two of her HIV-positive patients, both of whom were former sex workers and former drug abusers;

b.      a trip Dr. Mandefro took to Ethiopia to assess and compare the HIV treatment situation there;

c.      the lack of sexual autonomy asserted by African-American women as a factor in the spread of HIV; and

d.      events in Dr. Mandefro's personal life, including her own relationships.

16.      Two of the individuals who Pureland filmed in connection with the Film were Tara Stanley and Chevelle Wilson, both of whom are or were HIV-positive.

17.      On May 26, 2005, Ms. Stanley entered an agreement with Pureland entitled "Appearance Release and Consent for the Release of Confidential Medical and HIV Information." (attached as Ex. E.)

18.      On June 5, 2006, Ms. Wilson entered an agreement with Pureland entitled "Appearance Release and Consent for the Release of Confidential Medical and HIV Information." (attached as Ex. F.)

19.      Pureland filmed numerous scenes with Ms. Stanley and Ms. Wilson. Dr. Mandefro was present for some scenes and not present for others.

20.      Scenes filmed with Ms. Stanley and Ms. Wilson included discussion of their medical and personal history and of their romantic and sexual relationships with their current and former partners, including discussions of previous drug abuse, sexual abuse, and prostitution.

21.      While being filmed, Ms. Stanley revealed that her mother had prostituted her when she was younger. This admission is shown in the Film. Ms. Stanley also revealed another troubling incident from her childhood, but subsequently asked

4

Pureland not to include this scene in the Film. Pureland promised not to include the scene in the Film. This scene was not included in the Film.

22.    Dr. Mandefro was not present when either of Ms. Stanley's admissions were filmed, nor was she present when Ms. Stanley and Pureland agreed that the second admission would not be included in the Film.

23.    Pureland filmed Ms. Stanley and Ms. Wilson in scenes that were not centered around their medical histories, including the wedding party of Ms. Wilson and her husband, Robert Barrett, which Dr. Mandefro attended.

24.    Ms. Stanley passed away in Spring 2006. I have been informed that a report prepared by the coroner concluded that the cause of Ms. Stanley's death was a probable drug overdose.

25.    Dr. Mandefro invited me to participate in a Truth Circle, in which she would also be a participant, which would take place in March 2006.

26.    Dr. Mandefro has espoused the use of "Truth Circles"—gatherings of women speaking openly and honestly about personal issues—as a tool to help prevent the spread of HIV and to improve women's confidence and autonomy.

27.    I indicated interest in shooting footage of the Truth Circle. Dr. Mandefro consented to Pureland shooting the event, on the condition that the other participants were comfortable with this.

28.    Because I would be participating in the event and could not simultaneously operate a camera, Pureland hired a camera operator to record the event. Reva Goldberg, the producer of the Film, recorded sound at the event.

5

29.    Prior to the event, Pureland contacted the women who would be participating in the Truth Circle in order to address any concerns they might have about being filmed.  Pureland later agreed to discuss whether footage from the Truth Circle would be used after the event was over.  After the event, Pureland agreed to inform the women what footage it intended to use in the Film once the footage had been edited.

30.    Pureland later sent the participants a clip showing the edited scene of the Truth Circle.  None of the women, including Dr. Mandefro, objected to Pureland's use of this footage, and the Film includes a scene showing these parts of the Truth Circle.

31.    From the Film's inception, I discussed Pureland's desire to obtain film footage of Dr. Mandefro's personal life with Dr. Mandefro.

32.    I emphasized, on many occasions, the importance of such a storyline to the film.

33.    Among the emails I sent or received regarding Pureland's interest in getting footage of Dr. Mandefro doing things outside of work are the following:

a.    Email to Dr. Mandefro on February 21, 2005, in which I Abt stated: "I MUST, MUST have footage of both Dre and Nes, so please try and grab some stuff of them chillin if you possibly can." (attached as Ex. G).  "Dre and Nes" were men with whom Dr. Mandefro had an actual or potential romantic and/or sexual relationship.

b.    Email to Dr. Mandefro on April 21, 2005, in which I stated: "We really need to capture you interacting with guys.  So far we have only HEARD about your dating life rather than witnessed it.  This does not a dynamic film make.  Please let me know about any such opportunities…" (attached as Ex. H).

6

c.    Email from Dr. Mandefro to me on February 24, 2007, in which Dr. Mandefro stated: "as for dre, he's ready to talk to you so just call him: [_]. be gentle with him... he's really feeling like our relationship is being 'exploited', *his words not mine*, so just go easy. let me know how it goes..." (emphasis added) (attached as Ex. I).

34.    Beginning in September 2004 and continuing intermittently at least through January 18, 2007, Pureland filmed scenes of Dr. Mandefro experiencing or discussing her personal life on at least thirty-six separate tapes covering a total of approximately twenty-three and one-half hours of filming, including the following scenes, among numerous others:

a.    In September 2004, Pureland filmed Dr. Mandefro at an outdoor dance party, including scenes dancing with her friends, for approximately four hours;

b.    In December 2004, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately twenty-six minutes;

c.    In December 2004, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her feelings about being single and about her relationships, for approximately one hour;

d.    In January 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre" for approximately forty-one minutes;

e.    In Summer 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre" for approximately one hour;

f.    In October 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship and sexual intercourse with "Dre";

g.    In November 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre" and other men she was dating at the time;

h.    In March 2006, as discussed further below, Pureland filmed Dr. Mandefro and her friends talking about their personal and sexual lives for approximately three hours;

i.    In Fall 2006, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about four men she was dating at the time, including "Dre";

j.    In October 2006, Pureland filmed Dr. Mandefro talking about her personal life with Ms. Wilson, including a discussion about her sex life and discussion revealing that she had had unprotected sex with "Dre" and subsequently learned that he was not sexually monogamous with her.

(*see* Log, attached as Ex. J).

35.    Dr. Mandefro discussed her relationship with her boyfriend "Dre" on film, and allowed Pureland to film scenes with him. As Dr. Mandefro was aware,

"Dre" was neither a medical worker nor an HIV patient. His only connection to the Film was his personal relationship with Dr. Mandefro.

36.    With Dr. Mandefro's knowledge, consent, and assistance, Pureland also filmed Dr. Mandefro in settings outside of the medical field, including birthday parties, photography shoots, dinner parties, and nightclubs.

37.    These discussions and related scenes create a powerful storyline (the "Storyline"), which Pureland believes serves several vitally important purposes including strengthening the medical message of the Film, making the message of the Film accessible to a wider audience, and showing that some of the challenges faced by Dr. Mandefro are similar to those faced by her patients.

38.    In May 2007, at Dr. Mandefro's insistence, I met with Dr. Mandefro, Dr. Manel Silva, Ms. Reva Goldberg, and the editor of the Film. Dr. Mandefro did not mention a prior express oral agreement at this meeting, nor did she propose an express agreement be entered at the meeting. Neither at this meeting nor any other time did I or anyone else from Pureland make any promise that the Film would not be shown without Dr. Mandefro's express approval of the final edited version.

39.    Dr. Mandefro, through her counsel, sent a purported cease and desist letter to Pureland on October 22, 2007.

40.    In this letter, Dr. Mandefro asserted that she had granted only a "limited license" to Pureland to use her name and likeness, based on an alleged oral agreement in 2004.

41.    I am informed that Dr. Mandefro has asserted that this alleged 2004 oral agreement was "expressly conditioned" on the following terms:

(i) The Film would be used for educational, charitable, and legislative advocacy purposes, not for Pureland's commercial gain;

(ii) The focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same;

(iii) The Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission;

(iv) The Film would not contain confidential patient-physician relationship with those patients, without Dr. Mandefro's express permission; and

(v) The Film would not be displayed, distributed or viewed in any public forum without Dr. Mandefro's express approval of the final edited version.

42.     I am further informed that Dr. Mandefro has asserted in her filings related to this case that she and Pureland reiterated the purported 2004 oral agreement in oral agreements in 2006 (the "2006 Agreement") and 2007 (the "2007 Agreement").

43.     Dr. Mandefro communicated frequently via email with Pureland during the filming of *All of Us*.  Prior to the purported cease and desist letter, Dr. Mandefro never asserted to Pureland in a writing, via email or otherwise, that an express oral agreement had been reached in 2004.

44.     Similarly, prior to her filings in this case, Dr. Mandefro never asserted in any writing to Pureland, via email or otherwise, that an express oral agreement had been reached in either 2006 or 2007.

45.     I am informed that Dr. Mandefro now alleges that Pureland "expressly" agreed in 2004 and 2006 that "the Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission," and "expressly agreed" in 2004, 2006, and 2007 that "the Film would not be displayed,

distributed, or viewed in any public forum without Dr. Mandefro's express approval of the final version."

46.     At no point prior to sending the Cease and Desist Letter, including in emails sent to convince Pureland to remove footage concerning Dr. Mandefro's personal life, did Dr. Mandefro ever claim a contractual right to review of approve the Film, nor did she ever mention any "expressly" agreed-to terms between the parties. (*See, e.g.*, Ex. K, Email from Dr. Mandefro to Ms. Abt, dated August 17, 2007.)

47.     In order to settle its rights to the Film, Pureland filed this suit against Dr. Mandefro.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed in Brooklyn, New York on April 7, 2008.

_____
Emily Abt

SWORN TO AND SUBSCRIBED before me this _7th_ th day of April, 2008.

_____
Notary Public

AUSTIN KWAME WILKINSON
Notary Public, State of New York
No. 01WI5051848
Qualified in Kings County
Certificate Filed in New York County
Commission Expires Nov. 13, 2009

11

# Exhibit A



*Pureland Pictures, Inc. v. Mandefro*, 07 Civ. 10448 (LAP) (MHD)

Affidavit of Emily Abt, Exhibit A

**ALL OF US**
TRT 82 min.
Region 0 / NTSC / mini DV / 4:3 Letterboxed

# Exhibit B

Begin forwarded message:
**From:** Emily Abt <emily@purelandpictures.com>
**Date:** June 15, 2004 12:17:45 PM EDT
**To:** <mehret_madefro@student.hms.harvard.edu>
**Subject: Film and such**

Hey Darling,

I had such an awesome time with you this past weekend, am super glad I came, was just what doctor ordered (literally!).    Again, I am truly blessed by your friendship...

I met with my friend/fellow Producer Reva Goldberg yesterday and she has agreed to sign on as co-producer for a Pureland Pictures film about the current state of AIDS treatment in Africa/US as is experienced by a young, beautiful promising woman doctor (ahem, *you*).  Our goal is to assemble a sample reel and submit grant applications within the next 6 months.  I also want to pitch this to HBO and PBS's POV series (where TIFM aired) ASAP to try and get seed funds.  I think my friend at HBO might be really into this for a bunch of reasons...

Ok, a few quick qts:

-What were those books you recommended during our long chats? (South African one and a couple others...)
-Research materials.  Reva was wondering what some good resources would be.  Any recs. so that we can get a better handle on the AIDS crisis in Africa (articles, books, etc)?
-I do need you to make a final decision about this project.  Of course I'm totally hyped on the idea but I don't want to do this unless you are really committed.  Worst of all, would be to sink months of work into this and have you change your mind.  Once we start filming/raising funds, you need to be sure you will see the project thru, regardless of how long that takes (maybe even a few years!)  Also, if you are having mixed feelings please know that are friendship will not be affected at all, I am totally cool with your decision either way, just need you to make the call.

Also, when thinking about this, please note that we can't make the film happen without funding.  I have high hopes but if that doesn't happen, project can't move forward.

Hope your packing is going well...

Love, Em

PS  Have you seen purelandpictures.com lately?  Updated site, do peep if you get the chance...

# Exhibit C

VIDEO CONTENT THAT INCLUDES MEHRET'S PERSONAL LIFE

TAPES 1-4 - September 2004
ENTIRE TAPES- 4 HOURS
mehret attends outdoor dance club with friends, dances with friends

TAPE 7 - December 2004
9:30:00-35:00  26 MINUTES
mehret talks about her personal life, her friendships and her relationship with dre

TAPE 8 - December 2004
18:06 - 19:07 1 HOUR
mehret talks about her work, background, feelings about being single, her
relationships

TAPE 9 - January 2005
00- 41:00  41 MINUTES
mehret talks about her relationship with dre

TAPE 12 - June 2005
APPROX 20 MINUTES
mehret and manel  discuss their frustration with the dating scene, how fellow
residents think they're lesbians, they're friendship, mehret calls guy she's dating,
expresses dissappointment about not getting called more by him

TAPE 13 - July 2005
APPROX 20 MIN
Mehret has birthday party, her girls talk about how much they love her, how she
is the object of much love and guy attention

TAPE 14 - Fall 2006
APPROX 30 MIN
Manel's birthday party, Mehret gives us overview of her dating life and the 4 guys
she's dating, includes dre in this description, manel and mehret discuss in taxi
how they have no time for men

TAPE 16 - July 2006
20:29:46-21:08:07  39 MINUTES
emily and mehret argue over the making of the film and access issues

TAPE 17 - July 2006
06:54-17:00 11 MINUTES
mehret talks about her sick aunt, the vacation she's about to take,her family, her

community, her love of dancing, how she's breaking up with dre

TAPE 19- Summer 2005
33:00-55:00
mehret and manel talk about sisterhood, manel's willingness to be a single
parent, relationships with men, the need to be complete without men, mehret
discusses relationship with dre

TAPE 20 - Summer 2005
whole tape (1 hour)
mehret discusses her relationship with dre, how she wants to stick things out with
him, defends their relationship

TAPE 21 check this September 2005
3 MINUTES
mehret discusses the connection between her life and that of her patients

TAPE 29 October 11 2005
28:00-60:00 - 32 MINUTES
mehret talks about her relationship with dre, how they made up, slept together,
how he keeps pulling her back to him, how they spent lovely time together, etc.

TAPES 30, 31  October 28,2005 (both)
ENTIRE TAPES - 2 HOURS
mehret and friends engage in 'naked photo shoot' where they pose topless
together. after, mehret and her friends discuss their relationships with men

TAPE 33  November 4th, 2005
ROUGHLY 15 MINUTES
Dr. Anastos and Mehret discuss mehret's dating/personal life and the cost of
being a doctor on one's personal life & chances of having a family

TAPE 34  November 15, 2005
08:25-56:00  48 MINUTES
mehret talks about her relationship with dre,  shares text messages from him &
shows us the gift he gave her, says he's not her boyfriend, talks about other guys
she's dating, says she doesn't want to be physical with more than one person,
gave dre her bottomlines

TAPE 37 - 38  November 17, 2005
ENTIRE TAPES - I HOUR
mehret goes to brazilian charity event, dances, chats with guys and friends

TAPE 44 December 13, 2005

APPROX 8 MINUTES
51:00-59:00
mehret gives us update on research and love life, talks to us about how well things are going with dre

TAPE 48 January 14, 2006
APPROX 5 MINUTES
em asks mehret about dre, mehret talks about how she didnt want to spend new years with him

TAPE 51 March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives, mehret refers to her sex life with dre number of times (without using his name)

TAPE 56  March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives, mehret refers to her sex life with dre number of times (without using his name)

TAPE 57 March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives, mehret refers to her sex life with dre number of times (without using his name)

TAPE 65 May 27, 2006
APPROX 20 MINUTES
mehret shows us pictures of ex-boyfriend, discussion with mehret's parents about mehret's career, dreams, personal life, who she will marry (they would like it to be an ethiopian), their feelings on her ex-boyrfriend, etc.

TAPE 72 & 73  July 2, 2006, July 3,2006
ENTIRE TAPES- 1HR
mehret's 30th birthday celebration, dre there

TAPE 81  July 24-25, 2006
APPROX 20 MIN
mehret gets ready in bathroom, does hair, talks about exhaustion, costs of how hard she works

TAPE 85  July 26-27, 2006
ENTIRE TAPE - 1HR
mehret hangs out at night club in ethiopia with friends, dancing, drinking, etc

TAPE 86  July 27, 2006
APPROX 20 MINUTES
mehret discusses her dual identity, family in ethiopia, her friend teddy

TAPE 98  October 11, 2006
ENTIRE TAPE - I HR
chevelle interviews mehret about her personal life, her sex life, relationship with
Dre, mehret reveals she too has had unsafe sex and that she found out Dre was
cheating on her

TAPE 101  November 2, 2006
ENTIRE TAPE - I HOUR
mehret gets ready for NY Moves party with her date Lando, they help eachother
get dressed, go to gala event together,hangs with friends there, flirts and kisses
Lando

TAPE 108 - January 18, 2007
approx 10 minutes
mehret talks to school girls about her relationship with Dre (on the mend even
though he cheated on her) and how she waited until she was senior in college
before she had sex

# Exhibit D
## (same as Exhibit B)

Begin forwarded message:
**From:** Emily Abt <emily@purelandpictures.com>
**Date:** June 15, 2004 12:17:45 PM EDT
**To:** <mehret_madefro@student.hms.harvard.edu>
**Subject: Film and such**

Hey Darling,

I had such an awesome time with you this past weekend, am super glad I came, was just what doctor ordered (literally!).    Again, I am truly blessed by your friendship...

I met with my friend/fellow Producer Reva Goldberg yesterday and she has agreed to sign on as co-producer for a Pureland Pictures film about the current state of AIDS treatment in Africa/US as is experienced by a young, beautiful promising woman doctor (ahem, *you*).  Our goal is to assemble a sample reel and submit grant applications within the next 6 months.  I also want to pitch this to HBO and PBS's POV series (where TIFM aired) ASAP to try and get seed funds.  I think my friend at HBO might be really into this for a bunch of reasons...

Ok, a few quick qts:

-What were those books you recommended during our long chats? (South African one and a couple others...)
-Research materials.  Reva was wondering what some good resources would be.  Any recs. so that we can get a better handle on the AIDS crisis in Africa (articles, books, etc)?
-I do need you to make a final decision about this project.  Of course I'm totally hyped on the idea but I don't want to do this unless you are really committed.  Worst of all, would be to sink months of work into this and have you change your mind.  Once we start filming/raising funds, you need to be sure you will see the project thru, regardless of how long that takes (maybe even a few years!)  Also, if you are having mixed feelings please know that are friendship will not be affected at all, I am totally cool with your decision either way, just need you to make the call.

Also, when thinking about this, please note that we can't make the film happen without funding.  I have high hopes but if that doesn't happen, project can't move forward.

Hope your packing is going well...

Love, Em

PS  Have you seen purelandpictures.com lately?  Updated site, do peep if you get the chance...

# Exhibit E

FORM # 3

## APPEARANCE RELEASE
## AND CONSENT FOR THE RELEASE OF CONFIDENTIAL MEDICAL AND
## HIV INFORMATION

1. Appearance. I, _Tiara Stanley_ residing at
_871 E 220 St apt 12_, hereby consent and grant to Pureland Pictures, Inc.
("Production Company") and its affiliates, licensees, successors and assigns, permission
(1) to take photographs of me and record my voice in connection with the film currently
titled "MEHRET" (the "Film") (2) to put the finished pictures, negatives, reproductions
and copies or the original prints and negatives of me and any sound track recordings and
recordings which may be made of my voice, including the right to substitute the voice of
other persons for my voice, my name or likeness (collectively, the "Likenesses") in the
Film or not and (3) to use the Likenesses, and any biographical material about me which I
may provide, in any manner deemed proper by Production Company used in connection
with the exhibition, advertising, promotion, distribution and/or exploitation of the Film or
otherwise.

I agree that Production Company shall be the exclusive owner of the Likenesses
and Production Company and its affiliates, licensees, successors and assigns shall have
the right, throughout the world, in perpetuity, to copyright, to use and to license others to
use, in any manner in all media now known or hereafter devised, all or any portion
thereof or a reproduction thereof in connection with the Film or otherwise.

2. Medical and HIV Information. I authorize the Production Company to receive
and to disclose any and all medical information about me, including without limitation
my HIV status, including HIV test results and information about my diagnosis and
treatment for HIV-related conditions, including AIDS ("HIV Status") in the Film or in
any manner deemed proper by the Production Company used in connection with the
exhibition, advertising, promotion, distribution and/or exploitation of the Film or
otherwise.

To the maximum extent permitted by law, I hereby consent and permit Dr. Mehret
Mandefro, other health care providers affiliated with Montefiore Medical Center, and the
personnel of Montefiore Medical Center to disclose my HIV Status and other medical
information to the Production Company and acknowledge that the Production Company
may use these disclosures in the Film. I understand that, in connection with the creation,
exhibition, advertising, promotion, distribution and/or exploitation of the Film or
otherwise, the Production Company may disclose my HIV Status and other medical
information to the general public.

The purpose of these disclosures is to facilitate the development and production of
the Film. This consent for the Production Company to disclose my HIV Status will not

expire. I understand that HIV-related information about me is protected by New York Public Health Law, and cannot be disclosed except as authorized by such law.

I understand that I am not required to sign this form, and I may refuse to do so. I have read both pages of this form before signing it.

3. General. I hereby release Production Company and its officers, directors, employees, stockholder, agents and assigns from any all legal liability that may arise from any of the foregoing and waive any rights I may have to royalties or other compensation in connection with the foregoing.

In the event of any dispute arising out of or relating to this release, my sole remedy shall be an action for damages at law. I expressly waive any and all equitable rights I may have hereunder, including but not limited to any right to enjoin, rescind, terminate or otherwise interfere with the production, distribution and/or exploitation of the Film or any other productions based thereon in whole or in part. If any provision of this Consent and Release is found to be illegal or invalid, such invalidity will not affect the validity of the other provisions hereunder. This Consent and Release and the subject matter hereof shall be governed by the laws of the State of New York without regard to the conflicts of law principles thereof.

Name: _____

Date: 5/26/05

2

# Exhibit F

## APPEARANCE RELEASE
## AND CONSENT FOR THE RELEASE OF CONFIDENTIAL MEDICAL AND
## HIV INFORMATION

1. Appearance. I, *Chevelle Wilson*, residing at *2845 Story Ave*, hereby consent and grant to Pureland Pictures, Inc. ("Production Company") and its affiliates, licensees, successors and assigns, permission (1) to take photographs of me and record my voice in connection with the film currently titled "MEHRET" (the "Film") (2) to put the finished pictures, negatives, reproductions and copies or the original prints and negatives of me and any sound track recordings and recordings which may be made of my voice, including the right to substitute the voice of other persons for my voice, my name or likeness (collectively, the "Likenesses") in the Film or not and (3) to use the Likenesses, and any biographical material about me which I may provide, in any manner deemed proper by Production Company used in connection with the exhibition, advertising, promotion, distribution and/or exploitation of the Film or otherwise.

I agree that Production Company shall be the exclusive owner of the Likenesses and Production Company and its affiliates, licensees, successors and assigns shall have the right, throughout the world, in perpetuity, to copyright, to use and to license others to use, in any manner in all media now known or hereafter devised, all or any portion thereof or a reproduction thereof in connection with the Film or otherwise.

2. Medical and HIV Information. I authorize the Production Company to receive and to disclose any and all medical information about me, including without limitation my HIV status, including HIV test results and information about my diagnosis and treatment for HIV-related conditions, including AIDS ("HIV Status") in the Film or in any manner deemed proper by the Production Company used in connection with the exhibition, advertising, promotion, distribution and/or exploitation of the Film or otherwise.

To the maximum extent permitted by law, I hereby consent and permit Dr. Mehret Mandefro, other health care providers affiliated with Montefiore Medical Center, and the personnel of Montefiore Medical Center to disclose my HIV Status and other medical information to the Production Company and acknowledge that the Production Company may use these disclosures in the Film. I understand that, in connection with the creation, exhibition, advertising, promotion, distribution and/or exploitation of the Film or otherwise, the Production Company may disclose my HIV Status and other medical information to the general public.

The purpose of these disclosures is to facilitate the development and production of the Film. This consent for the Production Company to disclose my HIV Status will not

expire. I understand that HIV-related information about me is protected by New York Public Health Law, and cannot be disclosed except as authorized by such law.

I understand that I am not required to sign this form, and I may refuse to do so. I have read both pages of this form before signing it.

3. <u>General</u>. I hereby release Production Company and its officers, directors, employees, stockholder, agents and assigns from any all legal liability that may arise from any of the foregoing and waive any rights I may have to royalties or other compensation in connection with the foregoing.

In the event of any dispute arising out of or relating to this release, my sole remedy shall be an action for damages at law. I expressly waive any and all equitable rights I may have hereunder, including but not limited to any right to enjoin, rescind, terminate or otherwise interfere with the production, distribution and/or exploitation of the Film or any other productions based thereon in whole or in part. If any provision of this Consent and Release is found to be illegal or invalid, such invalidity will not affect the validity of the other provisions hereunder. This Consent and Release and the subject matter hereof shall be governed by the laws of the State of New York without regard to the conflicts of law principles thereof.

Name: _Chavelle Wilson_

Date: _6/5/06_

2

# Exhibit G

**From:** Emily Abt <emily@purelandpictures.com> _
**Date:** February 21, 2005 11:49:22 PM EST _
**To:** Mehret Ayalew Mandefro <mmandefr@montefiore.org> _
**Cc:** Reva Goldberg <reva@purelandpictures.com> _
**Subject: Maywehavesomegoodfootageplease?** __

Hey darling,

Hope you are okay.  Life. Death. Love. Drama – all in a Mehret minute.
 Wish I could film every one but since I can't...

Good job on your test sat, just a quick review in case you can't find
Reva's instructions:

HOW TO SHOOT

-mini mic jack goes into input with 'mic' written at top
-headphones go into jack with you guessed it...little headphones next
to it
-battery charger (which you should leave charging overnight so is all
ready to go for a shoot) is right under the place battery sits
-put camera in camera mode when shooting, VTR is for when you want
to see the footage you just shot
-check sound with headphones before you begin recording.  If it isn't
working check 1.) all connections  2.) that mike is on, little switch
should be pushed all the way up 3.) still not working? means battery
inside mike is down, replace battery
-always have an extra AAA battery handy for this reason_-make sure
there is enough light in room so that pic doesn't get grainy
-handle all equipment with care, never leave unattended!

WHEN TO SHOOT
-basically, whenever you don't feel like doing this is EXACTLY when
you should be doing this
-please film AT LEAST ONCE A WEEK, EVERY WEEK,EVEN IF JUST FOR
A FEW MINUTES
-you can put the camera down on a table and shoot yourself washing
dishes for all I care, just shoot something every week
-use this cam as your diary, do not self- edit, it will be just me, geeta,
reva and perhaps an assistant editor looking at this footage, if it sucks,
it won't end up in cut, I promise!
- I MUST, MUST have footage of both Dre and Nes, so please try and
grab some stuff of them chillin if you possibly can, try and be very lo-

pro about it so they don't freak

Good luck tomorrow with dude, is he still there?  Hope so.  Good luck and please call if you have any problems!

Love, Em

PS We need that contact for event on Thursday night ASAP or not gonna be able to shoot my dear...  Just tell us what the name of it  is if you don't have time or give us email for who is organizing Monte group...

# Exhibit H

From:  Emily  Abt <emily@purelandpictures.com>
Subject:  **back to biz**
Date:  April 21, 2005 6:10:53 PM EDT
To:  Mehret Ayalew Mandefro <mmandefr@montefiore.org>
Cc:  Reva Goldberg <reva@purelandpictures.com>

Dearest Mehret,

As you know, Reva and I have been slammed with outside work but now our focus is completely back on you and our little movie, lucky girl :)

A few important questions...please answer all.

- What are upcoming, important dates for us to shoot?  Here are a few things we are interested in capturing...
1. Manel's b-day party on 29th
2. The primary care resident  & social medicine resident event you mentioned that takes place in  early may.  When/where is it exactly?  Who should we speak to regarding access?
3. Most important to shoot soon: your patient who has been expressing strong interest in being filmed.  May I have her contact info?  I think it would be best if we saw her with you in hospital first and then saw you at her home with her.  I was thinking it might be most interesting if you interview her rather than me (as part of your residency project) to show the development of the relationship....

- How is it going with the self-filming stuff?  Do you need more tapes?  (I know Reva has the mike, we'll return to you when we see you next)

- Did you ever come across little missing mike piece?

- What are your plans this sat/sun?  I was thinking of just kicking it with you, whatever your plans are and doing a little filming while I'm at it.  Maybe we could check that beauty parlor you mentioned?

- We really need to capture you interacting with guys.  So far we have only HEARD about your dating life rather than witnessed it.  This does not a dynamic film make.  Please let me know about any such opportunities...

- Re Ethiopia... Are you definitely not going in June?  Are you definitely going in November?

- What was that Paul Farmer book you mentioned?  Women and Aids?  I'm gonna get it...

An update from us:

- we are continuing to apply for grants, hopefully we'll get one soon!
- our goal is to have a preview reel completed within next few months so we can throw a big fundraiser and screen it.  Wanted to have some Africa footage in there but...
- once we get reel together we are going to approach Bel Hooks for an interview about love, sex, black womanhood, poverty, AIDS to weave throughout film.  Dope idea, no???
- insurance no longer an issue so we're eager to get shooting again asap!

If is a pain to respond to all this via email, lets chat by phone or set-up a quick meeting...

Em and Reva

Emily Abt
Director/Producer
Pureland Pictures, Inc.
30 Garfield Place #PHE
Brooklyn, NY 11215
ph: 718. 965.0636
fax: 718.965.0637
cell: 646.894.5653
emily@purelandpictures.com
www.purelandpictures.com

# Exhibit I

On Feb 24, 2007, at 3:48 PM, Mehret Mandefro wrote:

> agreed... the trip was good and i think we are communicating better ind....
> dre, he's ready to talk to you so just call him: 212 495 9337. be gentl....
> he's really feeling like our relationship is being "exploited", his words ....
> just go easy. let me know how it goes...
>
> m
>
> **Emily Abt** < _emily@purelandpictures.com_ > wrote:
> hey hon,
>
> past couple days been dope in so many ways.  i feel like we're com....
> much better these days, even about delicate stuff. reva says that listen....
> the car, she felt like we had come a long way: more listening, less ang....
> progress!
>
> hope things went well with dre last night.  let me know how you woul....
> to proceed. i'm happy to reach out to him and would love for him to p....
> in film, even if it's conditional.
>
> oh and thanks for helping avoid a potentially awkward situation wit....
> she's been very clear with reva that she's feeling really hard up these ....
> seeing my penthouse crib would just add fuel to that fire, ya know?
>
> cheers, em
>
> emily abt
> pureland pictures, inc.
> 30 garfield place #phe brooklyn, ny 11215
> t: 718.965.9636  f: 718.965.0637  c: 646.894.5653
> purelandpictures.com


Mehret Mandefro,MD,MSc
TruthAIDS, Founding Director

TruthAIDS
P.O. Box 147
New York,NY 10035
Office:646-707-0485

# Exhibit J
## (same as Exhibit C)

VIDEO CONTENT THAT INCLUDES MEHRET'S PERSONAL LIFE

TAPES 1-4 - September 2004
ENTIRE TAPES- 4 HOURS
mehret attends outdoor dance club with friends, dances with friends

TAPE 7 - December 2004
9:30:00-35:00  26 MINUTES
mehret talks about her personal life, her friendships and her relationship with dre

TAPE 8 - December 2004
18:06 - 19:07 1 HOUR
mehret talks about her work, background, feelings about being single, her
relationships

TAPE 9 - January 2005
00- 41:00  41 MINUTES
mehret talks about her relationship with dre

TAPE 12 - June 2005
APPROX 20 MINUTES
mehret and manel  discuss their frustration with the dating scene, how fellow
residents think they're lesbians, they're friendship, mehret calls guy she's dating,
expresses dissappointment about not getting called more by him

TAPE 13 - July 2005
APPROX 20 MIN
Mehret has birthday party, her girls talk about how much they love her, how she
is the object of much love and guy attention

TAPE 14 - Fall 2006
APPROX 30 MIN
Manel's birthday party, Mehret gives us overview of her dating life and the 4 guys
she's dating, includes dre in this description, manel and mehret discuss in taxi
how they have no time for men

TAPE 16 - July 2006
20:29:46-21:08:07  39 MINUTES
emily and mehret argue over the making of the film and access issues

TAPE 17 - July 2006
06:54-17:00 11 MINUTES
mehret talks about her sick aunt, the vacation she's about to take,her family, her

community, her love of dancing, how she's breaking up with dre

TAPE 19- Summer 2005
33:00-55:00
mehret and manel talk about sisterhood, manel's willingness to be a single
parent, relationships with men, the need to be complete without men, mehret
discusses relationship with dre

TAPE 20 - Summer 2005
whole tape (1 hour)
mehret discusses her relationship with dre, how she wants to stick things out with
him, defends their relationship

TAPE 21 check this September 2005
3 MINUTES
mehret discusses the connection between her life and that of her patients

TAPE 29 October 11 2005
28:00-60:00 - 32 MINUTES
mehret talks about her relationship with dre, how they made up, slept together,
how he keeps pulling her back to him, how they spent lovely time together, etc.

TAPES 30, 31  October 28,2005 (both)
ENTIRE TAPES - 2 HOURS
mehret and friends engage in 'naked photo shoot' where they pose topless
together. after, mehret and her friends discuss their relationships with men

TAPE 33  November 4th, 2005
ROUGHLY 15 MINUTES
Dr. Anastos and Mehret discuss mehret's dating/personal life and the cost of
being a doctor on one's personal life & chances of having a family

TAPE 34  November 15, 2005
08:25-56:00  48 MINUTES
mehret talks about her relationship with dre,  shares text messages from him &
shows us the gift he gave her, says he's not her boyfriend, talks about other guys
she's dating, says she doesn't want to be physical with more than one person,
gave dre her bottomlines

TAPE 37 - 38  November 17, 2005
ENTIRE TAPES - I HOUR
mehret goes to brazilian charity event, dances, chats with guys and friends

TAPE 44 December 13, 2005

APPROX 8 MINUTES
51:00-59:00
mehret gives us update on research and love life, talks to us about how well
things are going with dre

TAPE 48 January 14, 2006
APPROX 5 MINUTES
em asks mehret about dre, mehret talks about how she didnt want to spend new
years with him

TAPE 51 March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives,
mehret refers to her sex life with dre number of times (without using his name)

TAPE 56   March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives,
mehret refers to her sex life with dre number of times (without using his name)

TAPE 57 March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives,
mehret refers to her sex life with dre number of times (without using his name)

TAPE 65 May 27, 2006
APPROX 20 MINUTES
mehret shows us pictures of ex-boyfriend, discussion with mehret's parents about
mehret's career, dreams, personal life, who she will marry (they would like it to be
an ethiopian), their feelings on her ex-boyrfriend, etc.

TAPE 72 & 73  July 2, 2006, July 3,2006
ENTIRE TAPES- 1HR
mehret's 30th birthday celebration, dre there

TAPE 81  July 24-25, 2006
APPROX 20 MIN
mehret gets ready in bathroom, does hair, talks about exhaustion, costs of how
hard she works

TAPE 85  July 26-27, 2006
ENTIRE TAPE - 1HR
mehret hangs out at night club in ethiopia with friends, dancing, drinking, etc

TAPE 86  July 27, 2006
APPROX 20 MINUTES
mehret discusses her dual identity, family in ethiopia, her friend teddy

TAPE 98  October 11, 2006
ENTIRE TAPE - I HR
chevelle interviews mehret about her personal life, her sex life, relationship with
Dre, mehret reveals she too has had unsafe sex and that she found out Dre was
cheating on her

TAPE 101  November 2, 2006
ENTIRE TAPE - I HOUR
mehret gets ready for NY Moves party with her date Lando, they help eachother
get dressed, go to gala event together,hangs with friends there, flirts and kisses
Lando

TAPE 108 - January 18, 2007
approx 10 minutes
mehret talks to school girls about her relationship with Dre (on the mend even
though he cheated on her) and how she waited until she was senior in college
before she had sex

# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Docket No. 07 CV 10448 (LAP) (MHD)

PURELAND PICTURES, INC.,

          Plaintiff,

**AFFIDAVIT OF REVA GOLDBERG
IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT**

          v.

MEHRET MANDEFRO

          Defendant.

---

REVA GOLDBERG declares pursuant to 28 U.S.C. § 1746:

1.      I am employed as a producer by Pureland Pictures, Inc. I submit this affidavit in support of the accompanying Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment.

2.      I am a documentary film producer. I have studied and worked in documentary film production for more than ten years, including working in the documentary department at CBS.

3.      A standard practice of documentary filmmakers is to accumulate enough material until specific storylines develop naturally and are more fully defined in the editing room.

4.      I am the producer of the film, *All of Us*.

5.      Two of the individuals who Pureland filmed in connection with the Film were Tara Stanley and Chevelle Wilson, both of whom are or were HIV-positive.

1

6.      Pureland filmed numerous scenes with Ms. Stanley and Ms. Wilson. Dr. Mandefro was present for some scenes and not present for others.

7.      Scenes filmed with Ms. Stanley and Ms. Wilson included discussion of their medical and personal history and of their romantic and sexual relationships with their current and former partners, including discussions of previous drug abuse, sexual abuse, and prostitution.

8.      Pureland filmed Ms. Stanley and Ms. Wilson in scenes that were not centered around their medical histories, including the wedding party of Ms. Wilson and her husband, Robert Barrett, which Dr. Mandefro attended.

9.      While being filmed, Ms. Stanley revealed that her mother had prostituted her when she was younger. This admission is shown in the Film. Ms. Stanley also revealed another troubling incident from her childhood, but subsequently asked Pureland not to include this scene in the Film. Pureland promised not to include the scene in the Film. This scene was not included in the Film.

10.      Dr. Mandefro was not present when either of Ms. Stanley's admissions were filmed, nor was she present when Ms. Stanley and Pureland agreed that the second admission would not be included in the Film.

11.      I am informed that Dr. Mandefro invited Ms. Abt to participate in a Truth Circle, in which she would also be a participant, which would take place in March 2006.

12.      Dr. Mandefro has espoused the use of "Truth Circles"—gatherings of women speaking openly and honestly about personal issues—as a tool to help prevent the spread of HIV and to improve women's confidence and autonomy.

2

13.    I am informed that Ms. Abt indicated interest in shooting footage of the Truth Circle.  Dr. Mandefro consented to Pureland shooting the event, on the condition that the other participants were comfortable with this.

14.    I attended the event to record sound along with a camera operator to record the event.

15.    Prior to the event, Pureland contacted the women who would be participating in the Truth Circle in order to address any concerns they might have about being filmed.  Pureland later agreed to discuss whether footage from the Truth Circle would be used after the event was over.  After the event, Pureland agreed to inform the women what footage it intended to use in the Film once the footage had been edited.

16.    Pureland later sent the participants a clip showing the edited scene of the Truth Circle.  None of the women, including Dr. Mandefro, objected to Pureland's use of this footage, and the Film includes a scene showing these parts of the Truth Circle.

17.    From the Film's inception, I discussed Pureland's desire to obtain film footage of Dr. Mandefro's personal life with Dr. Mandefro.

18.    I emphasized, on many occasions, the importance of such a storyline to the film.

19.    Among the emails I sent or received regarding Pureland's interest in getting footage of Dr. Mandefro doing things outside of work are the following:

a.    Email reply to a question I had previously asked, "Date for guitar session with Dre?," in which Dr. Mandefro, copying Ms. Abt, on November 29, 2005, stated: "lastly, I am meeting dre tomorrow and will ask him for a specific date that works with his sched. cool?" (attached as Ex. A).

3

        b.      Email from Dr. Mandefro to me on October 2, 2006, in which Dr. Mandefro stated:

> first off, it seems like trying to "force" drama is the very thing that does not come off as genuine… yet it seems like its genuine real life/ action with me and the people in my lives you are seeking… that said as i think about all of the stuff and truthAIDS it seems like a good way to talk about my story and link it will [*sic*] the other ladies is the theme of relationships… remember when you guys had the a-ha moment in lagano that my arch was research to action… well i think a similar a-ha moment for the film should be that this is the film that makes the world realize that HIV is about RELATIONSHIPS… not sex. [all alterations in original].
>
> . . .
>
> TruthIAIDS [*sic*] is growing and right now it's about framing the HIV prevention around our relationships, and marrying rights-based rhetoric to realize love, trust, intimacy and identity are really what's putting women at risk… not just sex, and these common human sentiments are about relationships… all kinds of them, the bond with yourself, your partner, your family, and the commty at large.
>
> (attached as Ex. B).

        c.      Email from me to Dr. Mandefro on October 4, 2006, in which I stated:

> [W]e need you to tell us where the real risks and challegnes are for you, career-wise and personally, and where they might manifest themselves in action. If those challenges are within relationships, we need scenes to show that.
>
> The film poses the following questions which need to somehow be answered in action if the story is going to feel whole:
>
> . . .
>
> -Why does she care about this so deeply? What in her life (and thus the audiences' lives) makes this research something we should all take personally?
>
> (attached as Ex. C).

        20.      Beginning in September 2004 and continuing intermittently at least through January 18, 2007, Pureland filmed scenes of Dr. Mandefro experiencing or

discussing her personal life on at least thirty-six separate tapes covering a total of approximately twenty-three and one-half hours of filming, including the following scenes, among numerous others:

      a.    In September 2004, Pureland filmed Dr. Mandefro at an outdoor dance party, including scenes dancing with her friends, for approximately four hours;

      b.    In December 2004, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately twenty-six minutes;

      c.    In December 2004, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her feelings about being single and about her relationships, for approximately one hour;

      d.    In January 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately forty-one minutes;

      e.    In Summer 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre," for approximately one hour;

      f.    In October 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship and sexual intercourse with "Dre";

g.      In November 2005, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about her relationship with "Dre" and other men she was dating at the time;

h.      In March 2006, as discussed further below, Pureland filmed Dr. Mandefro and her friends talking about their personal and sexual lives for approximately three hours;

i.      In Fall 2006, Pureland filmed Dr. Mandefro talking about her personal life, including a conversation about four men she was dating at the time, including "Dre";

j.      In October 2006, Pureland filmed Dr. Mandefro talking about her personal life with Ms. Wilson, including a discussion about her sex life and discussion revealing that she had had unprotected sex with "Dre" and subsequently learned that he was not sexually monogamous with her.

(*See* Log, attached as Ex. D).

21.    With Dr. Mandefro's knowledge, consent, and assistance, Pureland also filmed Dr. Mandefro in settings outside of the medical field, including birthday parties, photography shoots, dinner parties, and nightclubs.

22.    In May 2007, at Dr. Mandefro's insistence, I met with Dr. Mandefro, Dr. Manel Silva, Ms. Abt, and the editor of the Film. Dr. Mandefro did not mention a prior express oral agreement at this meeting, nor did she propose an express agreement be entered at the meeting. Neither at this meeting nor at any other time did I or anyone else from Pureland make any promise that the Film would not be shown without Dr. Mandefro's express approval of the final edited version.

6

23.    Dr. Mandefro, through her counsel, sent a purported cease and desist letter to Pureland on October 22, 2007.

24.    In this letter, Dr. Mandefro asserted that she had granted only a "limited license" to Pureland to use her name and likeness, based on an alleged oral agreement in 2004.

25.    I am informed that Dr. Mandefro has asserted that this alleged 2004 oral agreement was "expressly conditioned" on the following terms:

    (i)    The Film would be used for educational, charitable, and legislative advocacy purposes, not for Pureland's commercial gain;

    (ii)   The focus of the Film would be on the high incidence of HIV/AIDS in the African American female community and Dr. Mandefro's professional efforts in learning about and preventing same;

    (iii)  The Film would not contain any footage concerning Dr. Mandefro's personal life without Dr. Mandefro's express permission;

    (iv)  The Film would not contain confidential patient-physician relationship with those patients, without Dr. Mandefro's express permission; and

    (v)   The Film would not be displayed, distributed or viewed in any public forum without Dr. Mandefro's express approval of the final edited version.

26.    I am further informed that Dr. Mandefro has asserted in her filings related to this case that she and Pureland reiterated the purported 2004 oral agreement in oral agreements in 2006 (the "2006 Agreement") and 2007 (the "2007 Agreement").

27.    Dr. Mandefro communicated frequently via email with Pureland during the filming of *All of Us*. Prior to the purported cease and desist letter, Dr. Mandefro never asserted to Pureland in a writing, via email or otherwise, that an express oral agreement had been reached in 2004.

7

28.    Similarly, prior to her filings in this case, Dr. Mandefro never asserted in any writing to Pureland, via email or otherwise, that an express oral agreement had been reached in either 2006 or 2007.

29.    At no point prior to sending the Cease and Desist Letter, including in emails sent to convince Pureland to remove footage concerning Dr. Mandefro's personal life, did Dr. Mandefro ever claim a contractual right to review of approve the Film, nor did she ever mention any "expressly" agreed-to terms between the parties. (*See, e.g.*, Ex. E, Email from Dr. Mandefro to Ms. Goldberg, dated April 8, 2007; Ex. F, Email from Dr. Mandefro to Ms. Goldberg, dated April 9, 2007; Ex. G, Email from Dr. Mandefro to Ms. Goldberg, dated August 22, 2007.)

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed in Brooklyn, New York on April 7, 2008.

_____
Reva Goldberg

SWORN TO AND SUBSCRIBED before me
this _7th_ th day of April, 2008.

_____
Notary Public

AUSTIN KWAME WILKINSON
Notary Public, State of New York
No. 01WI5051848
Qualified in Kings County
Certificate Filed in New York County
Commission Expires Nov. 13, 2009

8

# Exhibit A

**From:** "Mehret Ayalew Mandefro" <mmandefr@montefiore.org>
**Date:** November 29, 2005 5:41:56 PM EST
**To:** "Mehret Ayalew Mandefro" <MMANDEFR@montefiore.org>,
<reva@purelandpictures.com>
**Cc:** <emily@purelandpictures.com>, <valerie@purelandpictures.com>
**Subject: Re: Upcoming Shoots**

Hello ladies... my vacation starts the 16th of june but i don't know
when it ends. i am trying to get the month of july "off" to be abroad
since we are trying to do both rwanda and ethiopia. so have to get back
to you about that. as for the dec 15 contact person that would be jerry.
d.c. is not going to happen this month because the lady i want to
interview is in india. but i am going home for christmas so yeah:):)
lastly, i am meeting dre tomorrow and will ask him for a specific date
that works with his sched. cool?

xo,
m

p.s. new york move is going to sponsor my fundraiser!!!! they want to
feature it in either their May women liberation's issue or the june
entertainment issue so that's the new timeline... they think we could
pull a budget of 100,000 through sponsors. am soooooooo psyched... they
are going to do all the press and organize the entire event. thinking
about maybe doing it in diane von furstenberg's new space or the puck
building. the publisher is so into the idea!!! it's soooooooooooooooooo
on. think am going to shoot for one million dollars. am meeting with
carol tomorrow to discuss  exactly how far that amount would go in terms
of treatment for women, and maybe even starting to build an inpatient
ward to the existing hospital.

Reva Goldberg <reva@purelandpictures.com> 11/28/05 4:27 PM >>>
Hi Mehret,

Hope you had a lovely Turkey Day.  Looking forward to seeing you (and
Ashaki) next week.

--Steve okayed us for clinic Dec. 5th. He asked me if you were letting
any
necessary clinic people know we'd be there, and I told her I'd ask you
to do
that.

--Now for some annoying, yet very important, nudging. We need to lock
down

some important dates with you.

1) Your June vacation dates:  If we are going to book those flights to
Rwanda and Ethiopia with frequent flyer miles, we have to do it asap.
Can
you let us know when will you be able to determine your travel dates?

2) Dates for trip to D.C.?

3) Date for guitar session with Dre?

4) Contact info for point person I need to get permission from to shoot
your
presentation December 15th?

Would be awesome if you could get back to us about this stuff within
next
few days so we can keep the momentum going.

Xo
Reva

# Exhibit B

From: Mehret Mandefro <daremercy@yahoo.com>
Subject: **october**
Date: October 2, 2006 11:36:17 AM EDT
To: "emily@purelandpictures.com" <emily@purelandpictures.com>, "reva@purelandpictures.com" <reva@purelandpictures.com>

hey guys. i've been thinking lots about our meeting and have the following updates and thoughts...

first off, it seems like trying to "force" drama is the very thing that does not come off as genuine... yet it seems like its genuine real life/ action with me and the people in my lives you are seeking... that said as i think about all of the stuff and truthAIDS it seems like a good way to talk about my story and link it will the other ladies is the theme of relationships... remember when you guys had the a-ha moment in lagano that my arch was research to action... well i think a similar a-ha moment for the film should be that this is the film that makes the world realize that HIV is about RELATIONSHIPS... not sex.

For Tara... the relationship factor is one that highlights abuse and intimate partner violence and the UNTOLD one as of yet about her and her brother who she so wanted to be a part of the film. Maurice saved Tara from the street.... guys this is HUGE. The way that America looks at young, black men, is not one where they are saving their family members. Would be very powerful to talk about the RELATIONSHIP between a brother and her sister.... You already said you have footage of her son that you are going to use as well. That said we learn how the love from intimate partner violence can hurt, and that one is a common one, but the salvation that can come from the family unit is one that no one has heard about or thought about.... and it would be a great way to do her story justice.

As for Chevelle, the relationship is the obvious one of her and her love with Rob but the greater one is the one she develops with herself... as you follow her in church and see her battle addiction. Done...

Then there's me... what defines me and only has is the relationships i have with peope... you have tons of footage of me and my friends and the incredible bonds i have with these people and the concept of sisterhood... you also have one on one stuff with manel, and my mom..... TruthAIDS is very much building on these relationships becuase this organization is growing out of sisterhood bonds ... my friends are helping start this movement. Tonight... we have our first brainstorming session... will be me, manel, sara, suruhbi and chitty.... YOU also have can play the relationship bond i have with my professional mentors: Chinazo, Paul. Am meeting with chinazo today to set a date for you guys to film...

In any case, I think the above way of framing the story about relationships is a much more authentic way of getting the footage you need because it's TRUE!!! As for the ideas about Bel/Mindy/Gloria... I don't know guys, am not even sure at this stage if those are the people i need to have on my board. The process has been so organic and I don't want to change that now. You know? So am planning on doing the Mindi interview, but will not be asking her to join my board becasue i don't know if I want that or if that make sense.... TruthAIDS is growing and right now it's about framing the HIV prevention around our relationships, and marrying rights-based rhetoric to realize love, trust, intimacy and identity are really what's putting women at risk... not just sex, and these common human sentiments are about relationships... all kinds of them, the bond with yourself, your partner, your friends, your family, and the commty at large.

---

Stay in the know. Pulse on the new Yahoo.com. Check it out.

# Exhibit C

From: Reva Goldberg <reva@purelandpictures.com>
Subject: **Re: october**
Date: October 4, 2006 11:24:55 AM EDT
To: Mehret Mandefro <daremercy@yahoo.com>
Cc: Emily Abt <emily@purelandpictures.com>, Manel Silva <mokachica@yahoo.com>

Hi Mehret,

HIV is definitely about relationships and that will come through in the film (as will your strong bond with your friends and mentors) but this doesn't solve the problem of needing to show, in action, the struggles you face in being a doctor/activist trying to make change around a complex issue. Nor does it solidify the link between your life and the lives of Chevelle and Tara.

Of course none of us want to manufacture or 'force' any drama but please trust Em, Geeta and I that something is really missing in our footage of you.   In our shared opinion, we are in danger of making a much less powerful film if we are not given access to a different side of your character. The footage we have of you with friends shows that you have good relationships and support but it doesn't reflect any challenges in those relationships. Without downs, the ups will not have any power - one of the natural rules of storytelling. We have a ton of footage of the strong, competent, unwavering Mehret but little of you coming up against obstacles on your path. Powerful/dramatic moments happen in your life every day in your relationships. We just haven't captured enough of them on camera like we have with Tara and Chevelle.

Filming the brainstorming session you had the other night might have been an opportunity to capture the real challenges of developing truthAIDS. We should have been there filming. Please let us know about these opportunities so we can be there to document them. Is there anything like that coming up again soon?

Geeta has tried to get us to accept that - based on the footage we have - you can only serve as the narrator for Tara and Chevelle's stories and the film probably won't be feature length.  This is a disappointing prospect for us and we want your role to be bigger than that - not just an entre into their lives, but a story that puts the audience in the shoes of a young activist and makes them reflect on their own experience.

We know it won't help to capture scenes that are inconsistent with your real goals. As we discussed in the meeting, we need you to tell us where the real risks and challenges are for you, career-wise and personally, and where they might manifest themselves in action. If those challenges are within relationships, we need scenes to show that.

The film poses the following questions which need to somehow be answered in action if the story is going to feel whole:

- What is Mehret going to do with the information she is collecting from the stories of Chevelle and Tara and from her visit to Ethiopia?

- Can she actually make a difference given the huge challenge she has undertaken? And how will she do that?

- What will she do to help those kids in Awassa?

- What is she doing to prevent what happened to Chevelle and Tara from happening to other young women in the South Bronx?

- Why does she care about this so deeply? What in her life (and thus the audiences' lives) makes this research something we should all take personally?

SHOOT LOGISTICS (aka your homework, please):

1)   Regarding Mindy, it's cool if you don't want to ask her to be on board anymore. We do need the interview to have some emotional weight, though, if we're going to film it. Stakes have to be raised or it just feels like yet another interview to the audience. How about if you talk to Mindy about some of the challenges you are facing with truthAids?

2)   Cool if you don't want to pursue big name people as board members. But let's find an alternative: please let us know of events/occassions you believe will show the challenge and tension of your truthAIDS work.

3)   Lando shoot: when is that going to happen? This Friday eve would be ideal.

4)   I'm working on access for outreach with sex workers and will let you know when/if I have a breakthrough there. Em and I would also like to find a way for you and Chevelle to do a sex ed sort of talk with grade school girls at a school in the Bronx.  Do you have any connects in this area? We think this would nicely fill a gap in the film because we don't have any prevention-related research/work in the film.

5)   We also need a dinner date for you and Chevelle and Robert. Please let us know your October schedule so we can lock this in.

6)   We like your idea about reaching out to Maurice.  A scene with Maurice and you, where he shows you old pictures of Tara and talks about his relationship with her could be powerful.  We could also show him the trailer which I think he would be moved by.  Would you like to arrange this or should we?  I remember you got his number?

7)   We are also going to try to get an interview with Steven and would be cool if you could be there for that, too. Will let you know if we get access.

The messages we all want the film to communicate must be revealed in action if the audience is going to feel in their souls that it's true. Please hit us back as soon as you can so we can spring into action - time is of the essence as Geeta starts the edit in November and all shoots must be completed by then.  Please help us make the best film we can and finish this up strong, we simply can't do it without you.  I know this requires a lot of trust on your part, to allow us to film situations in which you may struggle, but please take these last important steps with us so we can make the most powerful MEHRET possible.

More soon,

Reva and Em

P.S. A couple docs you may want to check out for inspiration and to see what we're talking about in terms of scenes that challenge their heroes:
STREETFIGHT and/or BORN INTO BROTHELS.


On Oct 2, 2006, at 11:36 AM, Mehret Mandefro wrote:

hey guys. i've been thinking lots about our meeting and have the following updates and thoughts...

first off, it seems like trying to "force" drama is the very thing that does not come off as genuine... yet it seems like its genuine real life/ action with me and the people in my lives you are seeking... that said as i think about all of the stuff and truthAIDS it seems like a good way to talk about my story and link it will the other ladies is the theme of relationships... remember when you guys had the a-ha moment in lagano that my arch was research to action... well i think a similar a-ha moment for the film should be that this is the film that makes the world realize that HIV is about RELATIONSHIPS... not sex.

For Tara... the relationship factor is one that highlights abuse and intimate partner violence and the UNTOLD one as of yet about her and her brother who she so wanted to be a part of the film. Maurice saved Tara from the street.... guys this is HUGE.  The way that America looks at young, black men, is not one where they are saving their family members. Would be very powerful to talk about the RELATIONSHIP between a brother and her sister.... You already said you have footage of her son that you are going to use as well.  That said we learn how the love from intimate partner violence can hurt, and that one is a common one, but the salvation that can come from the family unit is one that no one has heard about or thought about.... and it would be a great way to do her story justice.

As for Chevelle, the relationship is the obvious one of her and her love with Rob but the greater one is the one she develops with herself... as you follow her in church and see her battle addiction. Done...

Then there's me... what defines me and only has is the relationships i have with peope... you have tons of footage of me and my friends and the incredible bonds i have with these people and the concept of sisterhood... you also have one on one stuff with manel, and my mom..... TruthAIDS is very much building on these relationships becuase this organization is growing out of sisterhood bonds ... my friends are helping start this movement. Tonight... we have our first brainstorming session... will be me, manel, sara, suruhbi and chitty.... YOU also have can play the relationship bond i have with my professional mentors: Chinazo, Paul. Am meeting with chinazo today to set a date for you guys to film...

In any case, I think the above way of framing the story about relationships is a much more authentic way of getting the footage you need because it's TRUE!!! As for the ideas about Bel/Mindy/Gloria... I don't know guys, am not even sure at this stage if those are the people i need to have on my board.  The process has been so organic and I don't want to change that now. You know? So am planning on doing the Mindi interview, but will not be asking her to join my board becasue i don't know if I want that or if that make sense.... TruthIAIDS is growing and right now it's about framing the HIV prevention around our relationships, and marrying rights-based rhetoric to realize love, trust, intimacy and identity are really what's putting women at risk... not just sex, and these common human sentiments are about relationships... all kinds of them, the bond with yourself, your partner, your friends, your family, and the commty at large.

Stay in the know. Pulse on the new Yahoo.com. Check it out.

# Exhibit D

VIDEO CONTENT THAT INCLUDES MEHRET'S PERSONAL LIFE

TAPES 1-4 - September 2004
ENTIRE TAPES- 4 HOURS
mehret attends outdoor dance club with friends, dances with friends

TAPE 7 - December 2004
9:30:00-35:00  26 MINUTES
mehret talks about her personal life, her friendships and her relationship with dre

TAPE 8 - December 2004
18:06 - 19:07 1 HOUR
mehret talks about her work, background, feelings about being single, her
relationships

TAPE 9 - January 2005
00- 41:00  41 MINUTES
mehret talks about her relationship with dre

TAPE 12 - June 2005
APPROX 20 MINUTES
mehret and manel  discuss their frustration with the dating scene, how fellow
residents think they're lesbians, they're friendship, mehret calls guy she's dating,
expresses dissappointment about not getting called more by him

TAPE 13 - July 2005
APPROX 20 MIN
Mehret has birthday party, her girls talk about how much they love her, how she
is the object of much love and guy attention

TAPE 14 - Fall 2006
APPROX 30 MIN
Manel's birthday party, Mehret gives us overview of her dating life and the 4 guys
she's dating, includes dre in this description, manel and mehret discuss in taxi
how they have no time for men

TAPE 16 - July 2006
20:29:46-21:08:07  39 MINUTES
emily and mehret argue over the making of the film and access issues

TAPE 17 - July 2006
06:54-17:00 11 MINUTES
mehret talks about her sick aunt, the vacation she's about to take,her family, her

community, her love of dancing, how she's breaking up with dre

TAPE 19- Summer 2005
33:00-55:00
mehret and manel talk about sisterhood, manel's willingness to be a single
parent, relationships with men, the need to be complete without men, mehret
discusses relationship with dre

TAPE 20 - Summer 2005
whole tape (1 hour)
mehret discusses her relationship with dre, how she wants to stick things out w
him, defends their relationship

TAPE 21 check this September 2005
3 MINUTES
mehret discusses the connection between her life and that of her patients

TAPE 29 October 11 2005
28:00-60:00 - 32 MINUTES
mehret talks about her relationship with dre, how they made up, slept toget
how he keeps pulling her back to him, how they spent lovely time together, etc

TAPES 30, 31  October 28,2005 (both)
ENTIRE TAPES - 2 HOURS
mehret and friends engage in 'naked photo shoot' where they pose topless
together. after, mehret and her friends discuss their relationships with men

TAPE 33  November 4th, 2005
ROUGHLY 15 MINUTES
Dr. Anastos and Mehret discuss mehret's dating/personal life and the cost of
being a doctor on one's personal life & chances of having a family

TAPE 34  November 15, 2005
08:25-56:00  48 MINUTES
mehret talks about her relationship with dre,  shares text messages from him &
shows us the gift he gave her, says he's not her boyfriend, talks about other guys
she's dating, says she doesn't want to be physical with more than one person,
gave dre her bottomlines

TAPE 37 - 38  November 17, 2005
ENTIRE TAPES - I HOUR
mehret goes to brazilian charity event, dances, chats with guys and friends

TAPE 44 December 13, 2005

APPROX 8 MINUTES
51:00-59:00
mehret gives us update on research and love life, talks to us about how well things are going with dre

TAPE 48 January 14, 2006
APPROX 5 MINUTES
em asks mehret about dre, mehret talks about how she didnt want to spend new years with him

TAPE 51 March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives, mehret refers to her sex life with dre number of times (without using his name)

TAPE 56  March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives, mehret refers to her sex life with dre number of times (without using his name)

TAPE 57 March 8, 2006
ENTIRE TAPE (I HOUR)
mehret and her friends (including emily) discuss their personal & sex lives, mehret refers to her sex life with dre number of times (without using his name)

TAPE 65 May 27, 2006
APPROX 20 MINUTES
mehret shows us pictures of ex-boyfriend, discussion with mehret's parents about mehret's career, dreams, personal life, who she will marry (they would like it to be an ethiopian), their feelings on her ex-boyrfriend, etc.

TAPE 72 & 73  July 2, 2006, July 3,2006
ENTIRE TAPES- 1HR
mehret's 30th birthday celebration, dre there

TAPE 81  July 24-25, 2006
APPROX 20 MIN
mehret gets ready in bathroom, does hair, talks about exhaustion, costs of how hard she works

TAPE 85  July 26-27, 2006
ENTIRE TAPE - 1HR
mehret hangs out at night club in ethiopia with friends, dancing, drinking, etc

TAPE 86  July 27, 2006
APPROX 20 MINUTES
mehret discusses her dual identity, family in ethiopia, her friend teddy

TAPE 98  October 11, 2006
ENTIRE TAPE - I HR
chevelle interviews mehret about her personal life, her sex life, relationship with
Dre, mehret reveals she too has had unsafe sex and that she found out Dre was
cheating on her

TAPE 101  November 2, 2006
ENTIRE TAPE - I HOUR
mehret gets ready for NY Moves party with her date Lando, they help eachother
get dressed, go to gala event together,hangs with friends there, flirts and kisses
Lando

TAPE 108 - January 18, 2007
approx 10 minutes
mehret talks to school girls about her relationship with Dre (on the mend even
though he cheated on her) and how she waited until she was senior in college
before she had sex

# Exhibit E

From: Mehret Mandefro <mehret@truthaids.org>
Subject: **Re: monday meeting reschedule**
Date: April 8, 2007 4:39:46 PM EDT
To: Reva Goldberg <Reva@purelandpictures.com>, mehret@truthaids.org
Cc: Emily Abt <emily@purelandpictures.com>
Reply-To: mehret@truthaids.org

hello reva,

i have rearranged every meeting this coming week including rescheduling a conference call with the milken people for alternate days to schedule for tomorrow night meeting. i also feel like as a resident i have bent over backwards in numerous ways with scheduling to make this film a priority and would really appreciate the same from you guys in the final stretch. this is not about me and emily anymore... this is about a movement and the questions from the press i am getting that i don't want to speak on without getting pureland's in put. i am really trying to prevent public drama by handling the stuff in house. trust me on this like i have trusted you. we all need to talk asap. from now on the discussion about the film is about pureland and truthaids. this is also why manel requested to be at the meeting. if emily has any problems she can call me reva. i will no longer accept communication from you on this matter as it is now getting awkward. lastly, i cannot do next monday.

i have gone above and beyond what any medical resident could ever do the last three years to make this film happen. the very least the pureland team, including geeta, can do is sit down and have a conversation. after all that's all this film is really about. believe me it's in your best interest as i can no longer evade some of the pointed question being brought to me by the black HIV activist world. at least if we talk i can try and move forward.

sincerely,
mehret

*Reva Goldberg <Reva@purelandpictures.com> wrote:*

> hey, mehret. hope you're having a good weekend.
>
> emily and i have been talking (she's at home in cambridge with family and in-laws-to-be right now so can't access email) but we've decided that given where we're at with the edit process this week we should push the meeting back a little bit. can you let me know if next monday night works for you instead?
>
> also, although we initially planned to have a big meeting, we feel it would be better and more productive for this important conversation to happen between you and em alone (rather than with geeta, manel and me present).
>
> can you let me know when you get this message and tell me if next monday (4/16) works for you? sorry for the last-minute change.
>
> thanks,
> rg
>
>
> reva goldberg
> pureland pictures, inc.
> 30 garfield place #phe brooklyn, ny 11215
> t: 718.965.0636  f: 718.965.0637  c: 646.526.5199
> purelandpictures.com

Mehret Mandefro,MD,MSc
TruthAIDS, Founding Director

TruthAIDS
P.O. Box 147
New York,NY 10035
Office:646-707-0485
mehret@truthaids.org

# Exhibit F

From:    Mehret Mandefro <mehret@truthaids.org>
Subject:    **Re: Farewell...**
Date:    April 9, 2007 1:16:27 PM EDT
To:    reva@purelandpictures.com
Reply-To:    mehret@truthaids.org

hey. would really appreciate it if you could fax the
contract i signed to the office.  the number is
718-579-2599. do you know if it was a Life Rights
consent? am starting to get a clear head about this
and proceed smarter so would like to review it before
meeting with the team.


M


--- reva@purelandpictures.com wrote:

> Mehret, still at doctor but just read your email and
> tried to reach you by phone. Please call me and give
> me the chance to talk this through with you, now
> that I'm caught up on the situation, before you take
> any further action. We will figure this out and do
> what has to be done so that we can finish what we
> started.
> -----Original Message-----
>
> From: Mehret Mandefro <mehret@truthaids.org>
> Subj: Farewell...
> Date: Mon Apr 9, 2007 1:55 am
> Size: 5K
> To:  Reva Goldberg <Reva@purelandpictures.com>;
> mehret@truthaids.org
> cc: Emily Abt <emily@purelandpictures.com>
>
>
> Dear Emily and Reva
>
> It is with a heavy heart and sadness I am inform you
> that I have officially signed off from MEHRET, the
> film.  When I started this project two and a half
> years ago, I had a vision of partnership that would
> arrive at a greater truth.  A truth so needed that
> many would follow.  Along the way, in filming, I saw
> glimpses of the truth.  And when I saw the trailer,
> the truth shined through in a way that let me know
> this was about something bigger than all of us.
>
> But all along the way, since the inception, people
> were quietly asking me about race, and issues of
> ownership of my story as well as the patients
> stories.
> From my family, my friends, the black community,
> including all the academics you interviewed, the
> question has been is she going to let you tell "our
> story", more importantly, does she understand only
> you
> can. My response was uniformly we are doing this
> together, I trust her she will. The trailer was
> proof
> that this trust was merited.  But in D.C., when I
> saw
> the short version and realized that a happy ending
> was
> a negotiable the first seeds of worry were planted.
>
> The essence of how to tell "our story" lies in the
> joy not the pain, the latter being the mistake many

AIDS documentaries had been . That was when I realized I may need to have a discussion with the Pureland Team.

Then, in the preceeding weeks to NYU, I received a grant proposal that had serious flaws in the facts framing my research and my own decisions about unprotected sex falsely. Especially my turning point,
which was not about my own privileged episode of unprotected sex (for which the reasons stated in the grant were plainly false) but rather the moment I sat
at Tara's bed and entitled her enough to ask Steven to
come in the room with me there.   In reading the words, I realized the truth could be warped or co-opted in ways that could actually do a disservice to the movement. This was further echoed in the portrayals of Tara and Chevelle in the grant that stripped them of their strength.  I thought to myself,
damn... I really should have sat with them to write this
out. Lastly, at NYU, the way race was discussed by Pureland was very problematic and I had to answer for
it, with tough questions from the black people after the panel.  Please, note, you have yet to have a predominately African American crowd to answer to, thus all questions have been held for me after the session in all three cities: Brooklyn, D.C, and NYC.


For all the above reasons, I began to have doubt about
how "our story"  could begin to be told if the very people telling it did not see the problems arising from the feedback audiences were giving me. So I put the problem solving hat on, still believed in the goals of the project and rolled my sleeves up because
the time had come for a hard conversation if the integrity and authenticity of this story was to be maintained. I wanted to have a conversation with all players in the room because truth is bore out through
discussion. But then something weird started to happen
that confirmed that my doubts about integrity maybe valid after all.

There was great resistance around this meeting and in
particular about meeting the editor. I was in particular interested in meeting with Geeta because based on the grant proposal I was worried my research
was being misrepresented and she herself said the storyline was hanging on my research so I though it was only fair for her to hear what my research was about from my own mouth. However, Emily was very clear
on the phone with me last night.  When I asked why she
didn't want me to meet with Geeta I was told because Emily "doesn't want another cook in the kitchen."
What is so threatening about having a discussion

after
all about my life unless the reason lies in the
potential that I may tell the story better... but if
so,
wouldn't that serve Pureland anyhow? Isn't that the
overall goal... telling the best and truest story
possible? In hearing Emily's words, all my doubts
were
confirmed ... this project was never about a
partnership...therefore it could never be about
staying
true to a movement that was trying to bring together
different groups of women.

In closing, this film has been a very tough process,
and heavy burden given the emotional cost, and the
amount of time it has taken away from my medical
training.  But I really believed the feminist divide
between women of color and white women, and between
privileged and unprivileged could be bridged and I
thought that was the point of the movement we were
trying to reflect.  Sadly, I realize this attempt
towards a greater vision was reduced to a power
struggle of which I want no part. Ironically, the
same
dynamic we are trying to teach about is what has
compromised the integrity of this project... how's
that
one for irony.  Funny enough... I bet an honest truth
circle with all players could have fixed it.

Thank you for the lessons learned.

All the best,
Mehret

p.s. I will be writing a more formal letter to the
faculty I recruited for the film to let them know I
am
signing off.   I would also appreciate a copy of the
contract I signed.


Mehret Mandefro,MD,MSc
TruthAIDS, Founding Director

TruthAIDS
P.O. Box 147
New York,NY 10035
Office:646-707-0485
mehret@truthaids.org


Mehret Mandefro,MD,MSc
TruthAIDS, Founding Director

TruthAIDS
P.O. Box 147
New York,NY 10035
Office:646-707-0485
mehret@truthaids.org

# Exhibit G

From:    Mehret Mandefro <mehret@truthaids.org>
Subject:    **Re: Your email**
Date:    August 22, 2007 6:17:59 PM EDT
To:    Reva Goldberg <reva@purelandpictures.com>
Cc:    emily@purelandpictures.com
Reply-To:    mehret@truthaids.org

Hello Reva,

Thanks for your email. However, good intentions are not the point. If I thought you were interested in discrediting me I would not have embarked on the project. Whether you realize it or not I already have left Montefiore with some professional damage regarding this project that required me to step back and rethink what other unintended consequences may unfold.

In my final reviews, the film loomed large and was perceived by professional community as distracting me from real medicine. Moreover, the fear of exceptionalizing me, instead of being known for my chops is exactly what happened. Actually the direct word used was that I was an "actress" ...This was a very tough experience to swallow and combined with the total blockade when it came to giving them anything for the research symposium it truly was a disaster. So the professional concerns are REAL, whether you intended it or not. That is why I have been forced to start thinking and preparing for what other unintentional consequences may come.

In talking it out, "exoticizing" my personality or portraying my person in a way that will get in the way of my medical credibility is the resounding echo many of my advisors have raised. And now that I have communicated the concerns, if it ends up being an issue, I can say I did my part and tried to discuss the matter with you.

Hope your vacation was nice. I will be in touch around Sept 15.

Best,
Mehret

**Reva Goldberg <reva@purelandpictures.com>** wrote:

Hi Mehret,

We hear your concerns. Please be assured that we have no interest in doing anything to discredit/undermine you or your work. Our goal is to portray you in a positive and compelling light and we are confident that you'll see that when you look at the cut.

Wedding stuff is taking over Emily's time for the next few weeks and I'm dealing with time sensitive client matters but let's get in touch around September 15th to schedule a time for you to screen the cut.

Best,
Reva

reva goldberg
pureland pictures, inc.
30 garfield place #phe brooklyn, ny 11215
t: 718.965.0636  f: 718.965.0637  c: 646.526.5199
purelandpictures.com